# EXHIBIT A

| | CIVIL DOCKET NO. | Trial Court of Massachusetts |
|---|---|---|
| **Summons** | 2384CV00411-BLS1 | **The Superior Court** |

| CASE NAME: | |
|---|---|
| JANE DOE, for herself and the class, | John E. Powers, III, Acting Clerk of Courts |
| | Suffolk Superior Civil, County |
| Plaintiff(s) | COURT NAME & ADDRESS: |
| vs. | **Three Pemberton Square** |
| THE CHILDREN'S HOSPITAL CORPORATION | **Boston, MA. 02108** |
| | **RECEIVED** |
| Defendant(s) | MAR 16 2023 |

THIS SUMMONS IS DIRECTED TO  THE CHILDREN'S HOSPITAL CORPORATION C/O OFFICE OF GENERAL COUNSEL
(Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the                 Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business,                 Court (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address:

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. **(cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

RECEIVED                    www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____, Chief Justice on _____, 20____ . (Seal)

Acting Clerk _____

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____          Signature: _____

**N.B.  TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

rev. 7/2022

Date Filed 2/15/2023 9 38 AM
Superior Court - Suffolk
Docket Number

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE, | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION** |
| for herself and the class, | |
| v | CIVIL ACTION NO. _____ |
| THE CHILDREN'S HOSPITAL CORPORATION, | |
| Defendant | **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below),

alleges as follows

### Preliminary Statement

1.      Plaintiff brings this action to remedy the secret interception of the contents of internet

communications between healthcare consumers and the defendant, The Children's Hospital

Corporation, which does business as Boston Children's Hospital ("Boston Children's")  Specifically,

Boston Children's aided in the interception of communications between Plaintiff and other Class

Members (defined below) and a website maintained by Boston Children's (the "Boston Children's

Website")  Boston Children's assisted in the interception of these communications by Google,

Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other

companies that provide so-called "tracking software "  The Plaintiff's and Class Members'

---

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of both Jane Doe and the minor children of Jane Doe  Ms  Doe's identity will be disclosed to counsel for the Defendant when agreements or court orders are in place that protect the privacy of Plaintiff and her children.

Date Filed 2/15/2023 9 38 AM
Superior Court - Suffolk
Docket Number

communications with the Boston Children's Website were secretly and contemporaneously monitored, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the Boston Children's Website, including all communications in the purportedly "secure" patient portal for the website

2       Boston Children's actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website  During the loading of webpages on the Boston Children's Website, Boston Children's assists Google, Facebook, and others to intercept communications surreptitiously

3       Boston Children's did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the Boston Children's Website, nor do they seek or obtain their content for such interception. On the contrary, Boston Children's **_falsely_** told (and continues to tell) healthcare consumers, through their published online policies and terms of service, that they do **_not_** share such information.

4       The Massachusetts Wiretap Act (M G L  c  272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication"  "Wire" communications include communications over the internet between websites and website users  The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party  It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted, instead, an unlawful interception occurs when

a       the identity of the parties to the communication,

b       the existence of the communication, **_or_**

    c   any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded

5    The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G L. c  272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms  The purposes for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6.    Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information  The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance

7.    Moreover, although this case concerns communications between healthcare consumers and healthcare providers, the Massachusetts Wiretap Act claim of the Plaintiff and the Members of the Class does not depend on the nature of the relationship between Plaintiff and the Members of the Class and Boston Children's. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication

8    The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **_and_** any party that aids such an interception

9.    Boston Children's aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with the Boston Children's Website  Plaintiff seeks statutory

Date Filed 2/15/2023 9 38 AM
Superior Court - Suffolk
Docket Number

remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Boston Children's Website

## PARTIES

10.     Plaintiff is a resident of Burlington, Massachusetts. Plaintiff's minor children are patients at Boston Children's  Plaintiff regularly uses the Boston Children's Website to (i) obtain information about Boston Children's doctors (including their credentials and backgrounds), (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her children; and (iii) obtain and review her children's medical records through the website's patient portal

11      Defendant The Children's Hospital Corporation ("Boston Children's") is a corporation that operates in Boston, Massachusetts  Its functions include providing healthcare services at various facilities in Boston and the surrounding communities, including seven hospital campuses and four physician offices (the "Boston Children's Facilities")  All of the Boston Children's Facilities share the Boston Children's Website  Boston Children's maintains and controls the content of the Boston Children's Website

## JURISDICTION

12      The exercise of personal jurisdiction over Boston Children's is proper according to M G L  c  223 § 3 because, among other things, Boston Children's is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Boston Children's activities and conduct in the Commonwealth of Massachusetts

## FACTUAL ALLEGATIONS

### The Boston Children's Facilities and Its Website

13      Boston Children's operates hospitals and other healthcare facilities in Boston and surrounding communities  The Boston Children's Facilities offer inpatient and outpatient care to residents near Boston and surrounding communities in eastern Massachusetts  The facilities focus on

pediatric care and provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, newborn care, children's services, and trauma care.

14.    Boston Children's maintains the Boston Children's Website as a common website for its hospitals and other healthcare facilities, found at https://www.childrenshospital.org/. Through that website, healthcare consumers can obtain information about the services Boston Children's provides, including information about doctors, services, and treatments provided by Boston Children's for particular medical conditions.

15.    The Boston Children's Website is designed for communications with healthcare consumers. The website includes the following functions:

(a)    The Boston Children's Website provides general information about the Boston Children's Facilities.

(b)    The Boston Children's Website provides information about healthcare services provided at the Boston Children's Facilities, communicated through service-specific pages for a range of services such as an "Eating Disorders Program," "Emergency Medicine," "Gynecology," and "Neurology," among others.

(c)    The Boston Children's Website provides substantive information about specific health conditions through the website's "Conditions & Treatments" section, which presents a comprehensive database of conditions Boston Children's treats, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Boston Children's.

(d)    The Boston Children's Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e)    The Boston Children's Website permits healthcare consumers to book an appointment online through the website.

(f)    The Boston Children's Website permits healthcare consumers to access and pay bills online.

(g)    The Boston Children's Website lets healthcare consumers access their private medical information online through the MyChildren's Patient Portal.

16.    Because the Boston Children's Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors,

specialties, and the website user's own healthcare condition and needs, a website user's interaction

with the website reveals personal information about the website user

### Reasonable Expectations of Users of the Boston Children's Website

17    Healthcare consumers in Massachusetts have a valid interest in preserving the

confidentiality of communications with healthcare providers  Among the ways healthcare consumers

communicate with healthcare providers is through those providers' websites, such as the Boston

Children's Website

18    Users of healthcare-related websites such as the Boston Children's Website have a

legitimate expectation and understanding that their communications with the website will be private

They also have a legitimate expectation that healthcare providers such as Boston Children's will not

share their private health information—including their communications with the website—with third

parties without their consent

19    The expectations and understandings of website users are supported by state law,

which prohibits healthcare providers such as Boston Children's from using or disclosing individuals'

"communications" with healthcare providers without valid authorization from the individual. *See*

M G L  c  111 § 70E

20    Healthcare consumers would **not** anticipate or expect that their communications with

healthcare providers, including Boston Children's, which reveal information about that individual's

personal health conditions, will be intercepted and secretly shared with third parties such as Google

and Facebook for marketing purposes

21    The expectations and understanding of users of Boston Children's Website are

informed by what Boston Children's tells them about how it handles their personal information

22    The Boston Children's "Web Site User Privacy Rights" notice states·

Boston Children's Hospital is strongly committed to protecting the privacy of its
online users  patients, families, donors, the media, and others  We do not collect

personally identifiable information about individuals, except when it is knowingly provided by such individuals (e g , web forms) **We do not share voluntarily provided, personally identifiable information for any purpose other than its intended use.**

(emphasis added) This is false  As explained more fully below, Boston Children's injects hidden code into its website that permits third parties such as Google and Facebook to contemporaneously and surreptitiously intercept the contents of healthcare consumers' communications with the Boston Children's Website  That hidden code tracks the user's IP address (i e , the user's unique identity on the internet), connects the IP address to the user's browsing activity, and shares that same information with third parties such as Google and Facebook  The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use to serve personalized advertising to those individuals

23       Boston Children's Privacy Notice also says. "We collect some basic web log file data about site visitors  This information includes domain names, website traffic patterns and server usage statistics  This information is used for site management and administration and to improve the overall performance and user experience on our site " This statement is deceptive and false in multiple respects. This statement is deceptive by creating the false impression that only Boston Children's (i e , "we"') logs such activity, when in reality, Boston Children's injects hidden code into its website permitting Google, Facebook, and other third parties to intercept and record each user's activity on the website  The statement is also false when it states that log files are retained only for "site management" and "performance" purposes  Google, Facebook, and other third parties log and use the intercepted communications for those third parties' own commercial purposes, including serving personalized advertising and applications for particular individuals identified and tracked through the tracking technologies.

24       The same Boston Children's Privacy Notice also states that when a user completes a "form" on the Boston Children's Website, the "forms are located on a secure site," suggesting that

7

Boston Children's takes special measures to protect information a website user communicates to Boston Children's through the Boston Children's Website  This, too, is false  For certain forms on the Boston Children's Website, Boston Children has configured its website to permit Google, Facebook, and other third parties to intercept the contents of information the website user has inserted into "forms" to communicate with the website  The Find-A-Doctor form described below is an example, as described below, Boston Children's has configured the form to communicate to Google, Facebook, and other third parties the contents of criteria the healthcare consumer selects in seeking a doctor

25.    The Boston Children's Privacy Notice also says. "We do not sell visitors' personal information to third parties, such as marketers." This too is deceptive  Although Google and Facebook do not pay money for Boston Children's to install their tracking technologies on the Boston Children's Website, Boston Children's does receive value in return, including free analytical data collected by Google and free advertising optimization from Facebook  That is, Boston Children's, in substance, barters the content of its website visitors' communications with the Boston Children's Website in exchange for services by Google and Facebook that are valuable to Boston Children's

26.    The Boston Children's Privacy Notice also contains a disclosure about website "cookies" that is likewise deceptive. As an initial matter, the tracking technologies upon which Plaintiff's claims are not based on cookies—as described below, the technologies are hidden snippets of Javascript code, which is a different technology  If any event, the "cookie" disclosure is deceptive by creating the false impression that (i) tracking of website users will only be for "record-keeping purposes" to track user "preferences", (ii) cookies are only used to share "non-identifiable demographic information"; and (iii) the user can "turn off cookies "

27    Setting aside the fact that tracking technologies such as Google Analytics and Meta Pixel are not "cookies" at all, the reality is (i) these tracking technologies are used for more than "record-keeping" but instead are used by third parties such as Google and Facebook for their own

commercial purposes, (ii) the tracking technologies **do** share identifiable information, including user IP addresses and other unique identifiers, and (iii) turning off "cookies" for a website through your browser will not disable tracking technologies such as Google Analytics and Meta Pixel, primarily because, as noted, those technologies are not "cookies," and turning off cookies will not stop the execution of the hidden code for Google Analytics, Meta Pixel, and similar tracking technologies

28    Moreover, the cookie disclosure states that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site " This may be true for cookies, but it is not true for Javascript-based tracking technologies such as Google Analytics and Meta Pixel  Both Google and Facebook maintain records on their own servers of all information intercepted and communicated to them through each tracking technology, exiting the Boston Children's site does not cause any such intercepted data to be deleted from the servers of third parties such as Google and Facebook

29    In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Boston Children's false and deceptive statements on the Children's Hospital Website  The interceptions of website users' communications with Boston Children's were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users

**Third-Parties Offering Tracking Technologies**

30    Plaintiff describes in this complaint various tracking technologies implemented on the Boston Children's Website that cause the secret interception, recording, and retransmission of the contents of Class Members' internet communications with Boston Children's. The next section presents a basic overview of how the technologies work  This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Boston Children's and the purposes for which interceptions are made

31      Meta Platforms, Inc , referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California  It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services

32.     Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers

33      Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram  Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual  These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also *on the activities of those individuals on other websites that Facebook does not own*

34.     Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites

35      Facebook explains on its own website· "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website "

36      Facebook explains further  "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager "

---

[2] Facebook rebranded its parent company as "Meta" in October 2021

37.    Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing** "[3]

38    Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc  Google LLC is referred to in this complaint as simply "Google " Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers

39    Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail  Google maintains detailed profiles on individuals, whether or not they have a Google account

40.    Google derives a substantial portion of its revenues through individually targeted advertising  Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual

41    One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics  Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website  The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website  Notwithstanding its availability as a free service to website owners, Google

---

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything,* Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug 11, 2022) (emphasis adeded)

profits from Google Analytics by using the data it obtains for its own commercial purposes, including using that data to further build individuals' profiles  Google can then use this information to serve such individuals with better-targeted individualized advertisements

### Website Tracking Technologies on the Boston Children's Website

42      Boston Children's has injected hidden code into the Boston Children's Website that contemporaneously intercepts healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook  This includes, for example, associating the content of the user's communications with the Boston Children's Website with the website user's Facebook profile

43      These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Boston Children's, the contents of those communications and identifying information about the Class Members  The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website

44.      Boston Children's uses several tracking technologies on their website, including Google Analytics and Meta Pixel  The tracking technologies are implemented through similar means

45.      Before describing how such technologies work, it is important to define some basic technological terms.

46.      A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

47.    An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Boston Children's Website, as of the time of this complaint, is 45.60.73.21. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

48.    A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://" For example, the URL for the main landing page for the Boston Children's Website is https://www.childrenshospital.org/. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the Boston Children's Website has a page specifically about the Boston Children's Cancer and Blood Disorders Center; that page's URL is https://www.childrenshospital.org/centers/cancer-and-blood-disorders-center.

49.    A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by Javascript code. Both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

50.    **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a

13

website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

51.    With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Boston Children's) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is then executed automatically within the individual's web browser.

52.    The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

53.    When the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as https://www.childrenshospital.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

14

Date Filed 2/15/2023 9 38 AM
Superior Court - Suffolk
Docket Number

54    When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website  This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook  A third-party such as Google and Facebook can then add the content of the user's communications with the Boston Children's Website to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them

55    The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user  For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website, instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate

56    The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and the Boston Children's Website contemporaneously with those communications  The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

57.     The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

58.     Boston Children's appears to be among these websites that removed Meta Pixel in reaction to the Market Article. Based on archived versions of Boston Children's website, it appears Boston Children's removed Meta Pixel from its website in approximately late June 2022, within a few weeks after the Markup Article was published. Boston Children's, however, continues, to the present, to secretly inject Google Analytics and several other third-party tracking technologies onto its website. These tracking technologies are each substantially similar to the now-removed Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of communications with the website.

### Boston Children's Use of Tracking Technologies on the Boston Children's Website

59.     Boston Children's uses various tracking technologies across the numerous web pages on the Boston Children's Website. Several of those tracking technologies are injected into the code of all, or almost all, of the pages within the Boston Children's Website. For example, on nearly every page of the Boston Children's Website, Boston Children's has injected secret code that loads Google Analytics. It also appears Meta Pixel was injected into most webpages on the Boston Children's website before Boston Children's removed Meta Pixel in late June 2022.

---

[4]    *See*    https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

16

60.    The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

61.    Below is an image of the main landing page for the Boston Children's Website:



62.    When a user loads the main landing page for the Boston Children's Website, the webpage causes the user's web browser to download from Google's servers a file called "ga.js," which

contains the Javascript code for Google Analytics ("ga" stands for "Google Analytics," and "js" standards for Javascript). The website then causes the user's web browser to execute the Javascript code contained in the "ga.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

63.     The image below depicts the landing page for the Boston Children's Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



64.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics Javascript code causes the user's web browser to

intercept and transmit to Google when a small file is loaded from Google's servers (with emphasis added):



65.     Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Boston Children's Website are:

    (a)    The URL of the webpage visited (the text after the letters "utmhn," which includes the text "www.childrenshospital.org"); and

      (b)     The title of the webpage (after the letters "utmdt," which includes "Home Page | Boston Children's Hospital").

66.     The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Boston Children's).

67.     Notably, when the website user's web browser intercepts the contents of communications between the website user and the Boston Children's website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers necessarily reveals the user's unique IP address to Google.

68.     Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Boston Children's Website is the same individual.

69.     As noted, Boston Children's recently removed Meta Pixel from its website, likely in response to press coverage following the Markup Article. Archived versions of the Boston's Children website are available, however, on the Internet Archive's "Wayback Machine," which is a website that captures, retains, and makes publicly available historical versions of websites.[5] Archived versions of the Boston Children's Website available on the Wayback Machine confirm that Boston's Children

---

[5] *See* https://archive.org/web/.

implemented Meta Pixel code on the main landing page of its website more than three years before this complaint up to as recently as late June 2022.

70.     When Boston Children's used Meta Pixel, Meta Pixel loaded a Javascript file called "fbevents.js." That Javascript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Boston Children's Website. The network activity that was intercepted and transmitted to Facebook when loading the Boston Children's Website's landing page is depicted below (with highlighting added):



71.     Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Boston Children's website, including the URL of the webpage visited. The transmission to Facebook also

Date Filed 2/15/2023 9 38 AM
Superior Court - Suffolk
Docket Number

includes information about the user's browser configuration and various codes to associate the communications with Boston Children's advertising account with Facebook

72      Also, the Javascript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook  This permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram)  With that information, Facebook could serve personalized advertising to the website user in the future

73      Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites)

74.     The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the Boston Children's Website and further confirm that individual's real-world identity

75      Boston Children's also implemented an optional feature of both Google Analytics and Meta Pixel that closely tracked how a website user scrolls through and clicks different parts of a webpage  For example, a user scrolling down on the webpage would find the following area of the webpage relating to donations

## Giving at Boston Children's Hospital





**Walk to save kids' lives**

The Eversource Virtual Walk for Boston Children's Hospital brings our community together to help families find lifesaving answers and hope, here and around the world. Register today, fundraise, then walk and join us to celebrate your impact on June 12.

Learn more and register

**Your impact**

Whether you make a donation or fundraise, you're helping the world's sickest children and their families thrive. Lifesaving care, answers and breakthroughs here at Boston Children's Hospital are made possible by your generosity.

See how you give hope to all kids

76.    When a user scrolled and clicked on an area—for example the "Your impact" section in the page shown above, the user's actions were intercepted and transmitted to Facebook, including the text located in that area of the webpage. The information intercepted and transmitted to Facebook via Meta Pixel code is depicted below (with highlighting added):

23

✕ Headers  **Payload**  Preview  Response  »

▼ Query String Parameters      view source      view URL-e

  id: 486220931531947
  ev: SubscribedButtonClick
  dl: https://www.childrenshospital.org/
  rl:
  if: false
  ts: 1654560826984
    {"classList":"flex-cta-wrapper flex-cta-btn",
    stination":"","id":"","imageUrl":"","innerTex
    t":"Your impact\n\nWhether you make a donatic
    r fundraise, you're helping the world's sicke
  cd[buildren and their families thrive. Lifesavir
    are, answers and breakthroughs here at Bostor
    ildren's Hospital are made possible by your g
    rosity.\n\nSee how you give hope to all kids'
    umChildButtons":2,"tag":"div"}
       Your impact

  cd[buttonText]: you make a donation or fundraise,
      u're helping the world's sickest children
      their families th
  cd[formFeatures]: []
  cd[pageFeatures]:  {"title":"Home Page | Boston Childr
           n's Hospital"}
  cd[parameters]: []
  sw: 1920
  sh: 1080
  v: 2.9.61
  r: stable
  ec: 2
  o: 30
  fbp: fb.0.1654560778097.392849214
  it: 1654560770829
  coo: false

As shown above, the Meta Pixel code that the user had performed a "ButtonClick" and revealed to

Facebook the text the user had clicked.

24

Date Filed 2/15/2023 9 38 AM
Superior Court - Suffolk
Docket Number

77    Similarly, Google Analytics code tracked when users scrolled through a webpage  The fact that the user scrolled to a lower part of the page is intercepted and transmitted to Google via Google Analytics

78    That is, Boston Children's aided Google and Facebook in intercepting information concerning the particular webpages visited by each user and each user's movements and clicks within a webpage

79    Boston Children's configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer  The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes

80    The Boston Children's Website contains more than three hundred subpages for specific "Programs" and "Departments " For example, the Boston Children's Website contains a page entitled "Emergency Psychiatry Service," designed to provide information to the website user about psychiatric services Boston Children's offers for children and adolescents. A user, by visiting this webpage, reveals to Boston Children's that the user has some interest in psychiatric services (for example, the user may have a child in need of psychiatric care)  When the user communicates with Boston Children's by visiting this particular webpage, Boston Children's causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Emergency Psychiatric Service webpage.



81.    The graphic below presents the contents of the communication between the website

user and Boston Children's that are secretly intercepted and transmitted to Google when the above

page loads as a result of the Google Analytics Javascript code that Boston Children's secretly injects

into the website (with highlighting added):

26

```
×   Headers   Payload   Preview   Response   Initiator   »

▼ Query String Parameters     view source    view URL-encoded

   utmwv: 5.7.2
   utms: 3
   utmn: 240256340
   utmhn: www.childrenshospital.org
   utmcs: UTF-8
   utmsr: 1920x1080
   utmvp: 1311x979
   utmsc: 24-bit
   utmul: en-us
   utmje: 0
   utmfl: -
   utmdt:  Emergency Psychiatry Service | Boston Childre
           n's Hospital
   utmhid: 2112037926
   utmr: 0
   utmp: /programs/emergency-psychiatry-service
   utmht: 1675378338536
   utmac: UA-11514582-1
   utmgtm: 45Xe3210n71KDCBQR
      __utma=98476749.1679664301.1675354141.1675375204.1
      675378316.6;+__utmz=98476749.1675354141.1.1.utmcsr
   utmcc:
      =google|utmccn=(organic)|utmcmd=organic|utmctr=(no
      t%20provided);
   aip: 1
   utmjid:
   utmu: qmAgAABAAAGBAAAAAgAAAAAE~
```

82.    As reflected in the above screenshot, the code injected into the Boston Children's Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Emergency Psychiatric Service" webpage on Boston Children's website—information that Google retains and can use for its own commercial purposes.

83.    The same webpage also, until recently, contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. Boston

27

Children's caused the secret interception and transmission to Facebook of the contents of the communication between the website user and Boston Children's, including that the user is visiting an "Emergency Psychiatric Service" webpage, information that Facebook retains and can use for commercial purposes

84      The Boston Children's Website contains hundreds of similar pages on particular medical specialties and practices that the Boston Children's Facilities offer  For each such page, the Boston Children's Website aids or aided in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Emergency Psychiatric Services example

85.      The Boston Children's Website also includes a search function that permits an individual to search for medical or other information relevant to them  Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Boston Children's  When an individual uses the search function, Boston Children's aids in the secret interception of the contents of that search and transmission of those contents to Google, Facebook, and other third parties. Below, for example, is the search results page for "my child has stomach pain "



86.     When a user performs this search on the Boston Children's Website, and the results

page then loads, the Google Analytics code is activated, causing the individual's web browser to

intercept the user's search terms and transmit them to Google. Below is the information that the

Google Analytics code causes to be transmitted to Google (with highlighting added):



87.     As reflected in the above screenshot, the hidden Google Analytics code causes the

precise search terms entered by the user to be transmitted to Google, which Google can then use for

its own commercial purposes.

88.     Prior to the removal of Meta Pixel from the Boston Children's Website, healthcare

consumers' searches on the Boston Children's Website were similarly intercepted and transmitted to

Facebook through the hidden Meta Pixel code. Below is a screenshot showing how the search terms

would have been intercepted and transmitted to Facebook via hidden Meta Pixel code, as confirmed

by an archived version of the website on the Wayback Machine (with highlighting added):

```
▼ Query String Parameters       view source      view URL-encoded
   id: 486220931531947
   ev: PageView
       https://www.childrenshospital.org/search/node?keys=my%20child%20has%
   dl:
       20stomach%20pain
   rl:
   if: false
   ts: 1654560786522
   sw: 1920
   sh: 1080
   v: 2.9.61
   r: stable
   ec: 2
   o: 30
   fbp: fb.0.1654560774832.1750915368
   it: 1654560751455
   coo: false
   rqm: GET
```

89.     The Boston Children's Website also includes a "Find A Doctor" feature that permits

healthcare consumers to search for doctors using search terms and other filtering criteria, such as

locations and doctor gender. For example, the screenshot below depicts the search results page when

a user with a child experiencing stomach pain enters the phrase "stomach pain"[6] into the search bar

on the Find A Doctor Page and applies filters to search for male physicians within 25 miles of Boston

zipcode 02210:

---

[6] This is an example and does not reflect Plaintiff's personal activity on the website.



90.    Depicted below are the contents of the user's communication with the Boston

Children's website that are intercepted and transmitted to Google via hidden Google Analytics Code

(with highlighting added):

× Headers   **Payload**   Preview   Response   Initiator   Timing

▼ **Query String Parameters**   view source   view URL-encoded

v: 1
_v: j99
a: 1791540425
t: event
ni: 1
_s: 4
https://doctors.childrenshospital.org/search?display_location=02210&distance=25&location=42.3517272%2C-71.0408624&sort=relevance%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&filter=gender%3AMale
ul: en-us
de: UTF-8
dt: Stomach pain in 02210 - ProviderMatch
sd: 24-bit
sr: 1920x1080
vp: 1294x962
je: 0
ec: Web Vitals
ea: FID
el: 1675378795737-9096337289761
ev: 1
_utma: 98476749.1679664301.1675354141.1675375204.167537
8316.6
_utmz: 98476749.1675354141.1.1.utmcsr=google|utmccn=(orga
nic)|utmcmd=organic|utmctr=(not%20provided)
_utmht: 1675378804442
_u: SDCCCEABBAAAACAEK~
jid:
gjid:
cid: 2082766424.1675354141
tid: UA-31344009-7
_gid: 1174674318.1675354294
z: 1567927039

91.    The above screenshot reflects that when an individual enters a search on the Boston

Children's "Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the

contents of the search and transmits them to Google, including not only the search terms entered by the user ("stomach pain") but also the other filtering criteria the user has selected (a location within 25 miles of 02210 and a male doctor in the above example). Google retains that information and may use it for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes

92.     If the user then clicks on the "Request Appointment" button next to a particular doctor on the results page, that action is contemporaneously intercepted and retransmitted to Google The page below depicts the information intercepted and retransmitted to Google (with highlighting added)·

✕  Headers   Payload   Preview   Response   Initiator   Timing

ui. ci. uu
sr: 1920x1080
uaW: 1
uaa: x86
uab: 64
uafvl: Not_A%20Brand;99.0.0.0|Google%20Chrome;109.0.5414.120|Chromiu
m;109.0.5414.120
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 2
sid: 1675378795
sct: 3
seg: 1
   https://doctors.childrenshospital.org/search?display_location=02
   210&distance=25&location=42.3517272%2C-71.0408624&sort=relevanc
dl: e%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&
   filter=gender%3AMale
dt: Stomach pain in 02210 - ProviderMatch
en: click_request_or_book_appointment_button
_c: 1
ep.gtm_container_id: GTM-P8QWW8F
ep.gtm_container_version: 465
ep.debug_mode: true
ep.event_category: Engagement
ep.event_action: Click Request or Book Appointment
ep.event_label: Stomach pain in 02210 - ProviderMatch
ep.gtm_tag_name: K - GA4 - Book Appointment
ep.value: 250
_et: 15400

93.     That is, Boston Children's causes the surreptitious interception by Google of a prospective patient's request for an appointment with a particular doctor for a particular condition.

94.     Before it removed Meta Pixel from the Boston Children's Website in or around late June 2022, searches using the Find-A-Doctor function were likewise intercepted and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the precise search terms entered

35

with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

95.     In addition to the "Request an Appointment" function through search results, the Boston Children's Website also includes a "Request an Appointment" form an individual can fill out to request an appointment with a Boston Children's physician. An individual visiting that page necessarily reveals that the individual is seeking medical care either for him or herself or for the individual's child. "The Request An Appointment" page is depicted below.



96.     When a user loads the request-an-appointment form, hidden Google Analytics code causes the secret interception and transmission to Google of the communication reflecting that user

accessed the form. Depicted below are the contents of the communication that are intercepted and

retransmitted to Google via the hidden Google Analytics code (with highlighting added):



97.    When a user fills out the web form seeking an appointment and then submits the form,

the action of submitting the form is likewise intercepted and transmitted to Google.

98.    Portions of the Boston Children's website are designed to be accessible only by

patients of the website. So-called "patient portals" are common on healthcare provider websites.

Patient portals permit a patient of a healthcare facility to access medical records, pay bills, schedule

visits, and renew medications, among other tasks.

99.    After the publication of the Markup Article highlighting the use of Meta Pixel on

hospital websites, including patient portals, some healthcare providers removed all tracking

technologies (including Meta Pixel and Google Analytics) from their patient portals Boston Children's, however, elected to maintain Google Analytics within its patient portal (i e , a portion of the website patients can access only after logging in) Boston Children's, therefore, continues to aid Google in intercepting communications with patients of the hospital

100.    As discussed above, Plaintiff's claim under the Massachusetts Wiretap Act depends on neither the nature of the contents of a communication nor whether a website user is already a patient of Boston Children's The Wiretap Act prohibits **any** secret interception without regard to the contents of the communication or the relationship among the parties Nonetheless, the fact that Boston Children's permits Google to intercept communications with known patients concerning their medical condition, medical records, and other sensitive matters in a purportedly "secure" area of the website underscores Boston Children's total disregard for the privacy of its patients and other website users.

101     For example, when a website user first accesses the login page for the patient portal, hidden Google Analytics code that Boston Children's has injected into its own website causes the user's web browser to contemporaneously and surreptitiously communicate to Google that the user is visiting "Boston Children's Hospital External User Portal Login Page "

102     When a patient or the patient's parent or guardian registers for an account on the patient portal, each step in that process is intercepted and contemporaneously transmitted to Google When a website user first enrolls a patient in the patient portal, hidden Google Analytics causes the user's web browser to contemporaneously and surreptitiously communicate to Google that the website user is visiting the "MyChildrens Accounts – Add Patient" page

103     Then, when the website user adds a dependent (i e , the child patient) to the account, hidden Google Analytics code that Boston Children's has injected into its own website causes the

38

website user's web browser to contemporaneously and surreptitiously communicate to Google "Add

Dependent Complete" and that the website user's request to add a patient is "Pending"

104     After a website user has successfully registered an account and associated the account

with actual Boston Children's patients, the website user can then view the patient's medical records,

prescription, billing, and insurance information through the patient portal  Hidden Google Analytics

code that Boston Children's has injected the patient portal causes the user's web browser to

contemporaneously and surreptitiously track every click and page view in the patient portal and to

transmit that information to Google

105     For example, when a website user visits a page within the portal to view the patient's

test results, the hidden Google Analytics code communicates to Google that the website user is visiting

"mychildrens - Diagnostic Tests."

106     Likewise, when a website user clicks on a button to renew medication, the hidden

Google Analytics code communicates to Google that the user is visiting a page to "renew"

"medications "

107     And when a website user clicks on a link to view their billing summary, the hidden

Google Analytics code communicates to Google that the user is viewing his or her "Billing Summary."

108.    In addition to Google and Facebook, Boston Children's enables the communications

between healthcare consumers and Boston Children's to be intercepted and transmitted to various

other companies without the consumer's knowledge or consent  These additional third parties include

    (a)    **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar
        to Google Analytics and Meta Pixel, Boston Children's inserts code into their website
        that causes communications between the user and the website to be intercepted by
        and transmitted to Microsoft's Bing Ads servers  The contents intercepted include the
        URL and title of each website visited and the user's IP address  Microsoft can then
        monetize that information through advertisements

    (b)    **Doubleclick.** Google Doubleclick is an internet advertising platform  Similar to
        Google Analytics and Meta Pixel, Boston Children's inserts code into their website
        that causes communications between the user and the website to be intercepted by

and transmitted to Google  The contents intercepted include the URL and title of each website visited and the user's IP address  Google can then monetize that information through advertisements.

(c)     **Hotjar.** Hotjar is a so-called "session replay" provider that records an entire browsing path through the Boston Children's website and then permits Boston Children's to "replay" a particular individual's visit to the website, including every mouse move, click, and page loaded on the website

(d)     **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn  Similar to Meta Pixel, hidden Javascript code that Boston Children's injects into some pages on the Boston Children's Website cause the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's communications with the Boston Children's Website  LinkedIn can then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows

## The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary

109.     The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Boston Children's Website's operation  The Boston Children's Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint

110     Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website  For example, a website can contain links to its Facebook profile or invite website users to interact with Boston Children's via Facebook without using Meta Pixel  Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile, any website can have one without the other

111     Moreover, even if Boston Children's wanted to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate or lawful reason for Boston Children's to keep secret from its website users the use of these tracking technologies or to falsely and deceptively claim that it does not share the website communications with others and that it maintains the privacy of those communications

## Class Action Allegations

112    Plaintiff brings this action under Mass R Civ Proc 23 on behalf of herself and the Class, which includes·

All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www childrenshospital org within three years prior to the date of the filing of this initial complaint in this action

113    This action is properly maintainable as a class action

114    The Class Members are so numerous that joinder of all members in a single lawsuit is impractical

115    Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class  Among the predominant questions of law and fact common to the Class are·

(a)    Whether communications between Class Members and Boston Children's, through the Boston Children's Website, were wire communications under the Massachusetts Wiretap Act

(b)    Whether Boston Children's inserted tracking technologies into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel,

(c)    Whether the tracking technologies inserted into the hidden code of the Boston Children's Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M G L c. 272 § 99(B)(3),

(d)    Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website,

(e)    Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning,

(f)    Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Boston Children's,

41

(g)    Whether Class Members' privacy interests were violated by the interceptions of their communications with the Boston Children's website,

(h)    If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements

116.    Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Boston Children's Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent

117    Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class

118    A class action is superior to all other available methods for this controversy's fair and efficient adjudication  Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation  Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually  There will be no difficulty in managing this action as a class action

119    Boston Children's has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

120    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count

121    The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any

wire or oral communication through the use of any intercepting device by any person other than a
person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C) The Act provides
a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C)

122    An individual's communications with a website constitute "wire communications" as
defined in the Massachusetts Wiretap Act, M G L c. 272 § 99(B)(1) The communications between
Plaintiff and other Class Members and Boston Children's, through the Boston Children's Website,
were therefore wire communications under the Massachusetts Wiretap Act

123    The tracking technologies inserted into the hidden code of the Boston Children's
Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the
Massachusetts Wiretap Act, M G L c. 272 § 99(B)(3) "Intercepting devices" also include (i) any
devices Class Members used to access the Boston Children's Website; (ii) Class Members' web
browsers used to access the Boston Children's Website; (iii) Boston Children's own computer servers,
and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class
Members' communications with the Boston Children's Website.

124.    The computer code for tracking technologies such as Google Analytics, Meta Pixel,
and others enabled Google, Facebook, and other third parties to record and disclose to Google,
Facebook, and other third parties the contents of communications between Boston Children's and
users of the Boston Children's Website, including, but not limited to, the identity of the parties to the
communication, the existence of the communication, and the communication's content, substance,
purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the
precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the
precise contents of information the individuals inputted onto forms on the website

125    By inserting the computer code for Google Analytics, Meta Pixel, and other tracking
technologies, Boston Children's installed an intercepting device on their website with the intent to aid

43

Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Boston Children's

126     Class Members' communications between the Class Members and Boston Children's were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent  Moreover, their privacy interests were violated by the interception

127     Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Children's Hospital's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

### Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows

a     Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b     Awarding damages to Plaintiff and Class Members;

c.     Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d     Awarding such other and further relief which the Court finds just and proper

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable

Dated  February 15, 2023                     Respectfully submitted,


                                             */s/ Michelle H  Blauner* _____
                                             SHAPIRO HABER & URMY LLP
                                             Edward F  Haber (BBO #215620)
                                             Michelle H  Blauner (BBO #549049)
                                             Patrick J. Vallely (BBO #663866)
                                             One Boston Place
                                             Suite 2600
                                             Boston, MA 02108
                                             (617) 439-3939 – Telephone
                                             (617) 439-0134 – Facsimile
                                             ehaber@shulaw com
                                             mblauner@shulaw com
                                             pvallely@shulaw com



## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**                                              **SUPERIOR COURT**
                                                             **CIVIL ACTION**
                                                             **No. 2384CV00326-BLS-1**

### JOHN DOE 1 & another,[1]

#### vs.

### BOSTON MEDICAL CENTER CORPORATION

### <u>MEMORANDUM OF DECISION AND ORDER ON<br>DEFENDANT'S MOTION TO DISMISS</u>

Plaintiffs John Doe 1 and John Doe 2 commenced this putative class action against

defendant Boston Medical Center Corporation ("BMC"), alleging that it used digital marketing

tools on its website that illegally redirected website users' personal information, and the contents

of their communications with BMC's website, to third parties Google and Meta.  On the basis of

these allegations, the Complaint asserts claims for violations of the Massachusetts Wiretap

Statute, G.L. c. 272, § 99, and invasion of privacy under G. L. c. 214, § 1B.  Presently before the

court is BMC's motion to dismiss.  After a hearing on July 18, 2023, and consideration of the

parties' submissions, the motion is **DENIED**.

### BACKGROUND

The Complaint sets forth the following facts, with further facts reserved for later

discussion.  BMC is a 514-bed academic medical center in Boston that provides medical care to

patients of all ages.  BMC designs, maintains, and/or directs the design and maintenance of its

website from its offices in Massachusetts.  Plaintiffs are individuals residing in Massachusetts.

The BMC website allows users to, among other things, research health conditions,

research doctors and procedures BMC offers, request appointments, and log into BMC's patient

---

[1] John Doe 2, individually and on behalf of all others similarly situated.

portal known as MyChart. The website contains search bars that aid users in finding specific information on the site. The BMC website includes a viewable privacy policy stating that "Boston Medical Center will not intentionally share the contents of any electronic communications with a third-party entity." It further states that "[o]nline visitors utilizing this site do so anonymously," but notes that certain information may be collected, including "IP address and domain name, Time of visit, [and] Operation system." The website includes additional statements to the effect that BMC prioritizes patient privacy, and maintains privacy and security for its patients' protected health information and other personal and financial information.

Notwithstanding its privacy policy, since at least 2018, BMC has inserted embedded internet tracking software on its website. The software is unrelated to the website's functionality and is invisible to users. When a user visits the BMC website, the software sends data collected from those visits to third parties Meta (the parent company of Facebook) and Google.

In December 2019 or earlier, BMC installed the "Meta Pixel" on its website. The Meta Pixel is a piece of software code that gathers information from a user's internet browser when they are on the BMC website and sends it to Meta, including the user's IP address. If the user is a Facebook subscriber, Meta can use the data gathered, in conjunction with other information it gathers through the use of internet cookies and subscriber information, to identify the website user and target ads specifically for them based on their interaction with the website. Through the use of different internet cookies, Meta can also gather data from non-Facebook users, also for advertising purposes. Businesses employ the Meta Pixel to better tailor their advertising efforts. After a media exposé about the use of the Meta Pixel on hospital websites, BMC removed Meta Pixel from its website in September 2022.

2

In 2018, BMC installed Google Analytics software code on its website. The code includes and employs "Google tag manager" and internet cookies to send to Google the contents of website users' communications with the BMC website, and users' IP addresses. Google allows site owners to "anonymize" the data collected, which BMC has chosen not to enable. As of the date the Complaint was filed, Google Analytics software remained on the BMC website.

On multiple dates in 2021 and 2022, Plaintiff John Doe 1 used the BMC website, including to log into the MyChart portal, visit the "Make an Appointment" part of the website, and search "local anesthesia" and "hernia repair." John Doe 1 searched these topics around the same time he saw a surgeon at BMC for the same issue. He also used the BMC website to find a urologist, and through that online process became a patient of a BMC urologist. Using the Meta Pixel and Google Analytics software, BMC disclosed to those third parties the substance of John Doe 1's BMC website interactions, including revealing his status as a BMC patient, and the text of his searches on the BMC website. Also disclosed to Meta and Google were John Doe's IP address, and other unique identifiers, such as his Facebook ID. At the time he used the BMC website, John Doe 1 was not aware that his information and the contents of his online interactions with the BMC website were simultaneously being sent to Google and Meta.

Similarly, in 2021 and 2022, Plaintiff John Doe 2 used the BMC website to search for contact information about his doctors, make appointments, research medical conditions, and log into MyChart, all without knowing that the contents of those website interactions and his personal identifying information were being sent to Google and Meta.

## STANDARD OF REVIEW

Rule 12(b)(6) allows for dismissal of a complaint when the factual allegations contained within it do not suggest a plausible entitlement to relief. *Iannacchino v. Ford Motor Co.*, 451

3

Mass. 623, 635-636 (2008); *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 699-700 (2013).

In ruling on the motions, the court accepts the factual allegations as true and draws all reasonable

inferences in the non-moving party's favor.[2]  *Fraelick*, 83 Mass. App. Ct. at 699-700.

## DISCUSSION

BMC argues that Plaintiffs' claims must be dismissed due to lack of standing and failure

to meet the requirements of the relevant statutes.   As discussed below, the arguments are

unavailing.

### 1. **Standing**

Proof of standing requires that a plaintiff "allege sufficient facts to show that he has

suffered a nonspeculative, direct injury." *Pugsley v. Police Dep't of Boston*, 472 Mass. 367, 373

(2015).  In addition, "[w]hen a statute confers standing in relation to particular subject matter,

that statute, rather than more general ideas about standing, governs who may initiate legal action

in relation to the subject matter." *Rizkallah v. Director of Massachusetts Office of Medicaid*, 85

Mass. App. Ct. 1104, 2014 WL 886777, at *1 (2014) (Unpublished Opinion) (quoting

*Centennial Healthcare Inv. Corp. v. Commissioner of the Div. of Med. Assistance*, 61 Mass. App.

Ct. 320, 326 (2004)).  *See Murby v. Children's Hosp. Corp.*, 2016 WL 2678657, at *4 (Mass.

Super. 2016).  Under the statutes at issue here, the relevant standing requirements have been met.

Looking first at the Massachusetts Wiretap Statute, it contains a liquidated damages

provision providing that: "Any aggrieved person . . . shall have a civil cause of action . . . and

shall be entitled to recover . . . actual damages but not less than liquidated damages computed at

the rate of $100 per day for each day of violation or $1000, whichever is higher." G.L. c. 272, §

---

[2] The standard of review for a challenge to standing at this stage under Rule 12(b)(1) is functionally the same. *Abate v. Fremont Inv. & Loan*, 470 Mass. 821, 828 (2015).

99(Q). By providing such an award to an aggrieved person under the statute, with no additional showing of harm required, the Legislature necessarily deemed a properly alleged violation of the statute, alone, to constitute injury sufficient to confer standing. *See Pine v. Rust*, 404 Mass. 411, 418 (1989) (Massachusetts Wiretap Statute allows recovery of statutory minimum damages "without any proof of harm"); *In re Lubanski*, 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995) (same). Here, where, as discussed *infra*, Plaintiffs plausibly allege a violation of the Massachusetts Wiretap Statute, more is not required.

As for the Right of Privacy statute, G.L. c. 214, § 1B, it provides: "A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages." The plain language of the statute provides a cause of action to those whose right to privacy has been invaded in the manner described, with no additional requirement to proof any additional harm or damages, although the superior court has the authority to award damages. Thus, the invasion of privacy alleged — that BMC intentionally disclosed Plaintiffs' personal identifying information, including their IP addresses, along with the contents of their personal health-related website interactions — alone are sufficient to show they suffered a direct injury under the statute for purposes of standing. *See Murby*, 2016 WL 2678657, at *4 (where plaintiffs met statutory requirements to bring cause of action under the determination of need law, no additional showing needed to confer standing).[3]

---

[3] *Pugsley*, 472 Mass. 367, and *Ginther v. Commissioner of Ins.*, 427 Mass. 319, 323 (1998), upon which BMC relies, are distinguishable on the facts. The court in *Pugsley* determined the plaintiff police candidate had no standing because his alleged injury was speculative and hypothetical. *See* 472 Mass. at 371 (plaintiff's low position on eligibility list was "indicative of the unlikelihood that his name would ever have been reached" regardless of outcome of litigation). In *Ginther*, plaintiffs did not have standing where they did not hold an insurance policy by the "acquired insurer" or "otherwise participate in the Massachusetts insurance market." 427 Mass. at 323. Here,

### 2. **Massachusetts Wiretap Statute**

General Laws c. 272, § 99(Q) provides a cause of action for "any aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," except as permitted or authorized by the Wiretap Statute. "Interception" is defined to mean "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4). BMC argues that dismissal is required here because the Legislature intended the statute to apply only to "conversations," not internet tracking; the term "intercepting device" does not encompass the software code at issue here; and finally the alleged interceptions did not take place in Massachusetts.

Beginning with legislative intent, "[i]n enacting the wiretap act the Legislature sought to curtail two 'grave dangers': (1) 'the increasing activities of organized crime' and (2) 'the uncontrolled development and unrestricted use of modern electronic surveillance devices,' which the Legislature termed a danger "'to the privacy of all citizens.'" *Commonwealth v. Ennis*, 439 Mass. 64, 68 (2003) (quoting G.L. c. 272, § 99(A)). Nothing in this stated intent or in the language of the statute limits its reach to the equivalent of "in-person conversations" as argued by BMC. Indeed, it is well-established that the statute is to be interpreted broadly, and consistent with that principle, it already has been applied to electronic text messages. *See Commonwealth v. Moody*, 466 Mass. 196, 201, 209 (2013).[4] Plaintiffs' online search for doctors and requests for

---

by contrast, Plaintiffs fall within the "area of concern" of the statutes, *id.*, and have adequately pleaded aggrievement where their information and communications already have been disclosed.

[4] BMC's contention that *Moody* somehow supports its view is unpersuasive.

6

appointment are the modern equivalent of telephone inquiries and conversations that would have been made to doctors' offices in the past when the statute was enacted, and are therefore covered under its broad language.

BMC next argues that the statutory term "intercepting device" is limited to only "tangible" objects, and thus does not encompass the Meta Pixel and Google Analytics software at issue here. Again, the argument is unavailing. The Massachusetts Wiretap Statute broadly defines an "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G.L. c. 272, § 99(B)(4). Nothing in this language limits intercepting devices to being physical, tangible objects; neither does the common dictionary definition of "device" so limit that term. *See* Webster's College Dictionary p. 370 (1991) ("device" defined as "a thing made for a particular purpose, esp. a mechanical, electric, or electronic invention or contrivance"). Moreover, where cellphone, tablet, and computer applications and programs, and their interfacing with the internet, all rely on software for their operation, its use is practically implicit in any modern electronic communication. Thus, to restrict software code from being considered an intercepting device as BMC suggests would essentially nullify the statute's application.

Because the software code at issue here is alleged to have recorded and transmitted the contents of Plaintiffs' communications with BMC's website and their personal information to third parties, the Complaint sufficiently alleges the use of an intercepting device. *See Alves v. BJ's Wholesale Club, Inc.*, 22-2509-BLS1, slip op. at 10 (Super. Ct. June 21, 2023), citing *United States v. Hutchins*, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the [Federal] Wiretap Act"); *Rich v. Rich*, 2011 WL 3672059, at *6 (Mass. Super.

7

2011) (key logger software program deemed to be "intercepting device" under Massachusetts Wiretap Statute).[5]

Finally, where BMC is alleged to have added (or directed the addition of) the Meta Pixel and Google Analytics software to its website from its offices in Massachusetts, and Plaintiffs are Massachusetts residents who accessed BMC's website while in Massachusetts, the allegations suffice to show that the interceptions occurred in Massachusetts. In other words, because the sender and the intended recipient/interceptor are both in Massachusetts, the location of Meta and Google in California is not disqualifying, particularly in the absence of controlling authority holding otherwise.[6]

### 3. Invasion of Privacy

An invasion of privacy claim under G.L. c. 214, § 1B may be based either on the public disclosure of private facts or an intrusion upon a plaintiff's solitude or seclusion, i.e., an infringement upon the right to be left alone. *Polay v. McMahon*, 468 Mass. 379, 382 (2014). In either case, a plaintiff must put forward allegations plausibly suggesting that the invasion is both unreasonable and substantial or serious. *Id.* In determining whether a violation occurred, the court should consider "the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion" while balancing the extent of any intrusion "against any legitimate purpose" therefor. *Id.* at 383. Typically, whether an intrusion is unreasonable, substantial, or serious is a question of fact. *Id.*

---

[5] This conclusion is also consistent with the result reached in *Doe v. Partners Healthcare System, Inc.*, 1984CV01651-BLS1, endorsement denying motion to dismiss (Super. Ct. Dec. 7, 2020).
[6] The cases BMC cites in support of its argument are not persuasive because they involve out-of-state individuals directing the alleged interception. *See, e.g., Marquis v. Google, Inc.*, 2015 WL 13037257, at *7 (Mass. Super. 2015) (Google's California-based automated email scanning); *Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290, at *8 (D. Mass. 2020) (plaintiff's telephone calls to out-of-state location were recorded out-of-state).

Here, at the motion to dismiss stage, the alleged disclosure of personal and healthcare-related information over multiple website visits for the sole purpose of targeted advertising efforts suffices to advance Plaintiffs' claim. *See generally Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 383 (2005) ("statute . . . proscribes disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest" [citation omitted]).

BMC nevertheless argues that Plaintiffs' claim fails for lack of alleged damages. The statute provides the Superior Court with equity jurisdiction, however, to enforce a plaintiff's right to privacy, in addition to the authority to award damages. G.L. c. 214, § 1B. Here, where BMC is alleged to have intentionally placed the Meta Pixel and Google Analytics software on its website, the software's removal, the deletion of data collected, or the addition of appropriate disclaimers, would fall under the court's equity jurisdiction. Indeed, Plaintiffs seek injunctive relief enjoining the disclosures alleged absent a website users' consent. Whether the damages Plaintiffs further allege withstand scrutiny is a matter for later determination.

**4. Conclusion**

For all of these reasons, BMC's motion to dismiss is **DENIED**.

<div align="center">

**ORDER**

</div>

For the foregoing reasons, BMC's motion to dismiss is **DENIED**.

Dated: September 14, 2023

Hélène Kazanjian
Justice of the Superior Court

<div align="center">

9

</div>

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00411 BLS-1**

JANE DOE, for herself and the class,

Plaintiff,

v.

THE CHILDREN'S HOSPITAL
CORPORATION,

Defendants.

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S COMPLAINT

Defendant The Children's Hospital Corporation d/b/a Boston Children's Hospital ("Boston

Children's" or "BCH") answers the Complaint of Plaintiff Jane Doe, for herself and the class, as

set forth below. All allegations not expressly admitted are denied, and pursuant to Mass. R. Civ.

P. 8(b), all statements that BCH lacks knowledge or information sufficient to form a belief about

the truth of an allegation have the effect of a denial. BCH is not required to respond to section

headings within the Complaint; however, to the extent these section headings contain assertions or

allegations or otherwise require a response, they are denied, and the use of these section headings

is for convenience only.

## DEFENDANT BOSTON CHILDREN'S RESPONSES

### Preliminary Statement

1.      This paragraph summarizes what Plaintiff purports to do in bringing the complaint

and contains legal conclusions to which no response is required. To the extent a response is

1

required, BCH admits only that The Children's Hospital Corporation does business as Boston Children's Hospital, BCH operates a website, and that Google Analytics and the Facebook Pixel have been deployed on pages of its public website. BCH denies the remaining allegations.

2.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

3.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

4.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

5.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

6.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

7.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

8.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

9.      BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

## PARTIES

10.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

11.      BCH admits that it is a corporation that has locations in Boston, Massachusetts for the purpose of providing healthcare services. BCH admits that all BCH facilities share BCH's website, and that BCH maintains and controls www.bostonchildrenshospital.org.

## JURISDICTION

12.      This paragraph contains Plaintiff's allegations concerning whether this Court has personal jurisdiction over BCH for this case, which constitutes a legal conclusion to which no response is required. To the extent this paragraph may be deemed to contain factual allegations, BCH admits that it is subject to personal jurisdiction in Massachusetts for this claim.

## FACTUAL ALLEGATIONS

### The Boston Children's Facilities and Its Website

13.      Admit.

14.      BCH admits only that it operates https://www.childrenshospital.org/ for, among other reasons, information regarding services. BCH denies the remaining allegations.

15.      BCH admits that it utilizes the website https://www.childresnhospitral.org. Further answering, BCH states that the website referenced in this paragraph speaks for itself and is the best evidence of its contents, and BCH denies Plaintiff's attempts to summarize or characterize the contents or operations of that website to the extent that they are inconsistent with the actual contents or operations of that website. BCH denies all remaining allegations contained in this paragraph.

16.      BCH admits that it utilizes the website https://www.childresnhospitral.org. Further answering, BCH states that the website referenced in this paragraph speaks for itself and is the best evidence of its contents, and BCH denies Plaintiff's attempts to summarize or characterize the contents or operations of that website to the extent that they are inconsistent with the actual

contents or operations of that website. BCH denies all remaining allegations contained in this paragraph.

**<u>Reasonable Expectations of Users of the Boston Children's Website</u>**

17.     This paragraph contains a legal conclusion to which no response is required. To the extent a further response is deemed necessary, BCH denies the allegations contained in this paragraph.

18.     This paragraph contains a legal conclusion to which no response is required. To the extent a further response is deemed necessary, BCH denies the allegations contained in this paragraph.

19.     This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegations.

20.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

21.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

22.     The Web Site User Privacy Rights referenced in this paragraph speaks for itself and is the best evidence of its own contents. BCH denies Plaintiff's attempt to summarize or characterize the contents or operations of the Privacy Policy to the extent it is inconsistent with the actuals terms. The remainder of the paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

23.     The Web Site User Privacy Rights referenced in this paragraph speaks for itself and is the best evidence of its own contents. BCH denies Plaintiff's attempt to summarize or characterize the contents or operations of the Privacy Policy to the extent it is inconsistent with the

actuals terms. The remainder of the paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

24.    The Web Site User Privacy Rights notice referenced in this paragraph speaks for itself and is the best evidence of its own contents. BCH denies Plaintiff's attempt to summarize or characterize the contents or operations of the Privacy notice to the extent it is inconsistent with the actuals terms. The remainder of the paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

25.    The Web Site User Privacy Rights referenced in this paragraph speaks for itself and is the best evidence of its own contents. BCH denies Plaintiff's attempt to summarize or characterize the contents or operations of the Privacy Policy to the extent it is inconsistent with the actuals terms. The remainder of the paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

26.    The Web Site User Privacy Rights referenced in this paragraph speaks for itself and is the best evidence of its own contents. BCH denies Plaintiff's attempt to summarize or characterize the contents or operations of the Privacy Policy to the extent it is inconsistent with the actuals terms. The remainder of the paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

27.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

28.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

29.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegations.

**Third-Parties Offering Tracking Technologies**

30.     To the extent this paragraph purports to contain a description of Plaintiff's alleged claim, it is a legal conclusion to which no response is required. Otherwise, BCH denies the allegations the allegations contained in this paragraph.

31.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

32.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

33.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

34.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

35.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

36.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

37.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

38.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

39.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

40.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

41.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

## **Website Tracking Technologies on the Boston Children's Website**

42.    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

43.    This paragraph contains legal conclusions to which no response is required. To the extent a further response is required, BCH denies the remaining allegations.

44.    BCH admits only that Google Analytics is deployed public website. BCH denies the remaining allegations.

45.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

46.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

47.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

48.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

49.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

50.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

51.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

52.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

53.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

54.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

55.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

56.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

57.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

58.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

### **Boston Children's Use of Tracking Technologies on the Boston Children's Website**

59. This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH admits that Google Analytics is deployed on its public website.

BCH also admits that it previously deployed the Facebook Pixel on its public website. BCH denies the remaining allegations.

60.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

61.    BCH admits only that Plaintiff has copied a portion of a page from BCH's website. The website speaks for itself. BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

62.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

63.    BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

64.    BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

65.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph, and on that basis denies the allegations.

66.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

67.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

68.    BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

69.     BCH admits that it previously deployed the Facebook Pixel on its website. BCH denies the remaining allegations.

70.     BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

71.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

72.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

73.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

74.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

75.     BCH admits that Plaintiff has copied a portion of a page from BCH's website. The website speaks for itself. BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

76.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

77.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

78.     BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

79.     BCH denies that any PHI, as defined under HIPAA, is transmitted from BCH's public facing website to any third parties. To the extent a further response is required, BCH denies the remaining allegations.

80.     BCH admits only that Plaintiff has copied a portion of a page from BCH's website. The website speaks for itself. BCH denies that any personal health information is transmitted from BCH's public facing website to any third parties. To the extent a further response is required, BCH denies the remaining allegations.

81.     BCH admits that Google Analytics has been deployed on some pages on its public website. BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

82.     BCH is without knowledge or information as to the source of the graphic contained in paragraph 81 sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

83.     BCH admits only that it previously deployed the Facebook Pixel on its public website. BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

84.     BCH states that its website speaks for itself. BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

11

85.     BCH admits only that its website has a search function and Plaintiff has copied a page from BCH's website. The website speaks for itself. BCH denies that any private health information is transmitted from BCH's public facing website to any third parties. To the extent a further response is required, BCH denies the remaining allegations.

86.     BCH admits that Google Analytics has been deployed on pages on its public website. BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

87.     BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

88.     BCH admits that it previously deployed the Facebook Pixel on its public website. BCH states that the remainder of this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations. Further, BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

89.     BCH admits only that its website includes a "Find a Doctor" feature and that Plaintiff has copied a portion of a page from BCH's website. The website speaks for itself. BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegations.

90.     BCH admits that Google Analytics has been deployed on some pages on its public website. BCH states that the remainder of this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH is without knowledge or

12

information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

91. This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

92. BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

93. BCH denies that any personal health information is transmitted from BCH's public facing website via advertising technology. To the extent a further response is required, BCH denies the remaining allegations.

94. BCH admits only that it previously deployed the Facebook Pixel on its public website. The remainder of this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegation.

95. BCH admits only that its website includes a "Request an Appointment" feature and that Plaintiff has copied a page from BCH's website. The website speaks for itself. BCH denies that any protected health information is transmitted from BCH's public facing website via advertising technologies. To the extent a further response is required, BCH denies the remaining allegations.

96.     BCH admits only that Google Analytics has been deployed on pages on its public website. BCH is without knowledge or information as to the source of the graphic contained in this paragraph sufficient to form a belief as to the truth of the allegations regarding the graphic. To the extent a further response is required, BCH denies the allegations.

97.     This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

98.     BCH admits that its website includes a patient portal. BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegation.

99.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegations in the paragraph regarding health providers' removal of tracking technologies from their patient portals, and on that basis denies the allegation. BCH denies the remaining allegations.

100.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

101.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

102.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

103.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

104.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

105.    BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegation.

106.    BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegation.

107.    BCH is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in the paragraph, and on that basis denies the allegation.

108.    BCH admits that has deployed various advertising technology on pages of its public website. The remainder of this paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the remaining allegations.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

109.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

110.     BCH is without knowledge or sufficient information to form a belief as to the truth of the allegation in the paragraph, and on that basis denies the allegation.

111.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

**Class Action Allegations**

112.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations, and denies that Plaintiff, or any member of the putative Class, is entitled to any of the relief requested in the Complaint. BCH further denies that a Class should be certified.

15

113.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

114.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

115.    BCH states that this paragraph contains legal conclusions to which no response is required. To the extent a response is required, BCH denies the allegations.

116.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

117.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

118.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

119.    BCH states that this paragraph contains a legal conclusion to which no response is required. To the extent a response is required, BCH denies the allegations.

## <u>COUNT I</u>

### (Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)

120.    BCH repeats and realleges its responses to the allegations in paragraphs 1 to 119 of the Complaint as if fully set forth herein.

121.    BCH states that the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, speaks for itself and any characterization inconsistent therewith is denied. BCH notes that the purported quote to section (C) appears to be to section (Q). To the extent further response is required, BCH denies the allegations.

122.    Denied.

123.    Denied.

16

124.   Denied.

125.   Denied.

126.   Denied.

127.   Denied that Plaintiff, or any member of the putative class, is entitled to any of the relief requested in the Complaint or any relief whatsoever.

### Prayers For Relief

Denied that Plaintiff, or any member of the putative class, is entitled to any of the relief requested in the Complaint or any relief whatsoever.

### DEMAND FOR JURY TRIAL

BCH denies that all of Plaintiff's claims and prayers for relief carry a right to a jury trial. BCH demands a jury trial on all claims so triable.

### AFFIRMATIVE DEFENSES

Pending further investigation and discovery, BCH asserts the following affirmative defenses to the Complaint. BCH's investigation continues and BCH reserves the right to amend and/or supplement this Answer to assert other and additional defenses, counterclaims, cross claims, and third party claims as additional information is obtained. BCH does not assume any burden of proof, persuasion or production with respect to any issue where the applicable law places the burden on Plaintiff.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff and the putative class members have failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by the applicable statute of limitations.

17

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because they gave consent.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by their assumption of the risk.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by release.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by waiver.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, or reduced by their failure to avoid or mitigate damages.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff fails to establish that they or the putative class members have suffered or are in danger of immediately suffering a concrete legally cognizable injury. Plaintiff's claims and those of the putative class members are barred, in whole or in part, because Plaintiff and the putative class members have suffered no injury, harm, or damage.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by their own contributory negligence.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by estoppel.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by laches.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by the doctrine of unclean hands.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because, at all times, BCH acted in good faith.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because BCH is a charitable organization and recovery is barred or limited pursuant to G.L. c. 231 §85K.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff and the putative class lack standing.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, to the extent that any alleged injury was voluntarily incurred for the purpose of manufacturing a legal claim.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, precluded, and/or diminished, in whole or in part, by the doctrine of intervening and/or superseding causation because any alleged damages they claim were caused by third parties who were not employees or agents of Defendant.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because any alleged interception occurred outside of Massachusetts.

## NINETEENTH AFFIRMATIVE DEFENSE

Persons or entities other than BCH may have caused or contributed to the damages Plaintiff and the putative class members allegedly suffered and therefore any award in favor of Plaintiff or the putative class members must be reduced by an amount equal to the percentages of fault of others causing or contributing to the damages alleged.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because BCH did not perform any act or omission that was the proximate cause of Plaintiff's or the putative class members' alleged damages.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because BCH was without knowledge of the identity of the users of their informational websites.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because their proposed interpretation of the relevant statute would lead to absurd results.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by agreements that they independently entered into with third parties and/or by their prior disclosure of information to third parties.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because they have failed to join necessary and indispensable parties to the action.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, by misjoinder of the parties.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's complaint is not appropriate as a class action lawsuit since there is no commonality among the putative class.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff cannot show that any information allegedly collected or intercepted relates to putative class members. Because more than one individual may have access to a single device or computer, mini-trials would be necessary to determine if the information allegedly collected related to every individual actually using the computers and/or computer browsers at issue.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's complaint is not appropriate as a class action lawsuit since there is no typicality among the putative class.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's complaint is not appropriate as a class action lawsuit because questions of law or fact common to putative class members do not predominate over any questions affecting only individual members of the putative class.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiff's complaint is not appropriate as a class action lawsuit because a class action is not superior to other available methods for fairly and efficiently adjudicating the controversy.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because applying state law as urged by Plaintiff would violate the United States Constitution, including but not limited to the First and Fifth Amendments.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because the imposition of punitive and/or aggregated, class-wide damages in this case would be excessive and violate BCH's Due Process and other Constitutional rights, under both the United States and Massachusetts Constitutions.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, to the extent they allege that BCH aided parties not in the case in committing an interception.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because BCH cannot be held liable for aiding a third party in committing an "interception" unless

22

Plaintiff proves that the third party committed an actionable interception, and BCH cannot be required to defend the actions of third parties.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because application of the Wiretap Act as interpreted by Plaintiff would violate the rule of lenity.

### THIRTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred because Plaintiff and the putative class members are not aggrieved persons intended to be protected by the Wiretap Act.

### THIRTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred because the conduct alleged was not secret.

### THIRTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred because the conduct alleged did not involve an oral or wire communication.

### THIRTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred because the conduct alleged did not involve an interception.

### FORTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred because their personal or property interest or privacy was not invaded in the course of an alleged interception.

### FORTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims and those of the putative class members are barred because the conduct alleged did not involve an intercepting device.

**FORTY-SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred because the conduct alleged did not involve the interception of the contents of communications.

**FORTY-THIRD AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred because BCH did not act willfully.

**FORTY-FORTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred under M.G.L. c. 272, § 99(B)(3) because BCH maintained a website in the ordinary course of business.

**FORTY-FIFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred under M.G.L. c. 272, § 99(D)(1)(b) because BCH utilized an office intercommunication system in the ordinary course of its business.

**FORTY-SIXTH AFFIRMATIVE DEFENSE**

There is no threat of impending future harm that would entitle Plaintiff or the putative class members to injunctive relief.

**FORTY-SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and those of the putative class members are barred, in whole or in part, because there is no basis for attorney's fees in this action.

24

Dated:  October 11, 2023        Respectfully submitted,

                                **THE CHILDREN'S HOSPITAL CORPORATION**

By:    /s/ *Emyr T. Remy*
       Emyr Remy (BBO # 704156)
       remy@shb.com
       SHOOK, HARDY & BACON L.L.P.
       One Federal Street, Suite 2540
       Boston, MA 02110
       Tel: 617.531.1411 | Fax: 617 531.1602

       Tammy B. Webb (*pro hac vice* forthcoming)
       Patrick J. Gregory (*pro hac vice* forthcoming)
       tbwebb@shb.com
       pgregory@shb.com
       SHOOK, HARDY & BACON L.L.P.
       555 Mission Street, Suite 2300
       San Francisco, CA 94105
       Tel: 415.544.1900 | Fax: 415.391.0281

       Jenn Odell Hatcher (*pro hac vice*)
       jhatcher@shb.com
       SHOOK, HARDY & BACON L.L.P.
       2555 Grand Blvd.
       Kansas City MO 64108
       Tel: 816.559.0306 | Fax: 816.421.5547

       Jessica N. Wahl (*pro hac vice* forthcoming)
       jwahl@shb.com
       SHOOK, HARDY & BACON L.L.P.
       2049 Century Park East, Suite 3000
       Los Angeles, CA 90067
       Tel: 424.324.3477 | Fax: 424.204.9093

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

/s/ Emyr T. Remy
Emyr T. Remy

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>     for herself and the class,<br><br>       v.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>     Defendant. | **SUPERIOR COURT DEPARTMENT<br>OF THE TRIAL COURT<br>BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00411-BLS1<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1.      Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, The Children's Hospital Corporation, which does business as Boston Children's Hospital ("Boston Children's"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, Boston Children's aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by Boston Children's (the "Boston Children's Website"). Boston Children's assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called

---

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of both Jane Doe and the minor children of Jane Doe. Ms. Doe's identity has been disclosed to counsel for the Defendant per the Court's order of January 22, 2023.

"tracking technologies." The Plaintiff's and Class Members' communications with the Boston Children's Website were secretly and contemporaneously monitored, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the Boston Children's Website, including all communications in the purportedly "secure" patient portal for the website.

2.      Boston Children's actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. That hidden code enabled Google, Facebook, and other third parties to eavesdrop on healthcare consumers' communications with Boston Children's. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3.      Healthcare consumers' electronic communications with Boston Children's were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent, including through tracking technologies hidden on many webpages of the Boston Children's Website that permitted third parties to intercept Private Information, including, without limitation, requests for information on particular conditions and treatments, keyword searches, doctor searches, appointment requests, and access to the website's patient portal (including access to medical records). Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care and to know about the nature of that medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

4.    Boston Children's did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the Boston Children's Website, nor do they seek or obtain their consent for such interception. On the contrary, Boston Children's **falsely** told healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

5.    Despite the confidentiality that healthcare consumers expect with respect to their medical conditions and care, Boston Children's chose to put its business interests over the privacy of its patients. The unilateral disclosure of users' Private Information in this manner violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

6.    As described more fully below, Plaintiff and Class Members have suffered injury as a result of Boston Children's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their Private Information.

7.    In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist*

*Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq*.), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

8.      In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

9.      The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, Boston Children's intercepted the electronic communications at issue in a manner that violated HIPAA and Massachusetts law (both statutory and common law causes of action, as described below). The ECPA thus provides a private remedy for Boston Children's interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

10.     Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Boston Children's Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common

claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

11.     Plaintiff is a resident of Burlington, Massachusetts. Plaintiff's minor children are patients at Boston Children's. Plaintiff regularly used the Boston Children's Website to (i) obtain information about Boston Children's doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her children; and (iii) obtain and review her children's medical records through the website's patient portal.

12.     As described below, Boston Children's implemented tracking technologies that intercepted communications between Boston Children's and healthcare consumers on nearly every page of the Boston Children's Website. The webpages Plaintiff visited on the Boston Children's Website were among the webpages on which Boston Children's embedded code for various tracking technologies, including Meta Pixel and Google Analytics. *See* ¶¶ 94-96, *infra* (tracking technologies embedded on pages relating to doctors); ¶¶ 85-89, *infra* (tracking technologies embedded on pages about symptoms and medical procedures); ¶¶ 103-12, *infra* (tracking technologies embedded on patient portal used to obtain medical records).

13.     Plaintiff did not consent to or authorize the use of Private Information by third parties or Boston Children's enabling third parties to access and use such Private Information.

14.     Defendant The Children's Hospital Corporation ("Boston Children's") is a corporation that operates in Boston, Massachusetts. Its functions include providing healthcare services at various facilities in Boston and the surrounding communities, including seven hospital campuses and four physician offices (the "Boston Children's Facilities"). All of the Boston Children's Facilities share the Boston Children's Website. Boston Children's maintains and controls the content of the Boston Children's Website.

## JURISDICTION

15.    The exercise of personal jurisdiction over Boston Children's is proper according to

M.G.L. c. 223 § 3 because, among other things, Boston Children's is located in and conducts business

in Massachusetts, and Plaintiff's claim arises out of Boston Children's activities and conduct in the

Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The Boston Children's Facilities and Its Website

16.    Boston Children's operates hospitals and other healthcare facilities in Boston and

surrounding communities. The Boston Children's facilities offer inpatient and outpatient care to

residents near Boston and surrounding communities in eastern Massachusetts. The facilities focus on

pediatric care and provide healthcare across various specialties, including heart and vascular care,

orthopedics, cancer, diabetes, surgery, newborn care, children's services, and trauma care.

17.    Boston Children's maintains the Boston Children's Website as a common website for

its hospitals and other healthcare facilities, found at https://www.childrenshospital.org/. Through

that website, healthcare consumers can obtain information about the services Boston Children's

provides, including information about doctors, services, and treatments provided by Boston

Children's for particular medical conditions.

18.    The Boston Children's Website is designed for communications with healthcare

consumers. The website includes the following functions:

(a)    The Boston Children's Website provides general information about the Boston
Children's Facilities.

(b)    The Boston Children's Website provides information about healthcare services
provided at the Boston Children's Facilities, communicated through service-specific
pages for a range of services such as an "Eating Disorders Program," "Emergency
Medicine," "Gynecology," and "Neurology," among others.

(c)    The Boston Children's Website provides substantive information about specific health
conditions through the website's "Conditions & Treatments" section, which presents

a comprehensive database of conditions Boston Children's treats, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Boston Children's.

(d)    The Boston Children's Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e)    The Boston Children's Website permits healthcare consumers to book an appointment online through the website.

(f)    The Boston Children's Website permits healthcare consumers to access and pay bills online.

(g)    The Boston Children's Website lets healthcare consumers access their private medical information online through the MyChildren's Patient Portal.

19.    Because the Boston Children's Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the Boston Children's Website**

20.    Healthcare consumers have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Boston Children's Website.

21.    Users of healthcare-related websites such as the Boston Children's Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Boston Children's will not share their private health information—including their communications with the website—with third parties without their consent.

22.    The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Boston Children's from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See*

M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as New England Baptist from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

23.     Healthcare consumers would **<u>not</u>** anticipate or expect that their communications with healthcare providers, including Boston Children's, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

24.     The expectations and understanding of users of Boston Children's Website were informed by what Boston Children's told them about how it handles their personal information.

25.     During the class period, the Boston Children's "Web Site User Privacy Rights" notice stated:

> Boston Children's Hospital is strongly committed to protecting the privacy of its online users: patients, families, donors, the media, and others. We do not collect personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g., web forms). **<u>We do not share voluntarily provided, personally identifiable information for any purpose other than its intended use.</u>**

(emphasis added). This was false. As explained more fully below, Boston Children's injected hidden code into its website that permitted third parties such as Google and Facebook to contemporaneously and surreptitiously intercept the contents of healthcare consumers' communications with the Boston Children's Website. That hidden code tracked the user's IP address (i.e., the user's unique identity on the internet), connected the IP address to the user's browsing activity, and shared that same information with third parties such as Google and Facebook. The tracking technologies revealed private health information about particular individuals to Google and Facebook. Google and

Facebook can then use the intercepted communications to serve personalized advertising to those individuals.

26.    The same policy also stated: "We collect some basic web log file data about site visitors. This information includes domain names, website traffic patterns and server usage statistics. This information is used for site management and administration and to improve the overall performance and user experience on our site." This statement was deceptive and false in multiple respects. This statement was deceptive by creating the false impression that only Boston Children's (i.e., "we'") logged such activity, when in reality, Boston Children's injected hidden code into its website permitting Google, Facebook, and other third parties to intercept and record each user's activity on the website. The statement was also false when it stated that log files are retained only for "site management" and "performance" purposes. Google, Facebook, and other third parties logged and used the intercepted communications for those third parties' own commercial purposes, including serving personalized advertising and applications for particular individuals identified and tracked through the tracking technologies.

27.    The same Boston Children's policy also stated that when a user completes a "form" on the Boston Children's Website, the "forms are located on a secure site," suggesting that Boston Children's took special measures to protect information a website user communicates to Boston Children's through the Boston Children's Website. This, too, was false. For certain forms on the Boston Children's Website, Boston Children configured its website to permit Google, Facebook, and other third parties to intercept the contents of information the website user has inserted into "forms" to communicate with the website. The Find-A-Doctor form described below is an example; as described below, Boston Children's had configured the form to communicate to Google, Facebook, and other third parties the contents of criteria the healthcare consumer selects in seeking a doctor.

28.     The same Boston Children's policy also stated: "We do not sell visitors' personal information to third parties, such as marketers." This too was deceptive. Although Google and Facebook did not pay money for Boston Children's to install their tracking technologies on the Boston Children's Website, Boston Children's did receive value in return, including free analytical data collected by Google and free advertising optimization from Facebook. That is, Boston Children's, in substance, bartered the content of its website visitors' communications with the Boston Children's Website in exchange for services by Google and Facebook that were valuable to Boston Children's.

29.     The same Boston Children's policy also contained a disclosure about website "cookies" that was likewise deceptive. As an initial matter, the tracking technologies upon which Plaintiff's claims are not based on cookies—as described below, the technologies are hidden snippets of Javascript code, which is a different technology. If any event, the "cookie" disclosure was deceptive by creating the false impression that (i) tracking of website users would only be for "record-keeping purposes" to track user "preferences"; (ii) cookies were only used to share "non-identifiable demographic information"; and (iii) the user could "turn off cookies."

30.     Setting aside the fact that tracking technologies such as Google Analytics and Meta Pixel are not "cookies" at all, the reality is (i) these tracking technologies are used for more than "record-keeping" but instead are used by third parties such as Google and Facebook for their own commercial purposes; (ii) the tracking technologies **do** share identifiable information, including user IP addresses and other unique identifiers; and (iii) turning off "cookies" for a website through your browser will not disable tracking technologies such as Google Analytics and Meta Pixel, primarily because, as noted, those technologies are not "cookies," and turning off cookies will not stop the execution of the hidden code for Google Analytics, Meta Pixel, and similar tracking technologies.

31.     Moreover, the cookie disclosure stated that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." This may be true for cookies, but it is not

true for Javascript-based tracking technologies such as Google Analytics and Meta Pixel. Both Google and Facebook maintain records on their own servers of all information intercepted and communicated to them through each tracking technology; exiting the Boston Children's site does not cause any such intercepted data to be deleted from the servers of third parties such as Google and Facebook.

32.     In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Boston Children's false and deceptive statements on the Children's Hospital Website. The interceptions of website users' communications with Boston Children's were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third Parties Offering Tracking Technologies**

33.     Plaintiff describes in this complaint various tracking technologies implemented on the Boston Children's Website that cause the secret interception, recording, and retransmission of the contents of Class Members' internet communications with Boston Children's. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Boston Children's and the purposes for which interceptions are made.

34.     Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

35.     Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

---

[2] Facebook rebranded its parent company as "Meta" in October 2021.

36.     Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

37.     Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

38.     Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

39.     Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

40.     Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

41.     Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's

---

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything,* Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis adeded).

search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

42.    Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals whether or not they have a Google account.

43.    Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

44.    One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google profits from Google Analytics by using the data it obtains for its own commercial purposes, including using that data to further build individuals' profiles. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

**Website Tracking Technologies on the Boston Children's Website**

45.    Boston Children's has injected hidden code into the Boston Children's Website that contemporaneously intercepts healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example,

associating the content of the user's communications with the Boston Children's Website with the website user's Facebook profile.

46.     These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Boston Children's, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

47.     Boston Children's uses several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

48.     Before describing how such technologies work, it is important to define some basic technological terms.

49.     A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

50.     An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Boston Children's Website, as of the time of this complaint, is 45.60.73.21. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

51.     A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://" For example, the URL for the main landing page for the Boston

14

Children's Website is https://www.childrenshospital.org/. URLs can also point to specific pages on a website; sometimes, website owners code their websites in a way that causes URLs to reveal information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive" URLs. The Boston Children's Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communication made through a particular page on the Boston Children's Website. For example, the Boston Children's Website has a page specifically about the Boston Children's Cancer and Blood Disorders Center; that page's URL is https://www.childrenshospital.org/centers/cancer-and-blood-disorders-center. That is, one can tell from the URL itself the substance of the communication between Boston Children's and the healthcare consumer—that the consumer is requesting information from Boston Children's about cancer and blood disorders.

52.     A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by Javascript code. Both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

53.     **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

54.     With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Boston Children's) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is then executed automatically within the individual's web browser.

55.     The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

56.     When the Javascript code causes the user's web browser to retrieve a file from the third party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as https://www.childrenshospital.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

57.     When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about

the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party, such as Google or Facebook, can then add the content of the user's communications with the Boston Children's Website to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

58.    The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to a third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

59.    The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and the Boston Children's Website contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

60.    The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed

---

[4]    *See*    https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

61.    Boston Children's appears to be among these websites that removed Meta Pixel in reaction to the Market Article. Based on archived versions of Boston Children's website, it appears Boston Children's removed Meta Pixel from its website in approximately late June 2022, within a few weeks after the Markup Article was published. Boston Children's, however, continued to secretly inject Google Analytics and several other third-party tracking technologies onto its website. These tracking technologies were each substantially similar to Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of communications with the website. Only approximately nine months after this lawsuit was filed did Boston Children's remove the tracking technologies described in this complaint from its website.

**Boston Children's Use of Tracking Technologies on the Boston Children's Website**

62.    During the class period, Boston Children's used various tracking technologies across the numerous web pages on the Boston Children's Website. Several of those tracking technologies were injected into the code of all, or almost all, of the pages within the Boston Children's Website. For example, on nearly every page of the Boston Children's Website, Boston Children's injected secret code for Google Analytics. It also appears Meta Pixel was injected into most webpages on the Boston Children's website before Boston Children's removed Meta Pixel in late June 2022.

63.    Approximately nine months after the initial complaint was filed in this case, it appears Boston Children's significantly limited its use of Google Analytics and other tracking technologies. The examples provided below of Boston Children's deployment of Google Analytics and other tracking technologies on the Boston Children's Website reflect such deployment around the time of

the original complaint in this action (or, as to Meta Pixel, prior to late June 2022). Boston Children's controls when and how it uses Google Analytics and other tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect Boston Children's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

64.    The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

65.    Below is an image of the main landing page for the Boston Children's Website:



66.    When a user loads the main landing page for the Boston Children's Website, the webpage causes the user's web browser to download from Google's servers a file called "ga.js," which contains the Javascript code for Google Analytics ("ga" stands for "Google Analytics," and "js" standards for Javascript). The website then causes the user's web browser to execute the Javascript code contained in the "ga.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

67.     The image below depicts the landing page for the Boston Children's Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



68.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics Javascript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers (with emphasis added):



69.    Among the information transmitted to Google's servers contemporaneously with the

communications between the website user and the Boston Children's Website are:

(a)    The URL of the webpage visited (the text after the letters "utmhn," which includes
the text "www.childrenshospital.org"); and

(b)    The title of the webpage (after the letters "utmdt," which includes "Home Page |
Boston Children's Hospital").

70.     The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Boston Children's).

71.     Notably, when the website user's web browser intercepts the contents of communications between the website user and the Boston Children's website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers necessarily reveals the user's unique IP address to Google.

72.     Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Boston Children's Website is the same individual.

73.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[5] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

74.     As noted, Boston Children's removed Meta Pixel from its website in late June 2022, likely in response to press coverage following the Markup Article. Archived versions of the Boston's

---

[5] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

Children website are available, however, on the Internet Archive's "Wayback Machine," which is a website that captures, retains, and makes publicly available historical versions of websites.[6] Archived versions of the Boston Children's Website available on the Wayback Machine confirm that Boston's Children implemented Meta Pixel code on the main landing page of its website more than three years before this complaint up to as recently as late June 2022.

75.    When Boston Children's used Meta Pixel, Meta Pixel loaded a Javascript file called "fbevents.js." That Javascript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Boston Children's Website. The network activity that was intercepted and transmitted to Facebook when loading the Boston Children's Website's landing page is depicted below (with highlighting added):

---

[6] *See* https://archive.org/web/.



76.     Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Boston Children's website, including the URL of the webpage visited. The transmission to Facebook also includes information about the user's browser configuration and various codes to associate the communications with Boston Children's advertising account with Facebook.

77.     Also, the Javascript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could serve personalized advertising to the website user in the future.

78.     Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique

combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

79.    The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the Boston Children's Website and further confirm that individual's real-world identity.

80.    Boston Children's also implemented an optional feature of both Google Analytics and Meta Pixel that closely tracked how a website user scrolls through and clicks different parts of a webpage. For example, a user scrolling down on the webpage would find the following area of the webpage relating to donations:



81.    When a user scrolled and clicked on an area—for example, the "Your impact" section in the page shown above, the user's actions were intercepted and transmitted to Facebook, including the text located in that area of the webpage. The information intercepted and transmitted to Facebook via Meta Pixel code is depicted below (with highlighting added):



As shown above, the Meta Pixel code that the user had performed a "ButtonClick" and revealed to Facebook the text the user had clicked.

82.     Similarly, Google Analytics code tracked when users scrolled through a webpage. The fact that the user scrolled to a lower part of the page is intercepted and transmitted to Google via Google Analytics.

83.     That is, Boston Children's aided Google and Facebook in intercepting information concerning the particular webpages visited by each user and each user's movements and clicks within a webpage.

84.     Boston Children's configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which Boston Children's embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with Boston Children's, including Private Information, were intercepted similarly to the illustrative examples set forth below.

85.     The Boston Children's Website contains more than three hundred subpages for specific "Programs" and "Departments." For example, the Boston Children's Website contains a page entitled "Emergency Psychiatry Service," designed to provide information to the website user about psychiatric services Boston Children's offers for children and adolescents. A user, by visiting this webpage, reveals to Boston Children's that the user has some interest in psychiatric services (for example, the user may have a child in need of psychiatric care). When the user communicates with Boston Children's by visiting this particular webpage, Boston Children's causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Emergency Psychiatric Service webpage:



86.    The graphic below presents the contents of the communication between the website user and Boston Children's that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics Javascript code that Boston Children's secretly injects into the website (with highlighting added):



87.     As reflected in the above screenshot, the code injected into the Boston Children's Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Emergency Psychiatric Service" webpage on Boston Children's website—information that Google retains and can use for its own commercial purposes.

88.     The same webpage also, until recently, contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. Boston

Children's caused the secret interception and transmission to Facebook of the contents of the communication between the website user and Boston Children's, including that the user is visiting an "Emergency Psychiatric Service" webpage, information that Facebook retains and can use for commercial purposes.

89.    The Boston Children's Website contains hundreds of similar pages on particular medical specialties and practices that the Boston Children's Facilities offer. For each such page, the Boston Children's Website aided in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Emergency Psychiatric Services example.

90.    The Boston Children's Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Boston Children's. When an individual uses the search function, Boston Children's aids in the secret interception of the contents of that search and transmission of those contents to Google, Facebook, and other third parties. Below, for example, is the search results page for "my child has stomach pain."



91.    When a user performs this search on the Boston Children's Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the information that the Google Analytics code causes to be transmitted to Google (with highlighting added):



92.    As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be transmitted to Google, which Google can then use for its own commercial purposes.

93.    Prior to the removal of Meta Pixel from the Boston Children's Website, healthcare consumers' searches on the Boston Children's Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code. Below is a screenshot showing how the search terms

would have been intercepted and transmitted to Facebook via hidden Meta Pixel code, as confirmed by an archived version of the website on the Wayback Machine (with highlighting added):

```
▼ Query String Parameters    view source    view URL-encoded
    id: 486220931531947
    ev: PageView
        https://www.childrenshospital.org/search/node?keys=my%20child%20has%
    dl:
        20stomach%20pain
    rl:
    if: false
    ts: 1654560786522
    sw: 1920
    sh: 1080
    v: 2.9.61
    r: stable
    ec: 2
    o: 30
    fbp: fb.0.1654560774832.1750915368
    it: 1654560751455
    coo: false
    rqm: GET
```

94.     The Boston Children's Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using search terms and other filtering criteria, such as locations and doctor gender. For example, the screenshot below depicts the search results page when a user with a child experiencing stomach pain enters the phrase "stomach pain"[7] into the search bar on the Find A Doctor Page and applies filters to search for male physicians within 25 miles of Boston zip code 02210:

---

[7] This is an example and does not reflect Plaintiff's personal activity on the website.



95.    Depicted below are the contents of the user's communication with the Boston

Children's website that are intercepted and transmitted to Google via hidden Google Analytics Code

(with highlighting added):



× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

v: 1

_v: j99

a: 1791540425

t: event

ni: 1

_s: 4

dl: https://doctors.childrenshospital.org/search?display_location=02210&distance=25&location=42.3517272%2C-71.0408624&sort=relevance%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&filter=gender%3AMale

ul: en-us

de: UTF-8

dt: Stomach pain in 02210 - ProviderMatch

sd: 24-bit

sr: 1920x1080

vp: 1294x962

je: 0

ec: Web Vitals

ea: FID

el: 1675378795737-9096337289761

ev: 1

_utma: 98476749.1679664301.1675354141.1675375204.1675378316.6

_utmz: 98476749.1675354141.1.1.utmcsr=google|utmccn=(organic)|utmcmd=organic|utmctr=(not%20provided)

_utmht: 1675378804442

_u: SDCCCEABBAAAACAEK~

jid:

gjid:

cid: 2082766424.1675354141

tid: UA-31344009-7

_gid: 1174674318.1675354294

z: 1567927039

96. The above screenshot reflects that when an individual enters a search on the Boston Children's "Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the

contents of the search and transmits them to Google, including not only the search terms entered by the user ("stomach pain") but also the other filtering criteria the user has selected (a location within 25 miles of 02210 and a male doctor in the above example). Google retains that information and may use it for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

97.    If the user then clicks on the "Request Appointment" button next to a particular doctor on the results page, that action is contemporaneously intercepted and retransmitted to Google. The page below depicts the information intercepted and retransmitted to Google (with highlighting added):



× Headers Payload Preview Response Initiator Timing

sr: 1920x1080
uaW: 1
uaa: x86
uab: 64
uafvl: Not_A%20Brand;99.0.0.0|Google%20Chrome;109.0.5414.120|Chromium;109.0.5414.120
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 2
sid: 1675378795
sct: 3
seg: 1
dl: https://doctors.childrenshospital.org/search?display_location=02210&distance=25&location=42.3517272%2C-71.0408624&sort=relevance%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&filter=gender%3AMale
dt: Stomach pain in 02210 - ProviderMatch
en: click_request_or_book_appointment_button
_c: 1
ep.gtm_container_id: GTM-P8QWWBF
ep.gtm_container_version: 465
ep.debug_mode: true
ep.event_category: Engagement
ep.event_action: Click Request or Book Appointment
ep.event_label: Stomach pain in 02210 - ProviderMatch
ep.gtm_tag_name: X - GA4 - Book Appointment
ep.value: 250
_et: 15400

98. That is, Boston Children's causes the surreptitious interception by Google of a prospective patient's request for an appointment with a particular doctor for a particular condition.

99. Before it removed Meta Pixel from the Boston Children's Website in or around late June 2022, searches using the Find-A-Doctor function were likewise intercepted and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the precise search terms entered

with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

100.    In addition to the "Request an Appointment" function through search results, the Boston Children's Website also includes a "Request an Appointment" form an individual can fill out to request an appointment with a Boston Children's physician. An individual visiting that page necessarily reveals that the individual is seeking medical care either for him or herself or for the individual's child. "The Request An Appointment" page is depicted below.



101.    When a user loads the request-an-appointment form, hidden Google Analytics code causes the secret interception and transmission to Google of the communication reflecting that user

accessed the form. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via the hidden Google Analytics code (with highlighting added):



102. When a user fills out the web form seeking an appointment and then submits the form, the action of submitting the form is likewise intercepted and transmitted to Google.

103. Portions of the Boston Children's website are designed to be accessible only by patients of Boston Children's. So-called "patient portals" are common on healthcare provider websites. Patient portals permit a patient of a healthcare facility to access medical records, pay bills, schedule visits, and renew medications, among other tasks.

104. After the publication of the Markup Article highlighting the use of Meta Pixel on hospital websites, including patient portals, some healthcare providers removed all tracking

technologies (including Meta Pixel and Google Analytics) from their patient portals. Boston Children's, however, elected to maintain Google Analytics within its patient portal (i.e., a portion of the website patients can access only after logging in), until it removed Google Analytics from its website approximately nine months after the original complaint in this case was filed. Boston Children's, therefore, continued to aid Google in intercepting communications with patients of the hospital for nearly a year and a half after The Markup article publicized the privacy perils of tracking technologies on medical provider websites.

105.    The fact that Boston Children's permitted Google to intercept communications with known patients concerning their medical condition, medical records, and other sensitive matters in a purportedly "secure" area of the website underscores Boston Children's total disregard for the privacy of its patients and other website users.

106.    For example, when a website user first accessed the login page for the patient portal, hidden Google Analytics code that Boston Children's injected into its own website caused the user's web browser to contemporaneously and surreptitiously communicate to Google that the user is visiting "Boston Children's Hospital External User Portal Login Page."

107.    When a patient or the patient's parent or guardian registered for an account on the patient portal, each step in that process was intercepted and contemporaneously transmitted to Google. When a website user first enrolled a patient in the patient portal, hidden Google Analytics caused the user's web browser to contemporaneously and surreptitiously communicate to Google that the website user is visiting the "MyChildrens Accounts – Add Patient" page.

108.    Then, when the website user added a dependent (i.e., the child patient) to the account, hidden Google Analytics code that Boston Children's injected into its own website caused the website user's web browser to contemporaneously and surreptitiously communicate to Google: "Add Dependent Complete" and that the website user's request to add a patient is "Pending."

109.    After a website user successfully registered an account and associated the account with actual Boston Children's patients, the website user could then view the patient's medical records, prescription, billing, and insurance information through the patient portal. Hidden Google Analytics code that Boston Children's injected into the patient portal caused the user's web browser to contemporaneously and surreptitiously track every click and page view in the patient portal and transmit that information to Google.

110.    For example, when a website user visited a page within the portal to view the patient's test results, the hidden Google Analytics code communicated to Google that the website user is visiting "mychildrens - Diagnostic Tests."

111.    Likewise, when a website user clicked on a button to renew medication, the hidden Google Analytics code communicated to Google that the user visited a page to "renew" "medications."

112.    And when a website user clicked on a link to view their billing summary, the hidden Google Analytics code communicated to Google that the user viewed his or her "Billing Summary."

113.    In addition to Google and Facebook, Boston Children's enables the communications between healthcare consumers and Boston Children's to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a)    **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Boston Children's inserts code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(b)    **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Boston Children's inserts code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(c)    **Hotjar.** Hotjar is a so-called "session replay" provider that records an entire browsing path through the Boston Children's website and then permits Boston Children's to "replay" a particular individual's visit to the website, including every mouse move, click, and page loaded on the website.

(d)    **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn. Similar to Meta Pixel, hidden Javascript code that Boston Children's injects into some pages on the Boston Children's Website cause the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's communications with the Boston Children's Website. LinkedIn can then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

114.    The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Boston Children's Website's operation. The Boston Children's Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

115.    Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Boston Children's via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

116.    Moreover, even if Boston Children's wanted to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate or lawful reason for Boston Children's to keep secret from its website users the use of these tracking technologies or to falsely and deceptively claim that it does not share the website communications with others and that it maintains the privacy of those communications.

**Boston Children's Violated HIPAA and the FTC Act.**

117.     Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[8]

118.     Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

119.     HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

120.     The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[9]

---

[8] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[9] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

121.    Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

122.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

123.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

124.    "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

125.    An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[10]

126.    Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[11]

127.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[12]

128.    In other words, the HHS has expressly stated that entities like Boston Children's that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

---

[10] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.9.
[11] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.
[12] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

129.    The HHS Bulletin discusses the harms that disclosure may cause patients:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

130.    Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

131.    The HHS Bulletin went on to state:

Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

132.    Boston Children's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

133.    Boston Children's is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

134.    Boston Children's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

135.    Boston Children's improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, (c) appointment requests, and (d) patients' status as patients of Boston Children's by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, medical records access, and the patient portals).

136.    For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors, medical procedures, and medical records through the patient portal, Boston Children's permitted third parties to intercept information about Plaintiff's (and her child's) doctors, specific treatments connected to Plaintiff, and Plaintiff's patient status, each of which is protected information under HIPAA (even though some of those pages are publicly accessible).

137.    Boston Children's improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Boston Children's disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

138.    Boston Children's violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health

information to allow access only to those persons or software programs that have been granted access

rights." 45 C.F.R. § 164.312(a)(1).

139.    Boston Children's further violated other HIPAA regulations as follows:

(e)    Boston Children's failed to ensure the confidentiality and integrity of electronic PHI that Boston Children's created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(f)    Boston Children's failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(g)    Boston Children's failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Boston Children's in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(h)    Boston Children's failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(i)    Boston Children's failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(j)    Boston Children's failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

140.    Commenting on a June 2022 report discussing the use of tracking technologies by

hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior

privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the

hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA

violation."[13]

141.    Boston Children's undisclosed use of tracking technologies on their website violates

Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private

---

[13] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

right of action, Boston Children's violation demonstrates its unlawful conduct, which is relevant to

other claims and establishes a breach of its duty to maintain patient privacy.

142.    Further reiterating the importance of and necessity for data security and privacy

concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin

entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather,
> **it is anything that conveys information—or enables an inference—about a**
> **consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom,
> BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using
> a particular health-related app or website—one related to mental health or fertility, for
> example—or how they interact with that app (say, turning 'pregnancy mode' on or off)
> may itself be health information.[14]

143.    The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare

companies that they should not use tracking technologies to collect sensitive health information and

disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy
> promises or otherwise harm consumers.

> In today's surveillance economy, the consumer is often the product. Consumer data
> powers the advertising machine that goes right back to the consumer. But when
> companies use consumers' sensitive health data for marketing and advertising
> purposes, such as by sending that data to marketing firms via tracking pixels on
> websites or software development kits on apps, watch out.

144.    The federal government takes violations of health data privacy and security seriously,

as reflected in several high-profile FTC settlements with healthcare providers.

145.    For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and

Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate

---

[14] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from
FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-
guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[15]

146.    Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[16]

**<u>Boston Children's Violated Industry Standards</u>**

147.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

148.    The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

149.    AMA Code of Ethics Opinion 3.1.1 provides:

---

[15] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[16] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), https://www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

150.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

151.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[17]

152.    Boston Children's, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Boston Children's failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

---

[17] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

**Plaintiff and Class Members Suffered Harm from Boston Children's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

153.    As a direct and proximate cause of Boston Children's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by Boston Children's conduct in the following ways:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b)    Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c)    Boston Children's denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Boston Children's services or would have demanded compensation for Boston Children's use of their Private Information if they had known of Boston Children's practices;

(d)    Boston Children's eroded the essential confidential nature of the provider-patient relationship;

(e)    General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f)    Nominal damages for each independent violation;

(g)    Boston Children's took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h)    Boston Children's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i)    Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

154.    Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.childrenshospital.org between three years

prior to the date of the filing of the initial complaint in this action and the date Boston Children's removed from the Boston Children's Website the tracking technologies described in this complaint.[18]

155.    This action is properly maintainable as a class action.

156.    The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

157.    Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a)    Whether communications between Class Members and Boston Children's, through the Boston Children's Website, were electronic communications under the ECPA.

(b)    Whether Boston Children's inserted tracking technologies into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel;

(c)    Whether the tracking technologies inserted into the hidden code of the Boston Children's Website are "electronic devices" as defined in the ECPA;

(d)    Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website;

(e)    Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f)    Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Boston Children's;

(g)    Whether Class Members' privacy interests were violated by the interceptions of their communications with the Boston Children's website;

(h)    Whether and to what extent Boston Children's had a duty to protect the IHII and PHI of Plaintiff and Class Members;

---

[18] This precise date will be determined through discovery.

(i)     Whether Boston Children's had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(j)     Whether the promises made in Boston Children's Web Site User Privacy Rights either were or formed part of a contract between Boston Children's and Plaintiff and Class Members;

(k)     Whether Boston Children's disclosure of Plaintiff's and Class Members' IHII and PHI breached its promises set forth in its Web Site User Privacy Rights, giving rise to liability for breach of contract;

(l)     If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

158.     Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Boston Children's Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

159.     Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

160.     A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

161.     Boston Children's has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

<u>COUNT I</u>

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)**

162.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

163.    The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

164.    An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and Boston Children's, through the Boston Children's, were electronic communications under the ECPA.

165.    The tracking technologies inserted into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Boston Children's Website; (ii) Class Members' web browsers used to access the Boston Children's Website; (iii) Boston Children's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Boston Children's Website.

166.    The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

167.     As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Boston Children's configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Boston Children's, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Boston Children's), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers. Boston Children's also used tracking technologies on pages that would confirm to third parties such as Google and Facebook individuals' likely status as Boston Children's patients, including pages through which patients could request appointments, pay bills, or request medical records.

168.     With respect to Plaintiff, the tracking technologies revealed information regarding the doctors, treatments, and patient status for Plaintiff (and her child) by configuring the tracking technologies to reveal the substance of communications regarding searches for doctors, requests for information on particular conditions, and requests for medical records through the patient portal.

169.     By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

170.     Additionally, through the above-described tracking technologies, after Boston Children's intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their

past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

171.    Boston Children's facilitated the interception of communications between the Class Members and Boston Children's, and Boston Children's disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

172.    The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

173.    Boston Children's intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

174.    Because of Boston Children's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

175.    As alleged above, Boston Children's violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

176.    HIPAA defines IIHI as:

any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

177.    Plaintiff's Private Information that Boston Children's disclosed to third parties qualifies as IIHI, and Boston Children's violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Boston Children's used the intercepted electronic communications to increase its revenues.

178.    The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Boston Children's specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

179.    Boston Children's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

180.    Boston Children's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Boston Children's use of the Facebook source code was for Boston Children's commercial advantage to increase revenue from existing patients and gain new patients.

181.    The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

182.    Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Boston Children's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT II

**(Violation of the Massachusetts Right to Privacy Act,
M.G.L. c. 214 § 1B, on behalf of the Class)**

183.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

184.    The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

185.    The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

186.    Boston Children's had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

187.    Plaintiff and Class Members did not authorize Defendant to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

188.    Boston Children's distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, Boston Children's conduct reflected a public disclosure of private facts.

189.    Additionally, Boston Children's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

190.    Boston Children's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

191.    Plaintiff and Class Members suffered injuries as a direct and proximate result of Boston Children's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

192.    Boston Children's acts or omissions violate the Massachusetts Right to Privacy Act.

193.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 153, *supra*), plus costs and attorneys' fees.

## COUNT III

### (Breach of Fiduciary Duty, on behalf of the Class)

194.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

195.    A fiduciary relationship existed between Boston Children's, a healthcare provider, and Plaintiff, a Boston Children's patient. Furthermore, Boston Children's assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff.

196.    When possessing nonpublic medical information, medical providers such as Boston Children's have a duty to keep such information completely confidential.

197.    Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Boston Children's through its website, which included highly sensitive Private Information. Boston Children's policies bolstered that expectation, given Boston Children's promises to Plaintiff that Boston Children's would not disclose communications on the website to third parties.

198.    Contrary to its duties as a healthcare provider and its express promises of confidentiality, Boston Children's installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare.

199.    These disclosures were made without Plaintiff's knowledge, consent, or authorization.

200.    Boston Children's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of Boston Children's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

201.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 153, *supra*).

## COUNT IV

### (Negligence, on behalf of the Class)

202.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

203.    Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Boston Children's owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

204.    Boston Children's breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

205.    It was reasonably foreseeable that Boston Children's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their

tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

206.    Boston Children's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between Boston Children's and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

207.    In addition, Boston Children's had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

208.    Boston Children's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

209.    Boston Children's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

210.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 153, *supra),* plus costs and attorneys' fees.

## COUNT V

### (Breach of Confidence, on behalf of the Class)

211.　　Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

212.　　Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

213.　　Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

214.　　When possessing nonpublic medical information, medical providers such as Boston Children's have a duty to keep such information completely confidential.

215.　　Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Boston Children's through its website, which included highly sensitive Private Information. Boston Children's policies bolstered that expectation, given Boston Children's promises to Plaintiff that Boston Children's would not disclose communications on the website to third parties.

216.　　In light of the special relationship between Boston Children's and Plaintiff and Class Members, whereby Boston Children's became a guardian of Plaintiff's and Class Members' Private Information, Boston Children's became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Boston Children's did and does store and disclose.

217.    Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Boston Children's installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Boston Children's and the contents of those communications, including Private Information.

218.    Boston Children's made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

219.    The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Boston Children's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Boston Children's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

220.    Boston Children's disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

221.    The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

222.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 153, *supra*), plus costs and attorneys' fees

## COUNT VI

**(Breach of Contract, on behalf of the Class)**

223.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

224.    Boston Children's required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Boston Children's Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for Boston Children's provision of services through the Boston Children's Website, including the provision of information and the use of the website to obtain medical services.

225.    In so doing, Plaintiff and Class Members entered into contracts with Boston Children's (or, in the alternative, implied contracts) by which Boston Children's agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Boston Children's contractual promises included that (i) Boston Children's would not share "personally identifiable information" with third parties and (ii) information on individuals' interactions with the Boston Children's Website would be used for only specified purposes, which did not include third-party marketing.

226.    Plaintiff and Class Members fully performed their obligations under the contract with Boston Children's.

227.    Boston Children's breached its agreement with Plaintiff and Class Members by directly breaching its promises not to share information regarding website communications with third parties and to use such information for only specified purposes.

228.    As a direct and proximate result of Boston Children's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private

Information and have been denied the benefit of the bargain of their agreement with Boston Children's.

229.     As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 153, *supra,* plus costs and attorneys' fees.

## **COUNT VII**

### **(Unjust Enrichment, on behalf of the Class)**

230.     Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

231.     This claim is pleaded in the alternative to Plaintiff's other causes of action.

232.     Boston Children's benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

233.     Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

234.     Boston Children's consciously collected and used this information for its own gain, providing Boston Children's with economic, intangible, and other benefits, including substantial monetary compensation.

235.     Boston Children's unjustly retained those benefits at the expense of Plaintiff and Class Members because Boston Children's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

236.    The benefits that Boston Children's derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Boston Children's to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

237.    Had Boston Children's informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of Boston Children's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

238.    The Court should compel Boston Children's to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Boston Children's unjustly received and such other relief as the Court may deem just and proper.

### **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.    Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b.    Awarding damages to Plaintiff and Class Members;

c.    Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.    Awarding such other and further relief which the Court finds just and proper.

**<u>Jury Demand</u>**

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 31, 2025                     Respectfully submitted,


                                            _/s/ Patrick J. Vallely_
                                            SHAPIRO HABER & URMY LLP
                                            Edward F. Haber (BBO #215620)
                                            Michelle H. Blauner (BBO #549049)
                                            Patrick J. Vallely (BBO #663866)
                                            One Boston Place
                                            Suite 2600
                                            Boston, MA 02108
                                            (617) 439-3939 – Telephone
                                            (617) 439-0134 – Facsimile
                                            ehaber@shulaw.com
                                            mblauner@shulaw.com
                                            pvallely@shulaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on January 31, 2025

<u>*/s/ Patrick J. Vallely*</u>
Patrick J. Vallely