CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

## 2384CV00411 Doe, For Herself And The Class, Jane vs. The Children's Hospital Corporation

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 02/15/2023 |
| **ACTION CODE:** | BE1 | **CASE TRACK:** | B - Special Track (BLS) |
| **DESCRIPTION:** | Fraud, Business Torts, etc. | | |
| **CASE DISPOSITION DATE:** | 02/20/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 02/20/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

### PARTIES

| Plaintiff | Attorney |
|---|---|
| **Plaintiff**<br>Doe, For Herself And The Class, Jane | **Attorney** 215620<br>Edward F Haber<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 10/03/2023<br><br>**Attorney** 549049<br>Michelle H Blauner<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108<br>Work Phone (617) 208-4713<br>Added Date: 02/15/2023<br><br>**Attorney** 663866<br>Patrick Vallely<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 07/26/2023 |

| | |
|---|---|
| **Defendant**<br>The Children's Hospital Corporation<br>300 Longwood Ave<br>Boston, MA 02115 | **Attorney** **666841**<br>Lisa Oliver White<br>Shook, Hardy and Bacon L.L.P.<br>Shook, Hardy and Bacon L.L.P.<br>One Federal St<br>Suite 2620<br>Boston, MA 02110<br>Work Phone (617) 531-1411<br>Added Date: 03/22/2024<br><br>**Attorney** **704156**<br>Emyr Remy<br>Shook, Hardy and Bacon L.L.P.<br>Shook, Hardy and Bacon L.L.P.<br>One Federal St<br>Suite 2620<br>Boston, MA 02110<br>Work Phone (617) 531-1411<br>Added Date: 05/12/2023<br><br>**Attorney** **PHV6320909IL**<br>Tara D. Kennedy<br>Shook, Hardy & Bacon, LLP<br>111 South Wacker Drive<br>Suite 4700<br>Chicago, IL 60606<br>Work Phone (312) 704-7700<br>Added Date: 01/07/2025 |
| **Other interested party**<br>Avery Epstein (PHV atty for The Children's Hospital Corporation)<br>111 S. Wacker Drive<br>Suite 4700<br>Chicago, IL 60601<br><br>**Other interested party**<br>Jad Sheikali, Esq. (PHV atty for The Children's Hospital Corporation)<br>111 S. Wacker Drive<br>Suite 4700<br>Chicago, IL 60606<br><br>**Other interested party**<br>Jessica N. Wahl(PHV atty for Defendant)<br>Shook, Hardy & Bacon L.L.P.<br>2049 Century Park East<br>Suite 3000<br>Los Angeles, CA 90067<br><br>**Other interested party**<br>Jonn O. Hatcher (PHV Atty for Defendant)<br>Shook, Hardy & Bacon LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108 | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| **Other interested party** | |
|---|---|
| Tara D. Kennedy (PHV atty for Defendant Childrens Hospital Corporation)<br>Shook, Hardy & Bacon L.L.P.<br>111 South Wacker Drive<br>Suite 4700<br>Chicago, IL 60606 | |

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 02/15/2023 | Civil Filing Fee (per Plaintiff) Receipt: 38548 Date: 02/15/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 02/15/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 38548 Date: 02/15/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 02/15/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 38548 Date: 02/15/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| 02/15/2023 | Civil Filing Fee (per Plaintiff) Receipt: 38548 Date: 02/15/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 02/15/2023 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 38548 Date: 02/15/2023 | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **520.00** | **520.00** | **0.00** | **0.00** |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 02/15/2023 | 1 | Complaint electronically filed. | |
| 02/15/2023 | 2 | Civil action cover sheet filed. | |
| 02/15/2023 | 3 | Plaintiff Jane Doe, For Herself And The Class's Motion to proceed under a Pseudonym | |
| 02/15/2023 | 4 | Affidavit | |
| 02/22/2023 | 5 | General correspondence regarding NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS1"<br>This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to BLS1. Dated: February 15, 2023 Notice sent 2/21/23 | Salinger |
| 02/22/2023 | | Endorsement on Motion to Proceed in Pseudonym (#3.0): ALLOWED<br>After review, Allowed. Plaintiff shall file a notice with the court disclosing plaintiff's true name and address. The notice shall be Impounded in the interest of justice until the completion of this case or further order of the court, and the notice shall be served on defendant with the complaint (or provided to defense counsel if the complaint has already been served). Dated: 2/16/23 Notice sent 2/21/23 | Krupp |
| 03/03/2023 | | Plaintiff Jane Doe, For Herself And The Class's Submission of IMPOUNDED notice of plaintiff's true identity | |
| 03/23/2023 | | Attorney appearance electronically filed. | |
| 03/23/2023 | 6 | Defendant The Children's Hospital Corporation's Assented to Motion for Extension Of Time To Respond To Plaintiff 's Complaint | |
| 03/23/2023 | | Endorsement on Motion for extension of time to respond to plaintiff's complaint (#6.0): ALLOWED<br>ALLOWED. Defendant shall answer or otherwise respond to the complaint by 5/1/2023.<br><br>(Dated 3/27/2023) Notice sent 3/30/2023 | Krupp |
| 03/28/2023 | 7 | Service Returned for | |
| 03/30/2023 | 7 | Service Returned for<br>Defendant The Children's Hospital Corporation: Service made in hand to Lita Maffet, Legal Agent ; | |
| 05/12/2023 | | Attorney appearance<br>On this date Emyr Remy, Esq. added for Defendant The Children's Hospital Corporation | |
| 05/12/2023 | | Attorney appearance electronically filed. | |
| 05/12/2023 | 8 | Defendant The Children's Hospital Corporation's Notice of Motion To Dismiss Plaintiff's Complaint | |
| 05/19/2023 | | Attorney appearance electronically filed. | |
| 05/19/2023 | | Attorney appearance<br>On this date Alan Ye-Hung Wong, Esq. dismissed/withdrawn for Defendant The Children's Hospital Corporation | |

| | | | |
|---|---|---|---|
| 06/15/2023 | 9 | Defendant The Children's Hospital Corporation's Submission of Request Pursuant To Rule 9A (6) For Leave Of Court To Exceed The Page Limit For Its Reply Memorandum In Support Of Its Motion To Dismiss<br>Notice sent 6/26/23 | |
| 06/23/2023 | | Endorsement on Submission of Request pursuant to Rule 9A(a)(6) for leave of court to exceed the page limit for its reply memorandum in Support of its Motion to Dismiss (#9.0): ALLOWED<br>(Dated 6/20/2023) | Krupp |
| 06/23/2023 | 10 | Defendant The Children's Hospital Corporation's Motion to dismiss Plaintiff's Complaint | |
| 06/23/2023 | 11 | The Children's Hospital Corporation's Memorandum in support of Motion to Dismiss Plaintiff's Complaint | |
| 06/23/2023 | 12 | Opposition to Motion to Dissmiss filed by Jane Doe, For Herself And The Class | |
| 06/23/2023 | 13 | Reply/Sur-reply<br><br>In Support Defendant of the Children's Hospital Corporation's Motion to Dismiss Plaintiff's Complaint | |
| 06/23/2023 | | Notice of Filing | |
| 06/30/2023 | | Event Result:: Rule 12 Hearing scheduled on:<br>07/21/2023 02:00 PM<br>Has been: Rescheduled For the following reason: Joint request of parties<br>Hon. Peter B Krupp, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Krupp |
| 07/06/2023 | 14 | Plaintiff, Defendant Jane Doe, For Herself And The Class, The Children's Hospital Corporation's Joint Motion to<br>Reschedule Hearing Date | |
| 07/12/2023 | | Endorsement on Motion to Reschedule Hearing Date (#14.0): ALLOWED<br>Dated 7/10/23<br>Notice sent 7/12/23 | Kazanjian |
| 07/24/2023 | 15 | Plaintiff Jane Doe, For Herself And The Class's Notice of Supplemental Authority | |
| 07/24/2023 | | Exhibits/Appendix | |
| 07/26/2023 | | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Jane Doe, For Herself And The Class | |
| 07/26/2023 | | Attorney appearance electronically filed. | |
| 07/26/2023 | 16 | Defendant The Children's Hospital Corporation's Assented to Motion for Leave To Admit Jenn O . Hatcher Pro Hac Vice | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 07/26/2023 | | Matter taken under advisement: Rule 12 Hearing scheduled on:<br>07/26/2023 02:00 PM<br>Has been: Held - Under advisement<br>Hon. Helene Kazanjian, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Kazanjian |
| 08/14/2023 | 17 | Defendant The Children's Hospital Corporation's Assented to Motion for Leave To Admit Jenn O . Hatcher Pro Hac Vice | |
| 08/25/2023 | | Endorsement on Motion for leave to admit Jenn O. Hatcher Pro Hac Vice (#17.0): ALLOWED<br>(Dated 8/18/23) Notice sent 08/28/23 | Kazanjian |
| 09/15/2023 | 18 | MEMORANDUM & ORDER:<br><br>For the foregoing reasons, Boston Children's motion to dismiss is DENIED. (Dated: 9/14/23)<br><br>Judge: Kazanjian, Hon. Helene<br><br>Notice sent 9/18/2023. | Kazanjian |
| 09/25/2023 | 19 | Defendant The Children's Hospital Corporation's Assented to Motion for Extension of Time to Respond to Plaintiff Jane Doe's Complaint | |
| 09/28/2023 | | Endorsement on Motion for extension of time to respond to complaint; assented to (#19.0): ALLOWED<br>Dated: 9/26/23<br>Notice sent 10/2/23<br><br>Applies To: The Children's Hospital Corporation (Defendant) | Kazanjian |
| 10/03/2023 | | Attorney appearance<br>On this date Edward F Haber, Esq. added for Plaintiff Jane Doe, For Herself And The Class | |
| 10/11/2023 | 20 | Answer to original complaint<br><br>Applies To: The Children's Hospital Corporation (Defendant) | |
| 10/16/2023 | 21 | Defendant The Children's Hospital Corporation's Notice of Single Justice Petition | |
| 10/17/2023 | | Defendant The Children's Hospital Corporation's Notice of motion to report | |
| 10/18/2023 | 22 | Notice of docket entry received from Appeals Court<br>Please take note that on October 16, 2023, the following entry was made on the docket of the above-referenced case (2023-J-0609): Petition pursuant to G.L. c. 231, s. 118 filed for The Children's Hospital Corporation by Attorney Emyr Remy. | |
| 10/23/2023 | 23 | Plaintiff Jane Doe, For Herself And The Class's Notice of Memorandum in Opposition to Defendant's Petition for Interlocutory Review to the Single Justice Pursuant to M.G.L.c. 231, 118 | |
| 10/25/2023 | 24 | Defendant The Children's Hospital Corporation's Assented to Motion for Leave to Admit Tara D . Kennedy Pro Hac Vice | |

| | | | |
|---|---|---|---|
| 11/06/2023 | 25 | Defendant The Children's Hospital Corporation's Motion to Report the Court's Order Denying Motion to Dismiss to the Appeals Court for Interlocutory Review | |
| 11/06/2023 | 26 | The Children's Hospital Corporation's Memorandum in support of Motion to Report the Court's Order Denying Motion to Dismiss to the Appeals Court for Interlocutory Review | |
| 11/06/2023 | 27 | Opposition to Motion to Report the Court's Order Denying Motion to Dismiss to the Appeals Court for Interlocutory Review filed by Jane Doe, For Herself And The Class | |
| 11/06/2023 | 28 | Reply/Sur-reply<br><br>Defendant's Reply in Support of its Motion to Report the Court's Order Denying Motion to Dismiss to the Appeals Court for Interlocutory Review | |
| 11/06/2023 | | Defendant The Children's Hospital Corporation's Notice of Filing and List and Superior Court Rule 9A List of Documents filed | |
| 11/06/2023 | 29 | Notice of docket entry received from Appeals Court<br>Please take note that on November 6, 2023, the following entry was made on the docket of the above-referenced case: ORDER: I am in receipt of a letter pursuant to Mass. R. A. P. 16(l) that indicates Superior Court Judge Kazanjian recently made a report under Mass. R. Civ. P. 64 in two similar cases. It appears that several of the issues raised are identical, or nearly identical, to issues raised in petition before me. I assume, but do not know, that the Superior Court may stay further proceedings in the trial court in related cases such as this one, pending the outcome of the reported cases. Under these changed circumstances, the petition and relief requested no longer seem current. Accordingly, on or before November 9 , 2023, the defendant is to file a status report that indicates whether it intends to proceed with the petition as previously filed, and if so, why. If, after reviewing the position of defendant, the plaintiff wishes to respond further, the plaintiff may do so on or before November 13, 2023. (Englander, J.)<br>*Notice/attest/Kazanjian, J. | |
| 11/10/2023 | | Endorsement on Motion to Report the Court's Order Denying Motion to Dismiss to the Appeals Court for Interlocutory Review (#25.0): DENIED<br>The Court has reported its decision in two substantially similar cases (Dockets 2384CV480-BLS1 and 2384854-BLS1) Further proceedings in this case are stayed pending the outcome of the reported cases.<br>(Dated: 11/9/23) Notice sent 11/15/2023. | Kazanjian |
| 11/15/2023 | | Endorsement on Motion for Leave to Admit Tara D . Kennedy Pro Hac Vice (#24.0): ALLOWED<br>(Dated 11/13/2023) Notice sent 11/21/2023. | Kazanjian |
| 11/16/2023 | 30 | Defendant The Children's Hospital Corporation's Assented to Motion for Leave To Admit Jessica W . Wahl Pro Hac Vice | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 11/22/2023 | 31 | Notice of docket entry received from Appeals Court<br>Please take note that on November 20, 2023, the following entry was made on the docket of the above-referenced case: ORDER: The defendant-petitioners in 2023-J-603 and 2023-J-609 filed petitions under G.L. c. 231, s. 118 (first par.) with the single justice in October, seeking leave to take an interlocutory appeal from the denial of their respective motions to dismiss by a judge of the Superior Court. The cases primarily concern the applicability of the Wiretap Act to the internet, and focus on the defendant hospitals' use of tracking technology on their websites. Following the filing of the petitions, the judge handling these cases in the Superior Court has reported the issue regarding the application of the Wiretap Act to this Court in two similar cases, pursuant to Mass. R. Civ. P. 64. While the judge declined to also report the cases that are the subject of the two petitions before me, further proceedings in these cases have been stayed in the Superior Court pending the outcome of the report. Under the circumstances, the petitioners' request for leave to take an interlocutory appeal is denied. While the petition in 23-J-603, also raises an additional question concerning whether the tracking technology leads to violations of the Privacy Act, G. L. c. 214, s. 1B, that issue does not independently merit interlocutory appellate review. While the issue may be an interesting one, it is evident from the pleadings that the parties currently dispute material facts, including whether the particular tracking software at issue allows third-party vendors to specifically identify website users by name. Such factual disputes speak against interlocutory review of the Privacy Act issue at this time. Leave to take an interlocutory appeal is denied for this additional reason. (Englander, J.)<br>Notice/attest/Kazanjian, J. | |
| 11/29/2023 | | Endorsement on Motion for Leave To Admit Jessica W . Wahl Pro Hac Vice (#30.0): ALLOWED<br>(Dated 11/20/2023)<br>Notice sent 11/30/23 | Kazanjian |
| 03/22/2024 | | Attorney appearance electronically filed. | |
| 01/06/2025 | 32 | Defendant The Children's Hospital Corporation's Assented to Motion for leave to admit Avery Epstein Pro Hac Vice | |
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Plaintiff: Edward F Haber, Esq. ehaber@shulaw.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Other interested party: Jonn O. Hatcher (PHV Atty for Defendant) Shook, Hardy & Bacon LLP 2555 Grand Blvd., Kansas City, MO 64108<br>Other interested party: Tara D. Kennedy (PHV atty for Defendant Childrens Hospital Corporation) Shook, Hardy & Bacon L.L.P. 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Other interested party: Jessica N. Wahl(PHV atty for Defendant) Shook, Hardy & Bacon L.L.P. 2049 Century Park East Suite 3000, Los Angeles, CA 90067<br>Sent On: 01/06/2025 12:55:01 | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 01/07/2025 | | Attorney appearance<br>On this date Tara D. Kennedy added for Defendant The Children's Hospital Corporation | |
| 01/07/2025 | 33 | Defendant The Children's Hospital Corporation's Motion for<br>Leave to admit Jad Sheikali Pro Hac Vice | |
| 01/09/2025 | | Endorsement on Motion for leave to admit Avery Epstein Pro Hac Vice (#32.0): ALLOWED<br>(Dated 1/7/2025) Notice sent 01/09/2025. | Krupp |
| 01/13/2025 | | Endorsement on Motion for Leave to admit Jad Sheikali Pro Hac Vice (#33.0): ALLOWED<br>(dated 1/9/25) Notice sent 01/13/2025. | Krupp |
| 01/15/2025 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on:<br>01/15/2025 11:00 AM<br>Has been: Held via Video/Phone<br>Hon. Peter B Krupp, Presiding | Krupp |
| 01/15/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Plaintiff: Edward F Haber, Esq. ehaber@shulaw.com<br>Defendant: Emyr Remy, Esq. remy@shb.com<br>Defendant: Lisa Oliver White, Esq. lowhite@shb.com<br>Defendant: Tara D. Kennedy 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Other interested party: Jonn O. Hatcher (PHV Atty for Defendant) Shook, Hardy & Bacon LLP 2555 Grand Blvd., Kansas City, MO 64108<br>Other interested party: Tara D. Kennedy (PHV atty for Defendant Childrens Hospital Corporation) Shook, Hardy & Bacon L.L.P. 111 South Wacker Drive Suite 4700, Chicago, IL 60606<br>Other interested party: Jessica N. Wahl(PHV atty for Defendant) Shook, Hardy & Bacon L.L.P. 2049 Century Park East Suite 3000, Los Angeles, CA 90067<br>Other interested party: Avery Epstein (PHV atty for The Children's Hospital Corporation) 111 S. Wacker Drive Suite 4700, Chicago, IL 60601<br>Other interested party: Jad Sheikali, Esq. (PHV atty for The Children's Hospital Corporation) 111 S. Wacker Drive Suite 4700, Chicago, IL 60606<br>Sent On: 01/15/2025 15:02:40 | |
| 01/17/2025 | 34 | ORDER: Scheduling Order<br>See paper #34<br>dated (1/15/25)<br><br>Notice Sent 2/3/25 | Krupp |
| 01/31/2025 | 35 | Amended: original complaint filed by Jane Doe, For Herself And The Class | |
| 02/10/2025 | 36 | Defendant The Children's Hospital Corporation's Notice of<br>Removal<br><br>(U.S. Dist. #25-cv-10343) | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | |
|---|---|
| 02/20/2025 | REMOVED to the U.S. District Court Of Massachusetts |
| 02/20/2025 | Case transferred to another court. |

I HEREBY ATTEST AND CERTIFY ON February 20, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Buckley
Asst. Clerk

1

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-0411-BLS1<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Jane Doe[1] ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, The Children's Hospital Corporation, which does business as Boston Children's Hospital ("Boston Children's"). Specifically, Boston Children's aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by Boston Children's (the "Boston Children's Website"). Boston Children's assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking software." The Plaintiff's and Class Members'

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of both Jane Doe and the minor children of Jane Doe. Ms. Doe's identity will be disclosed to counsel for the Defendant when agreements or court orders are in place that protect the privacy of Plaintiff and her children.

communications with the Boston Children's Website were secretly and contemporaneously monitored, recorded, and transmitted to these third parties without their knowledge or consent whenever they visited any page of the Boston Children's Website, including all communications in the purportedly "secure" patient portal for the website.

2. Boston Children's actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the Boston Children's Website, Boston Children's assists Google, Facebook, and others to intercept communications surreptitiously.

3. Boston Children's did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the Boston Children's Website, nor do they seek or obtain their content for such interception. On the contrary, Boston Children's **falsely** told (and continues to tell) healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications over the internet between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when

a. the identity of the parties to the communication;

b. the existence of the communication; **or**

c. any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms. The purposes for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.

7. Moreover, although this case concerns communications between healthcare consumers and healthcare providers, the Massachusetts Wiretap Act claim of the Plaintiff and the Members of the Class does not depend on the nature of the relationship between Plaintiff and the Members of the Class and Boston Children's. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.

8. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

9. Boston Children's aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with the Boston Children's Website. Plaintiff seeks statutory

remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Boston Children's Website.

## PARTIES

10. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff's minor children are patients at Boston Children's. Plaintiff regularly uses the Boston Children's Website to (i) obtain information about Boston Children's doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her children; and (iii) obtain and review her children's medical records through the website's patient portal.

11. Defendant The Children's Hospital Corporation ("Boston Children's") is a corporation that operates in Boston, Massachusetts. Its functions include providing healthcare services at various facilities in Boston and the surrounding communities, including seven hospital campuses and four physician offices (the "Boston Children's Facilities"). All of the Boston Children's Facilities share the Boston Children's Website. Boston Children's maintains and controls the content of the Boston Children's Website.

## JURISDICTION

12. The exercise of personal jurisdiction over Boston Children's is proper according to M.G.L. c. 223 § 3 because, among other things, Boston Children's is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Boston Children's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The Boston Children's Facilities and Its Website

13. Boston Children's operates hospitals and other healthcare facilities in Boston and surrounding communities. The Boston Children's Facilities offer inpatient and outpatient care to residents near Boston and surrounding communities in eastern Massachusetts. The facilities focus on

pediatric care and provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, newborn care, children's services, and trauma care.

14. Boston Children's maintains the Boston Children's Website as a common website for its hospitals and other healthcare facilities, found at https://www.childrenshospital.org/. Through that website, healthcare consumers can obtain information about the services Boston Children's provides, including information about doctors, services, and treatments provided by Boston Children's for particular medical conditions.

15. The Boston Children's Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Boston Children's Website provides general information about the Boston Children's Facilities.

(b) The Boston Children's Website provides information about healthcare services provided at the Boston Children's Facilities, communicated through service-specific pages for a range of services such as an "Eating Disorders Program," "Emergency Medicine," "Gynecology," and "Neurology," among others.

(c) The Boston Children's Website provides substantive information about specific health conditions through the website's "Conditions & Treatments" section, which presents a comprehensive database of conditions Boston Children's treats, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Boston Children's.

(d) The Boston Children's Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e) The Boston Children's Website permits healthcare consumers to book an appointment online through the website.

(f) The Boston Children's Website permits healthcare consumers to access and pay bills online.

(g) The Boston Children's Website lets healthcare consumers access their private medical information online through the MyChildren's Patient Portal.

16. Because the Boston Children's Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors,

specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the Boston Children's Website**

17. Healthcare consumers in Massachusetts have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Boston Children's Website.

18. Users of healthcare-related websites such as the Boston Children's Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Boston Children's will not share their private health information—including their communications with the website—with third parties without their consent.

19. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Boston Children's from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E.

20. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Boston Children's, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

21. The expectations and understanding of users of Boston Children's Website are informed by what Boston Children's tells them about how it handles their personal information.

22. The Boston Children's "Web Site User Privacy Rights" notice states:

> Boston Children's Hospital is strongly committed to protecting the privacy of its online users: patients, families, donors, the media, and others. We do not collect

> personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g., web forms). **We do not share voluntarily provided, personally identifiable information for any purpose other than its intended use.**

(emphasis added). This is false. As explained more fully below, Boston Children's injects hidden code into its website that permits third parties such as Google and Facebook to contemporaneously and surreptitiously intercept the contents of healthcare consumers' communications with the Boston Children's Website. That hidden code tracks the user's IP address (i.e., the user's unique identity on the internet), connects the IP address to the user's browsing activity, and shares that same information with third parties such as Google and Facebook. The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use to serve personalized advertising to those individuals.

23. Boston Children's Privacy Notice also says: "We collect some basic web log file data about site visitors. This information includes domain names, website traffic patterns and server usage statistics. This information is used for site management and administration and to improve the overall performance and user experience on our site." This statement is deceptive and false in multiple respects. This statement is deceptive by creating the false impression that only Boston Children's (i.e., "we"") logs such activity, when in reality, Boston Children's injects hidden code into its website permitting Google, Facebook, and other third parties to intercept and record each user's activity on the website. The statement is also false when it states that log files are retained only for "site management" and "performance" purposes. Google, Facebook, and other third parties log and use the intercepted communications for those third parties' own commercial purposes, including serving personalized advertising and applications for particular individuals identified and tracked through the tracking technologies.

24. The same Boston Children's Privacy Notice also states that when a user completes a "form" on the Boston Children's Website, the "forms are located on a secure site," suggesting that

Boston Children's takes special measures to protect information a website user communicates to Boston Children's through the Boston Children's Website. This, too, is false. For certain forms on the Boston Children's Website, Boston Children has configured its website to permit Google, Facebook, and other third parties to intercept the contents of information the website user has inserted into "forms" to communicate with the website. The Find-A-Doctor form described below is an example; as described below, Boston Children's has configured the form to communicate to Google, Facebook, and other third parties the contents of criteria the healthcare consumer selects in seeking a doctor.

25. The Boston Children's Privacy Notice also says: "We do not sell visitors' personal information to third parties, such as marketers." This too is deceptive. Although Google and Facebook do not pay money for Boston Children's to install their tracking technologies on the Boston Children's Website, Boston Children's does receive value in return, including free analytical data collected by Google and free advertising optimization from Facebook. That is, Boston Children's, in substance, barters the content of its website visitors' communications with the Boston Children's Website in exchange for services by Google and Facebook that are valuable to Boston Children's.

26. The Boston Children's Privacy Notice also contains a disclosure about website "cookies" that is likewise deceptive. As an initial matter, the tracking technologies upon which Plaintiff's claims are not based on cookies—as described below, the technologies are hidden snippets of Javascript code, which is a different technology. If any event, the "cookie" disclosure is deceptive by creating the false impression that (i) tracking of website users will only be for "record-keeping purposes" to track user "preferences"; (ii) cookies are only used to share "non-identifiable demographic information"; and (iii) the user can "turn off cookies."

27. Setting aside the fact that tracking technologies such as Google Analytics and Meta Pixel are not "cookies" at all, the reality is (i) these tracking technologies are used for more than "record-keeping" but instead are used by third parties such as Google and Facebook for their own

commercial purposes; (ii) the tracking technologies **do** share identifiable information, including user IP addresses and other unique identifiers; and (iii) turning off "cookies" for a website through your browser will not disable tracking technologies such as Google Analytics and Meta Pixel, primarily because, as noted, those technologies are not "cookies," and turning off cookies will not stop the execution of the hidden code for Google Analytics, Meta Pixel, and similar tracking technologies.

28. Moreover, the cookie disclosure states that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." This may be true for cookies, but it is not true for Javascript-based tracking technologies such as Google Analytics and Meta Pixel. Both Google and Facebook maintain records on their own servers of all information intercepted and communicated to them through each tracking technology; exiting the Boston Children's site does not cause any such intercepted data to be deleted from the servers of third parties such as Google and Facebook.

29. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Boston Children's false and deceptive statements on the Children's Hospital Website. The interceptions of website users' communications with Boston Children's were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

30. Plaintiff describes in this complaint various tracking technologies implemented on the Boston Children's Website that cause the secret interception, recording, and retransmission of the contents of Class Members' internet communications with Boston Children's. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Boston Children's and the purposes for which interceptions are made.

31. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[2] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

32. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

33. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

34. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

35. Facebook explains on its own website: "The Meta Pixel is a snipper of JavaSript code that allows [companies] to track visitor activity on your website."

36. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

---

[2] Facebook rebranded its parent company as "Meta" in October 2021.

37. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[3]

38. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

39. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

40. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

41. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google

---

[3] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis aded).

profits from Google Analytics by using the data it obtains for its own commercial purposes, including using that data to further build individuals' profiles. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

**<u>Website Tracking Technologies on the Boston Children's Website</u>**

42. Boston Children's has injected hidden code into the Boston Children's Website that contemporaneously intercepts healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the Boston Children's Website with the website user's Facebook profile.

43. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Boston Children's, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

44. Boston Children's uses several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

45. Before describing how such technologies work, it is important to define some basic technological terms.

46. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

47. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Boston Children's Website, as of the time of this complaint, is 45.60.73.21. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

48. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://" For example, the URL for the main landing page for the Boston Children's Website is https://www.childrenshospital.org/. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the Boston Children's Website has a page specifically about the Boston Children's Cancer and Blood Disorders Center; that page's URL is https://www.childrenshospital.org/centers/cancer-and-blood-disorders-center.

49. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by Javascript code. Both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

50. **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a

website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

51. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Boston Children's) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is then executed automatically within the individual's web browser.

52. The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

53. When the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as https://www.childrenshospital.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

54. When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with the Boston Children's Website to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

55. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

56. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and the Boston Children's Website contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

57. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[4] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

58. Boston Children's appears to be among these websites that removed Meta Pixel in reaction to the Market Article. Based on archived versions of Boston Children's website, it appears Boston Children's removed Meta Pixel from its website in approximately late June 2022, within a few weeks after the Markup Article was published. Boston Children's, however, continues, to the present, to secretly inject Google Analytics and several other third-party tracking technologies onto its website. These tracking technologies are each substantially similar to the now-removed Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of communications with the website.

**Boston Children's Use of Tracking Technologies on the Boston Children's Website**

59. Boston Children's uses various tracking technologies across the numerous web pages on the Boston Children's Website. Several of those tracking technologies are injected into the code of all, or almost all, of the pages within the Boston Children's Website. For example, on nearly every page of the Boston Children's Website, Boston Children's has injected secret code that loads Google Analytics. It also appears Meta Pixel was injected into most webpages on the Boston Children's website before Boston Children's removed Meta Pixel in late June 2022.

---

4 *See* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

60. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

61. Below is an image of the main landing page for the Boston Children's Website:




62. When a user loads the main landing page for the Boston Children's Website, the webpage causes the user's web browser to download from Google's servers a file called "ga.js," which

contains the Javascript code for Google Analytics ("ga" stands for "Google Analytics," and "js" standards for Javascript). The website then causes the user's web browser to execute the Javascript code contained in the "ga.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

63. The image below depicts the landing page for the Boston Children's Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




64. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics Javascript code causes the user's web browser to

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

intercept and transmit to Google when a small file is loaded from Google's servers (with emphasis added):

```
× Headers  Payload  Preview  Response  »
▾ Query String Parameters    view source    view URL-enco
  utmwv: 5.7.2
  utms: 2
  utmn: 2083379780
  utmhn: www.childrenshospital.org
  utmcs: UTF-8
  utmsr: 1920x1080
  utmvp: 1294x979
  utmsc: 24-bit
  utmul: en-us
  utmje: 0
  utmfl: -
  utmdt: Home Page | Boston Children's Hospital
  utmhid: 1133903223
  utmr: 0
  utmp: /
  utmht: 1675375205340
  utmac: UA-11514582-1
  utmgtm: 2og210KDCBQR
  utmcc: __utma=98476749.1679664301.1675354141.167537132
         2.1675375204.5;+__utmz=98476749.1675354141.1.1.u
         tmcsr=google|utmccn=(organic)|utmcmd=organic|utm
         ctr=(not%20provided);
  aip: 1
  utmjid: 501729719
  utmredir: 1
  utmu: qmAgAABAAAGBAAAAAgAAAAAE~
```

65. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Boston Children's Website are:

(a) The URL of the webpage visited (the text after the letters "utmhn," which includes the text "www.childrenshospital.org"); and

(b) The title of the webpage (after the letters "utmdt," which includes "Home Page | Boston Children's Hospital").

66. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Boston Children's).

67. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Boston Children's website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers necessarily reveals the user's unique IP address to Google.

68. Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Boston Children's Website is the same individual.

69. As noted, Boston Children's recently removed Meta Pixel from its website, likely in response to press coverage following the Markup Article. Archived versions of the Boston's Children website are available, however, on the Internet Archive's "Wayback Machine," which is a website that captures, retains, and makes publicly available historical versions of websites.[5] Archived versions of the Boston Children's Website available on the Wayback Machine confirm that Boston's Children

[5] *See* https://archive.org/web/.

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

implemented Meta Pixel code on the main landing page of its website more than three years before this complaint up to as recently as late June 2022.

70. When Boston Children's used Meta Pixel, Meta Pixel loaded a Javascript file called "fbevents.js." That Javascript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Boston Children's Website. The network activity that was intercepted and transmitted to Facebook when loading the Boston Children's Website's landing page is depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing »

▾ **Query String Parameters** view source view URL-encoded

id: 486220931531947
ev: PageView
dl: https://www.childrenshospital.org/
rl:
if: false
ts: 1651385346093
sw: 1920
sh: 1080
v: 2.9.57
r: stable
ec: 0
o: 30
fbp: fb.0.1651385346089.104345538
it: 1651385345395
coo: false
exp: p1
rqm: GET

71. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Boston Children's website, including the URL of the webpage visited. The transmission to Facebook also

includes information about the user's browser configuration and various codes to associate the communications with Boston Children's advertising account with Facebook.

72. Also, the Javascript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could serve personalized advertising to the website user in the future.

73. Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

74. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the Boston Children's Website and further confirm that individual's real-world identity.

75. Boston Children's also implemented an optional feature of both Google Analytics and Meta Pixel that closely tracked how a website user scrolls through and clicks different parts of a webpage. For example, a user scrolling down on the webpage would find the following area of the webpage relating to donations:

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number




76. When a user scrolled and clicked on an area—for example the "Your impact" section in the page shown above, the user's actions were intercepted and transmitted to Facebook, including the text located in that area of the webpage. The information intercepted and transmitted to Facebook via Meta Pixel code is depicted below (with highlighting added):

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response »
▾ **Query String Parameters** view source view URL-e
id: 486220931531947
ev: SubscribedButtonClick
dl: https://www.childrenshospital.org/
rl:
if: false
ts: 1654560826984
cd[buttonFeatures]: {"classList":"flex-cta-wrapper flex-cta-btn",
stination":"","id":"","imageUrl":"","innerTex
t":"Your impact\n\nWhether you make a donatic
r fundraise, you're helping the world's sicke
children and their families thrive. Lifesavir
are, answers and breakthroughs here at Bostor
ildren's Hospital are made possible by your g
rosity.\n\nSee how you give hope to all kids'
umChildButtons":2,"tag":"div"}
cd[buttonText]: Your impact
Whether you make a donation or fundraise,
u're helping the world's sickest children
their families th
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Home Page | Boston Childr
n's Hospital"}
cd[parameters]: []
sw: 1920
sh: 1080
v: 2.9.61
r: stable
ec: 2
o: 30
fbp: fb.0.1654560778097.392849214
it: 1654560770829
coo: false

As shown above, the Meta Pixel code that the user had performed a "ButtonClick" and revealed to Facebook the text the user had clicked.

77. Similarly, Google Analytics code tracked when users scrolled through a webpage. The fact that the user scrolled to a lower part of the page is intercepted and transmitted to Google via Google Analytics.

78. That is, Boston Children's aided Google and Facebook in intercepting information concerning the particular webpages visited by each user and each user's movements and clicks within a webpage.

79. Boston Children's configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

80. The Boston Children's Website contains more than three hundred subpages for specific "Programs" and "Departments." For example, the Boston Children's Website contains a page entitled "Emergency Psychiatry Service," designed to provide information to the website user about psychiatric services Boston Children's offers for children and adolescents. A user, by visiting this webpage, reveals to Boston Children's that the user has some interest in psychiatric services (for example, the user may have a child in need of psychiatric care). When the user communicates with Boston Children's by visiting this particular webpage, Boston Children's causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Emergency Psychiatric Service webpage:




81. The graphic below presents the contents of the communication between the website user and Boston Children's that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics Javascript code that Boston Children's secretly injects into the website (with highlighting added):

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator »

▾ Query String Parameters view source view URL-encoded

utmwv: 5.7.2
utms: 3
utmn: 240256340
utmhn: www.childrenshospital.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1311x979
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Emergency Psychiatry Service | Boston Children's Hospital
utmhid: 2112037926
utmr: 0
utmp: /programs/emergency-psychiatry-service
utmht: 1675378338536
utmac: UA-11514582-1
utmgtm: 45Xe3210n71KDCBQR
utmcc: __utma=98476749.1679664301.1675354141.1675375204.1675378316.6;+__utmz=98476749.1675354141.1.1.utmcsr=google|utmccn=(organic)|utmcmd=organic|utmctr=(not%20provided);
aip: 1
utmjid:
utmu: qmAgAABAAAGBAAAAAgAAAAAE~

82. As reflected in the above screenshot, the code injected into the Boston Children's Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Emergency Psychiatric Service" webpage on Boston Children's website—information that Google retains and can use for its own commercial purposes.

83. The same webpage also, until recently, contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. Boston

Children's caused the secret interception and transmission to Facebook of the contents of the communication between the website user and Boston Children's, including that the user is visiting an "Emergency Psychiatric Service" webpage, information that Facebook retains and can use for commercial purposes.

84. The Boston Children's Website contains hundreds of similar pages on particular medical specialties and practices that the Boston Children's Facilities offer. For each such page, the Boston Children's Website aids or aided in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Emergency Psychiatric Services example.

85. The Boston Children's Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Boston Children's. When an individual uses the search function, Boston Children's aids in the secret interception of the contents of that search and transmission of those contents to Google, Facebook, and other third parties. Below, for example, is the search results page for "my child has stomach pain."

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number




86. When a user performs this search on the Boston Children's Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the information that the Google Analytics code causes to be transmitted to Google (with highlighting added):

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

utmwv: 5.7.2
utms: 3
utmn: 1878211897
utmhn: www.childrenshospital.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1236x979
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Node | Search | Boston Children's Hospital
utmhid: 357601238
utmr: 0
utmp: /search/node?keys=my%2520child%2520has%2520stomach%2520pain
utmht: 1675453192346
utmac: UA-11514582-1
utmgtm: 45Xe3210n71KDCBQR
utmcc: __utma=98476749.1701630058.1675438606.1675450611.1675453167.3;+__utmz=98476749.1675453167.3.3.utmcsr=google|utmccn=(organic)|utmcmd=organic|utmctr=(not%20provided);
aip: 1
utmjid:
utmu: qmAgAABAAAGBAAAAAgAAAAAE~

87. As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be transmitted to Google, which Google can then use for its own commercial purposes.

88. Prior to the removal of Meta Pixel from the Boston Children's Website, healthcare consumers' searches on the Boston Children's Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code. Below is a screenshot showing how the search terms

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

would have been intercepted and transmitted to Facebook via hidden Meta Pixel code, as confirmed by an archived version of the website on the Wayback Machine (with highlighting added):

▾ **Query String Parameters** view source view URL-encoded

id: 486220931531947
ev: PageView
dl: https://www.childrenshospital.org/search/node?keys=my%20child%20has%20stomach%20pain
rl:
if: false
ts: 1654560786522
sw: 1920
sh: 1080
v: 2.9.61
r: stable
ec: 2
o: 30
fbp: fb.0.1654560774832.1750915368
it: 1654560751455
coo: false
rqm: GET

89. The Boston Children's Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using search terms and other filtering criteria, such as locations and doctor gender. For example, the screenshot below depicts the search results page when a user with a child experiencing stomach pain enters the phrase "stomach pain"[6] into the search bar on the Find A Doctor Page and applies filters to search for male physicians within 25 miles of Boston zipcode 02210:

[6] This is an example and does not reflect Plaintiff's personal activity on the website.




90. Depicted below are the contents of the user's communication with the Boston Children's website that are intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting added):

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded


v: 1

_v: j99

a: 1791540425

t: event

ni: 1

_s: 4

dl: https://doctors.childrenshospital.org/search?display_location=02210&distance=25&location=42.3517272%2C-71.0408624&sort=relevance%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&filter=gender%3AMale

ul: en-us

de: UTF-8

dt: Stomach pain in 02210 - ProviderMatch

sd: 24-bit

sr: 1920x1080

vp: 1294x962

je: 0

ec: Web Vitals

ea: FID

el: 1675378795737-9096337289761

ev: 1

_utma: 98476749.1679664301.1675354141.1675375204.1675378316.6

_utmz: 98476749.1675354141.1.1.utmcsr=google|utmccn=(organic)|utmcmd=organic|utmctr=(not%20provided)

_utmht: 1675378804442

_u: SDCCCEABBAAAACAEK~

jid:

gjid:

cid: 2082766424.1675354141

tid: UA-31344009-7

_gid: 1174674318.1675354294

z: 1567927039


91. The above screenshot reflects that when an individual enters a search on the Boston Children's "Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

contents of the search and transmits them to Google, including not only the search terms entered by the user ("stomach pain") but also the other filtering criteria the user has selected (a location within 25 miles of 02210 and a male doctor in the above example). Google retains that information and may use it for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

92. If the user then clicks on the "Request Appointment" button next to a particular doctor on the results page, that action is contemporaneously intercepted and retransmitted to Google. The page below depicts the information intercepted and retransmitted to Google (with highlighting added):

× Headers Payload Preview Response Initiator Timing

sr: 1920x1080
uaW: 1
uaa: x86
uab: 64
uafvl: Not_A%20Brand;99.0.0.0|Google%20Chrome;109.0.5414.120|Chromium;109.0.5414.120
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 2
sid: 1675378795
sct: 3
seg: 1
dl: https://doctors.childrenshospital.org/search?display_location=02210&distance=25&location=42.3517272%2C-71.0408624&sort=relevance%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&filter=gender%3AMale
dt: Stomach pain in 02210 - ProviderMatch
en: click_request_or_book_appointment_button
_c: 1
ep.gtm_container_id: GTM-P8QWW8F
ep.gtm_container_version: 465
ep.debug_mode: true
ep.event_category: Engagement
ep.event_action: Click Request or Book Appointment
ep.event_label: Stomach pain in 02210 - ProviderMatch
ep.gtm_tag_name: K - GA4 - Book Appointment
ep.value: 250
_et: 15400

93. That is, Boston Children's causes the surreptitious interception by Google of a prospective patient's request for an appointment with a particular doctor for a particular condition.

94. Before it removed Meta Pixel from the Boston Children's Website in or around late June 2022, searches using the Find-A-Doctor function were likewise intercepted and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the precise search terms entered

with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

95. In addition to the "Request an Appointment" function through search results, the Boston Children's Website also includes a "Request an Appointment" form an individual can fill out to request an appointment with a Boston Children's physician. An individual visiting that page necessarily reveals that the individual is seeking medical care either for him or herself or for the individual's child. "The Request An Appointment" page is depicted below.




96. When a user loads the request-an-appointment form, hidden Google Analytics code causes the secret interception and transmission to Google of the communication reflecting that user

accessed the form. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via the hidden Google Analytics code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

utmwv: 5.7.2
utms: 13
utmn: 210667260
utmhn: www.childrenshospital.org
utmcs: UTF-8
utmsr: 1920x1080
utmvp: 1545x1223
utmsc: 24-bit
utmul: en-us
utmje: 0
utmfl: -
utmdt: Request An Appointment | www.childrenshospital.org | Boston Children's Hospital
utmhid: 1911314669
utmr: -
utmp: /request-an-appointment
utmht: 1675381687101
utmac: UA-11514582-1
utmgtm: 2og210KDCBQR
utmcc: __utma=98476749.1679664301.1675354141.1675375204.1675378316.6;+__utmz=98476749.1675354141.1.1.utmcsr=google|utmccn=(organic)|utmcmd=organic|utmctr=(not%20provided);
aip: 1
utmjid: 1613902854
utmredir: 1
utmu: qmAgAABAAAGBAAAAAgAAAAAE~

97. When a user fills out the web form seeking an appointment and then submits the form, the action of submitting the form is likewise intercepted and transmitted to Google.

98. Portions of the Boston Children's website are designed to be accessible only by patients of the website. So-called "patient portals" are common on healthcare provider websites. Patient portals permit a patient of a healthcare facility to access medical records, pay bills, schedule visits, and renew medications, among other tasks.

99. After the publication of the Markup Article highlighting the use of Meta Pixel on hospital websites, including patient portals, some healthcare providers removed all tracking

technologies (including Meta Pixel and Google Analytics) from their patient portals. Boston Children's, however, elected to maintain Google Analytics within its patient portal (i.e., a portion of the website patients can access only after logging in). Boston Children's, therefore, continues to aid Google in intercepting communications with patients of the hospital.

100. As discussed above, Plaintiff's claim under the Massachusetts Wiretap Act depends on neither the nature of the contents of a communication nor whether a website user is already a patient of Boston Children's. The Wiretap Act prohibits **any** secret interception without regard to the contents of the communication or the relationship among the parties. Nonetheless, the fact that Boston Children's permits Google to intercept communications with known patients concerning their medical condition, medical records, and other sensitive matters in a purportedly "secure" area of the website underscores Boston Children's total disregard for the privacy of its patients and other website users.

101. For example, when a website user first accesses the login page for the patient portal, hidden Google Analytics code that Boston Children's has injected into its own website causes the user's web browser to contemporaneously and surreptitiously communicate to Google that the user is visiting "Boston Children's Hospital External User Portal Login Page."

102. When a patient or the patient's parent or guardian registers for an account on the patient portal, each step in that process is intercepted and contemporaneously transmitted to Google. When a website user first enrolls a patient in the patient portal, hidden Google Analytics causes the user's web browser to contemporaneously and surreptitiously communicate to Google that the website user is visiting the "MyChildrens Accounts – Add Patient" page.

103. Then, when the website user adds a dependent (i.e., the child patient) to the account, hidden Google Analytics code that Boston Children's has injected into its own website causes the

website user's web browser to contemporaneously and surreptitiously communicate to Google: "Add Dependent Complete" and that the website user's request to add a patient is "Pending."

104. After a website user has successfully registered an account and associated the account with actual Boston Childen's patients, the website user can then view the patient's medical records, prescription, billing, and insurance information through the patient portal. Hidden Google Analytics code that Boston Children's has injected the patient portal causes the user's web browser to contemporaneously and surreptitiously track every click and page view in the patient portal and to transmit that information to Google.

105. For example, when a website user visits a page within the portal to view the patient's test results, the hidden Google Analytics code communicates to Google that the website user is visiting "mychildrens - Diagnostic Tests."

106. Likewise, when a website user clicks on a button to renew medication, the hidden Google Analytics code communicates to Google that the user is visiting a page to "renew" "medications."

107. And when a website user clicks on a link to view their billing summary, the hidden Google Analytics code communicates to Google that the user is viewing his or her "Billing Summary."

108. In addition to Google and Facebook, Boston Children's enables the communications between healthcare consumers and Boston Children's to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Boston Children's inserts code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(b) **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Boston Children's inserts code into their website that causes communications between the user and the website to be intercepted by

and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(c) **Hotjar.** Hotjar is a so-called "session replay" provider that records an entire browsing path through the Boston Children's website and then permits Boston Children's to "replay" a particular individual's visit to the website, including every mouse move, click, and page loaded on the website.

(d) **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn. Similar to Meta Pixel, hidden Javascript code that Boston Children's injects into some pages on the Boston Children's Website cause the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's communications with the Boston Children's Website. LinkedIn can then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

109. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Boston Children's Website's operation. The Boston Children's Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

110. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Boston Children's via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

111. Moreover, even if Boston Children's wanted to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate or lawful reason for Boston Children's to keep secret from its website users the use of these tracking technologies or to falsely and deceptively claim that it does not share the website communications with others and that it maintains the privacy of those communications.

## Class Action Allegations

112. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.childrenshospital.org within three years prior to the date of the filing of this initial complaint in this action.

113. This action is properly maintainable as a class action.

114. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

115. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Boston Children's, through the Boston Children's Website, were wire communications under the Massachusetts Wiretap Act.

(b) Whether Boston Children's inserted tracking technologies into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Boston Children's Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Boston Children's;

(g) Whether Class Members' privacy interests were violated by the interceptions of their communications with the Boston Children's website;

(h) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

116. Plainitff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Boston Children's Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

117. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

118. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

119. Boston Children's has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

120. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

121. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any

wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

122. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Boston Children's, through the Boston Children's Website, were therefore wire communications under the Massachusetts Wiretap Act.

123. The tracking technologies inserted into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the Boston Children's Website; (ii) Class Members' web browsers used to access the Boston Children's Website; (iii) Boston Children's own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the Boston Children's Website.

124. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

125. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's installed an intercepting device on their website with the intent to aid

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Boston Children's.

126. Class Members' communications between the Class Members and Boston Children's were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

127. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Children's Hospital's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 15, 2023

Respectfully submitted,

/s/ *Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 1 23-0411 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S) Jane Doe, for herself and the class | | DEFENDANT(S) The Children's Hospital Corporation |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Michelle Blauner (BBO #549049)<br>Shapiro Haber & Urmy LLP<br>One Boston Place, Suite 2600<br>Boston, MA 02108 | | ATTORNEY (if known) |
| Origin Code Original Complaint | | |

I HEREBY ATTEST AND CERTIFY ON February 20, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * ________ (B) ☑ Yes ☐ No

# BK 1 - consumer matters involving complex issues

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this class action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the defendants aided in the interception of communications between Plaintiff and other Class Members and a website maintained by The Children's Hospital Corporation. These communications were intercepted by Google, Facebook (now known as "Meta"), and other companies that provide so-called "tracking software." Class Members' communications with the Children's Hospital Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the Children's Hospital Website or any page within that website.

Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party and any party that aids such an interception. The Children's Hospital Corporation aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the Children's Hospital Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Children's Hospital Website.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record /s/ Michelle H. Blauner
DATE: 02-15-23

√2/17

NOTIFY

3

2/10/23 After review, ALLOWED. Plaintiff shall file a notice with the court disclosing Plaintiff's true name and address. The notice shall be impounded in the interest of justice until the completion of this case or further order of the court, and the notice shall be served on defendant with the complaint (or provided to defense counsel if the complaint has already been served).

COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-0411-BLS1<br><br>**JURY TRIAL DEMANDED** |

**<u>PLAINTIFF'S MOTION TO PROCEED IN PSEUDONYM</u>**

Plaintiff respectfully moves, *ex parte*, to proceed in this action under the pseudonym Jane Doe, and to permit the impoundment of her name and the names of her minor children and/or other identifying information about herself or her minor children for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2.[1]

The material sought to be precluded from public disclosure (both through proceeding in pseudonym and by impoundment for future court filings) are names of Plaintiff and her minor children and/or other identifying information concerning Plaintiff and her minor children.[2] The impoundment is necessary because the facts of the underlying action relate directly and specifically to sensitive medical information for Plaintiff and her minor children. Specifically, the claim arises from the Defendant's systematic violation of the privacy rights of healthcare consumers who accessed its website, exposing sensitive personal information to third parties without those

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."
[2] This could include social media handles, IP addresses, etc.

Notice sent 2/21/23 (2) DC

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

consumers' knowledge or consent. The information revealed during this litigation may include medical conditions experienced and procedures obtained by Plaintiff and her minor children Therefore, to protect the medical information that will necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect Plaintiff, as Defendant has already mishandled her and her children's personal medical information. Plaintiff recognizes that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiff's full name, which could also be used to identify her minor children, would have the unwelcome effect of making impoundment a more laborious, tedious, and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW her Motion for Proceed in Pseudonym, including permitting Plaintiff to refer to herself by the pseudonym "Jane Doe" in her Complaint and future court filings and to redact any documents filed in the future that contain personal identifying information for Plaintiff or her minor children. Because Plaintiff files this

motion at the time of the complaint filing (as directed by the Court clerk) and before service, Plaintiff agrees that any order will be subject to modification for good cause upon motion by any party.

Dated: February 15, 2023

Respectfully submitted,

/s/ *Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON February 20, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

4

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-0411-BLS1<br><br>**JURY TRIAL DEMANDED** |

**AFFIDAVIT OF ATTORNEY MICHELLE H. BLAUNER IN SUPPORT OF PLAINTIFF'S MOTION TO PROCEED IN PSEUDONYM**

I, Michelle H. Blauner, hereby state and depose:

1. I am counsel for the Plaintiff in the above-captioned case.

2. Plaintiff is an individual, the identity of whom is known to me and my firm.

3. The allegations in Plaintiff's Complaint in this action, to the extent they relate to Plaintiff and her minor children, reflect information Plaintiff has provided to my firm to prosecute this action.

4. The claims Plaintiff asserts relate to personal information of both Plaintiff and her minor children that Defendants inappropriately assisted third parties to intercept. That personal information is highly sensitive, personal, and confidential. It involves not only Plaintiff but also her minor children.

5. To protect the privacy interests of the Plaintiff and her minor children, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout this litigation.

Date Filed 2/15/2023 9:38 AM
Superior Court - Suffolk
Docket Number

6. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery while protecting the legitimate privacy interests of Plaintiff and her minor children..

Signed under the pains and penalties of perjury this 15th day of February 2023.

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

NOTIFY

V2/17

5

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2384CV00411-BLS1**

Case: Doe v. Children's Hospital Corp.

## NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

Hereafter, as shown above, all parties must include the initials "**BLS1**" at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel. Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project). Counsel may indicate their respective client's participation by completing, filing, and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: February 15, 2023

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON February 20, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

Notice Sent 2/21/23 (2) DC

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ____________________

Case: ________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) **Yes,**_____________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ________________________________________

Docket Number CIVIL DOCKET#: ____________________

Counsel For__________________ Date______________

Firm Name and Address:

__________________________

__________________________

__________________________

Please complete this form and return it to:

| | | |
|---|---|---|
| Assistant Clerk - BLS1<br>BLS1, Room 1309<br>3 Pemberton Square<br>Boston, MA 02108 | **OR** | Assistant Clerk - BLS2<br>BLS2, Room 1017<br>3 Pemberton Square<br>Boston, MA 02108 |

0328

6

3/28

NOTIFY

3/30/23
Notice sent
BH (2)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO. 2384CV00411 BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

THE CHILDREN'S HOSPITAL CORPORATION,

Defendants.

**ASSENTED-TO MOTION FOR EXTENSION OF TIME**
**TO RESPOND TO PLAINTIFF'S COMPLAINT**

Defendant The Children's Hospital Corporation files this Assented-To Motion for an Extension of Time to Respond to Plaintiff's Complaint. In support of this Motion, The Children's Hospital Corporation states:

1. Plaintiff filed her Complaint on February 15, 2023.
2. Plaintiff served her Complaint on The Children's Hospital Corporation on March 16, 2023.
3. Granting The Children's Hospital Corporation the requested extension of time will allow the Parties to resolve this issue without Court intervention.
4. Good cause exists for the requested extension. The extension of time will not prejudice any party or the Court, nor will it unduly delay resolution of this matter.
5. The Children's Hospital Corporation's counsel has conferred with Plaintiff's counsel who does not oppose the requested five-week extension of time.

3/27/23 ALLOWED. Defendant shall answer or otherwise respond to the complaint by 5/1/23.

Date Filed 3/23/2023 12:33 PM
Superior Court - Suffolk
Docket Number 2384CV00411



For the foregoing reasons, The Children's Hospital Corporation respectfully requests that the Court grant a five-week extension of time up to and including May 12, 2023 for The Children's Hospital Corporation to respond to Plaintiff's Complaint.

DATED: March 23, 2023

Respectfully submitted,

*/s/ Alan Y. Wong*
Alan Y. Wong (BBO# 687618)
awong@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal St., Ste. 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

***Attorney for The Children's Hospital Corporation***

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

DOCKET NO. 2384CV00411

**RULE 9C CERTIFICATION**

On March 20, 2023 counsel for The Children's Hospital Corporation communicated with counsel for Plaintiff in a good faith effort to narrow the areas of disagreement regarding this motion. Plaintiff does not oppose to the relief requested in this motion.

*/s/ Alan Y. Wong*
Alan Y. Wong

**CERTIFICATE OF SERVICE**

I, Alan Y. Wong, hereby certify that on March 23, 2023, a true and accurate copy of the foregoing document was served electronically, by agreement, upon all counsel of record in the above-captioned matter.

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Alan Y. Wong*
Alan Y. Wong (BBO# 687618)

7

| Summons | CIVIL DOCKET NO. 2384CV00411-BLS1 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: JANE DOE, for herself and the class, Plaintiff(s) vs. THE CHILDREN'S HOSPITAL CORPORATION Defendant(s) | | Acting Clerk of Courts: John E. Powers, III, Suffolk Superior Civil, County. COURT NAME & ADDRESS: Three Pemberton Square Boston, MA 02108 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
3/28/2023
E - FILED
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

THIS SUMMONS IS DIRECTED TO THE CHILDREN'S HOSPITAL CORPORATION (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court <u>and</u> mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Court (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, <u>**AND**</u>

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address:

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

2380310

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger, Chief Justice on ____________, 20____. (Seal)

Acting Clerk ____________

I HEREBY ATTEST AND CERTIFY ON February 20, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Marjorie M. Michael
Asst. Clerk

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

PROOF OF SERVICE OF PROCESS

**Suffolk County Sheriff's Department** • 132 Portland Street, Boston, MA 02114 • (617) 704-6999

*Suffolk, ss.*

**March 16, 2023**

**I hereby certify and return that on 3/16/2023 at 12:20 PM I served a true and attested copy of the Summons, Complaint, Affidavit, Motion, Affidavit and Notice in this action in the following manner: To wit, by delivering in hand to Lita Maffet, Legal, agent and person in charge at the time of service for The Children's Hospital Corporation, at 300 Longwood Avenue Boston, MA 02115 . Attest/Copies ($5.00) Basic Service Fee (IH) ($30.00) Conveyance ($0.90) Postage and Handling ($1.00) Travel ($1.00) Total: $37.90**

Deputy Sheriff Terrance Williams

Terrance Williams

*Deputy Sheriff*

Date:

rev. 7/2022

Date Filed 5/12/2023 10:49 PM
Superior Court - Suffolk
Docket Number 2384CV00411

ML

8

COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00411-BLS1<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT THE CHILDREN'S HOSPITAL CORPORATION'S NOTICE OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Pursuant to Superior Court Rule 9E, Defendant The Children's Hospital Corporation d/b/a Boston Children's Hospital hereby notifies the Court that on May 12, 2023, and pursuant to Superior Court Rule 9A(b)(2), it served upon Plaintiff a Motion to Dismiss Plaintiff's Complaint, pursuant to Massachusetts Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

Dated: May 12, 2023

Respectfully submitted,

**THE CHILDREN'S HOSPITAL CORPORATION**

By: */s/ Emyr T. Remy*

Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Jenn Odell Hatcher (*pro hac vice* forthcoming)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City MO 64108
Tel: 816.559.0306 | Fax: 816.421.5547

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

Date Filed 5/12/2023 10:49 PM
Superior Court - Suffolk
Docket Number 2384CV00411

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2023, the foregoing was filed via the Court's Electronic Filing System. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

Date Filed 6/15/2023 3:11 PM
Superior Court - Suffolk
Docket Number 2384CV00411

ML

6\23 0621

NOTIFY

9

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss**

**TRIAL COURT DEPARTMENT**
**SUPERIOR COURT**
**DOCKET NO. 2384CV00411** BLS1

JANE DOE, for herself and the class,

Plaintiff,

v.

THE CHILDREN'S HOSPITAL CORPORATION,

Defendants.

6/26/23
Notice sent
BA (2)

**DEFENDANT THE CHILDREN'S HOSPITAL CORPORATION'S UNOPPOSED REQUEST PURSUANT TO RULE 9A(A)(6) FOR LEAVE OF COURT TO EXCEED THE PAGE LIMIT FOR ITS REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant The Children's Hospital Corporation ("Children's Hospital") hereby requests, pursuant to Superior Court Rule 9A(a)(6), leave of court to file a 10-page Reply Memorandum in Support of its Motion to Dismiss. In support of this Request, Children's Hospital states:

6/26/23 ALLOWED

1. On May 12, 2023, Children's Hospital served its Motion to Dismiss and supporting Memorandum of Law on Plaintiff and filed a Notice of Motion with the Court. (Dkt. No. 8).

2. Due to the complexities of this case, on May 17 and May 18, 2023, the Parties conferred pursuant to Superior Court Rule 9C and agreed to the following briefing schedule:

**June 9, 2023**: Plaintiff's Opposition to Children's Hospital's Motion to Dismiss Due

**June 23, 2023**: Deadline for Children's Hospital to file its 9A Motion to Dismiss

3. Plaintiff also agreed to provide Children's Hospital with five additional pages for its Reply Memorandum in Support of its Motion to Dismiss, for a total of 10 pages.

4. Plaintiff does not oppose this Request.

WHEREFORE, The Children's Hospital Corporation respectfully requests that this Court grant it leave to file a 10-page Reply Memorandum in Support of its Motion to Dismiss (not counting the caption, title, and signature block). Children's Hospital will endeavor to keep the reply brief as concise as possible.

DATED: June 15, 2023

Respectfully submitted,

**THE CHILDREN'S HOSPITAL CORPORATION**

Emyr T. Remy (BBO # 704156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: (617) 531-1411 | Fax: (617) 531-1602

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Jenn Odell Hatcher (*pro hac vice* forthcoming)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City MO 64108
Tel: 816.559.0306 | Fax: 816.421.5547

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

**CERTIFICATE OF SERVICE**

I, Emyr T. Remy, hereby certify that on June 15, 2023, a true and accurate copy of the foregoing document was served electronically upon all counsel of record in the above-captioned matter.

Emyr T. Remy

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Buckley
Asst. Clerk

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

06.28

10

DV

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00411-BLS1<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT THE CHILDREN'S HOSPITAL CORPORATION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendant The Children's Hospital Corporation d/b/a Boston Children's Hospital ("Boston Children's" or "BCH") moves pursuant to Massachusetts Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. As explained in BCH's supporting memorandum of law, Plaintiff's Complaint should be dismissed because Plaintiff's novel allegation claiming breach of the Massachusetts Wiretap Statute fails for at least five reasons:

1. Plaintiff does not allege any ***oral or wire communication*** involving BCH;
2. Plaintiff fails to allege an ***interception***;
3. Plaintiff has not alleged that BCH or anyone ... on;
4. Plaintiff fails to allege that BCH or anyone i ... BMC ... ***ents*** of any communication; and
5. Plaintiff fails to allege use of an ***intercepting***

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

For these reasons, and as discussed in its supporting memorandum of law, BCH requests that this Court grant its Motion to Dismiss.

Dated: May 12, 2023

Respectfully submitted,

**THE CHILDREN'S HOSPITAL CORPORATION**

By: */s/ Emyr T. Remy*
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Jenn Odell Hatcher (*pro hac vice* forthcoming)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City MO 64108
Tel: 816.559.0306 | Fax: 816.421.5547

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>for herself and the class,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00411-BLS1<br><br>**JURY TRIAL DEMANDED** |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT THE CHILDREN'S HOSPITAL CORPORATION'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. PLAINTIFF'S ALLEGATIONS ..... 2

II. THE META PIXEL ..... 3

III. GOOGLE ANALYTICS ..... 5

IV. IP ADDRESSES ..... 5

V. META AND GOOGLE'S DISCLOSURES AND PLAINTIFF'S CONSENT ..... 6

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. PLAINTIFF FAILS TO PLEAD AN ORAL OR WIRE COMMUNICATION. ..... 8

II. THERE WAS NO INTERCEPTION BY BCH. ..... 10

A. The alleged communications were not secret. ..... 10

B. BCH did not use an intercepting device. ..... 12

C. BCH did not intercept any "contents" of communications. ..... 13

CONCLUSION ..... 15

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6

*Cardoso v. Whirlpool Corp.*,
2021 WL 2820822 (S.D. Fla. July 6, 2021) ........ 12

*Commonwealth v. Alleyne*,
23 Mass. L. Rep. 606 (Mass. Super. Ct., Nov. 17, 2008) ........ 10

*Commonwealth v. Connolly*,
454 Mass. 808 (2009) ........ 9, 10

*Commonwealth. v. Hyde*,
434 Mass. 594 (2001) ........ 8, 9

*Commonwealth v. Maccini*,
22 Mass. L. Rep. 393 (2007) ........ 11

*Commonwealth v. Moody*,
466 Mass. 196 (2013) ........ 9

*Commonwealth v. Narvaez*,
490 Mass. 807 (2022) ........ 12

*Commonwealth v. Rainey*,
491 Mass. 632 (2023) ........ 8, 9, 11

*Connor v. Whirlpool Corp.*,
2021 WL 3076477 (S.D. Fla. July 6, 2021) ........ 12

*Dillon v. Mass. Bay Transit Authority*,
49 Mass. App. Ct. 309 (2000) ........ 8

*Edwards v. Commonwealth*,
477 Mass. 254 (2017) ........ 7

*Glovsky v. Roche Bros. Supermarkets, Inc.*,
469 Mass. 752 (2014) ........ 6

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)....................14

*Hill v. MCI WorldCom Communs., Inc.*,
120 F. Supp. 2d 1194, 2000 U.S. Dist. LEXIS 17466 (S.D. Iowa 2000)....................14

*Iannacchino v. Ford Motor Co.*,
451 Mass. 623 (2008)....................7

*Jacome v. Spirit Airlines*,
2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021)....................12

*Kurowski v. Rush Sys. for Health*,
2023 U.S. Dist. LEXIS 35702 (N.D. Ill. March 3, 2023)....................13

*Lipsitt v. Plaud*,
466 Mass. 240 (2013)....................6

*Marquis v. Google, Inc.*,
2014 WL 4180400 (Mass. Jul. 27, 2014)....................10, 11

*Potter v. Havlicek*,
2008 WL 2556723 (S.D. Ohio June 23, 2008)....................12

*Rich v. Rich*,
28 Mass. L. Rep. 553, 2011 WL 3672059 (Mass. Super. Ct., July 8, 2011)....................10

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018)....................11

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012)....................12

*United States v. Ackies*,
918 F.3d 190 (1st Cir. 2019)....................12

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014)....................14

## INTRODUCTION

Defendant The Children's Hospital Corporation d/b/a Boston Children's Hospital ("Boston Children's" or "BCH") moves pursuant to Rule 12(b)(6) to dismiss this case for failure to state a claim. Plaintiff filed this putative class action against BCH for an alleged interception of internet communications. Plaintiff alleges that when she visited BCH's websites, the Meta[1] Pixel and Google Analytics technology embedded in BCH's websites recorded and sent her and others' website activity to Meta and Google. (Complaint, ¶¶ 22-23)

Notably, Plaintiff alleges a single cause of action — breach of the Massachusetts Wiretap Statute, M.G.L. c.272 § 99 ("Wiretap Statute" or "Statute"). Her novel attempt to invoke the Wiretap Statute fails for multiple reasons.

Plaintiff does not allege any oral or wire communication involving BCH. The Legislature enacted the Statute in the 1960s to address, primarily in the criminal context, the recording of human-to-human communications. While the Statute has permitted a civil action, Massachusetts appellate courts have never found that "hidden code" that permits third parties to "intercept and record" user activity on a website (Complaint, ¶¶ 22–23) (or anything remotely like it) constitutes communications that could be "wiretapped." Neither the plain language of the Statute, its history, nor Massachusetts case law support Plaintiff's attempt to sweep in website activity allegedly recorded by Meta and Google's technology to be an oral or wire communications.

Even if Plaintiff had pled an oral or wire communication, she has, for three reasons, failed to plead any "interception" as that term is defined in the Wiretap Statute.

***First***, an interception must be secret. Plaintiff has not alleged that BCH or anyone ***secretly*** obtained this data. It is common knowledge that Facebook, Google, and other companies collect data about its users' browsing activities on the Internet. Those companies use that data for a variety of purposes, including targeted advertisements. What's more, Facebook users specifically agree to Meta's Terms of Service and Privacy Policy, which permits Meta to collect information about their

[1] Meta, formerly known as The Facebook Company, is the developer and proprietor of the Facebook social media application. Complaint ¶ 31.

interactions with websites across the Internet, and which discloses that Meta uses cookies, pixels, and other technologies to collect information about websites they visit. *See* Facebook's Terms of Service, available at https://www.facebook.com/terms. Similarly, when Google users utilize Google services, they agree to Google's Privacy Policy to permit Google to collect information regarding the use of the website(s) visited. *See* Google's Privacy Policy at https://policies.google.com/privacy.

As a result, when Plaintiff visited third-party websites that include Facebook and Google codes, their browsers sent Facebook and Google the URL of the pages they visited. This is an entirely ordinary part of Internet commerce; BCH's websites include the same code that is present on countless websites. Because she consented to all these disclosures, Plaintiff cannot hold BCH liable for its limited role in Meta's and Google's accumulation of user data.

***Second***, "contents" must be intercepted to meet the statutory definition. Plaintiff has failed to allege that BCH (or anyone) intercepted the substantive contents of any communication. Plaintiff has only pled examples of typical interactions with public websites, failing to identify the contents of any "communication" ***she*** had with the BCH website. Moreover, she alleges only that the information collected includes buttons clicked, webpages visited, and search queries. Courts have rejected the notion that such "non-record" information constitutes "contents."

***Third***, the Statute's definition of interception requires that an "intercepting device" was used. The crux of Plaintiff's claim lies against Meta and Google's software code. But courts have routinely held under similarly worded wiretap laws that software code, such as a website pixel or tag, is not a device or apparatus.

Because Plaintiff has not alleged (1) an oral or wire communication, and (2) an interception, her lawsuit must be dismissed.

## BACKGROUND

### I. PLAINTIFF'S ALLEGATIONS

Boston Children's is a healthcare system in Boston, Massachusetts. Complaint ¶ 11. It owns and maintains one website that is at issue in this matter – childrenshospital.org (the

"Website".) *Id.* at ¶ 14. The Website hosts BCH's patient portal, which provides BCH's patients secure web-based access to portions of their medical information. *Id.* at ¶ 15. Plaintiff claims that the Website can be used to search for information related to specific health conditions, to pay bills, request an appointment, find a doctor, and the like. *Id.*

Plaintiff alleges that BCH implemented various advertising technology on its public facing website and its patient portal, including Google Analytics and the Meta Pixel. *Id.* at ¶ 2. Plaintiff further alleges that BCH tracks buttons pressed, searches, scrolls, mouse movements, and form submissions through two main forms of advertising technology: (1) Google Analytics and (2) Meta Pixel. Plaintiff acknowledges that BCH removed the Meta Pixel in 2022. *Id.* at 58.

Plaintiff's Complaint is fatally defective at the outset in that she fails to allege that she even accessed the Website at issue. Even assuming that she did access the Website, Plaintiff does not allege a single date, or year, that she accessed the Website. All Plaintiff pleads are hypothetical examples of website interactions a visitor *could* have. *Id.* at ¶¶ 59-107. Plaintiff does not even allege that she is a patient of BCH. *Id.* at ¶ 100. In fact, Plaintiff acknowledges in her Complaint that all the alleged "interceptions" in the Complaint are examples and "**do[] not reflect Plaintiff's personal activity on the website**." *Id.* at fn. 6 (emphasis added).

## II. THE META PIXEL

Advertising technologies have long been an ordinary, ubiquitous part of internet commerce. One kind of advertising technology is a pixel, which website owners use to gather information about visitors' interactions with their websites. This technology allows website operators to improve their websites' effectiveness by using analytics, reach target audiences, and hone marketing efforts. Separately, entities like Meta often use pixel data in conjunction with cookies—small pieces of text—to gather information about their users' browsing histories.

Here's how the Meta Pixel works: many Internet users have a Facebook account. *See* Complaint ¶ 32. By signing up for Facebook, those users give Meta permission to place cookies on the users' personal browsers, and those cookies contain information—like a user's Facebook ID—that allows Facebook to identify users. *See Id.* ¶ 34. Facebook installs cookies on its users'

browsers to understand how they interact with other websites. This process is not controlled or triggered by BCH (or any website operator's) use of pixel technology. *See Id.* ¶ 36.

Meanwhile, the website owner incorporates code (a tag or "pixel") in its website that gathers information about a visitor's interaction with the website. *Id.* at 42. That information, standing alone, is anonymous. It shows only that some device visited a particular webpage, or entered a particular search in the website's search bar. *See Id.* The pixel sends this anonymous information from the website to the visitor's browser. The user's browser then sends two distinct pieces of information to Facebook: (1) the anonymous website activity generated by the pixel, and (2) the information stored in the Facebook cookie installed on the user's browser.

In other words, the only potentially identifying information sent to Facebook (the Facebook ID) is placed in the cookie by Facebook (not BCH) based on the user's consent to have those cookies installed on their browser. BCH never possesses—or has the ability to possess—the information contained in third-party cookies. And there is no direct communication between BCH and Facebook; all information flows through the visitor's personal browser. *See Id.* ¶¶ 54-56. Facebook is the entity that then combines the two pieces of data to identify who visited a particular webpage and potentially offer targeted advertising to the user on Facebook. *Id.* at ¶ 54.

Notably, the pixel itself logs only the activity on the specific webpages that include the pixel. *See Id.* at 59. For example, if a business wants to know how many people are interested in a particular product, the business might add a Meta Pixel to the webpage dedicated to that product, so that it can gain insights on visitor engagement with that webpage. If, however, the business decides not to add the pixel code to a specific webpage, neither Meta nor the business will receive information about visitors' interactions with that webpage.

Importantly, throughout this process, Plaintiff retains full control over both their Facebook privacy settings (such as turning off or limiting sharing information with Facebook) and their personal browser and cookie retention settings (such as blocking or deleting cookies.)

## III. GOOGLE ANALYTICS

Another type of advertising technology website owners and operators frequently use to provide insights into their business is Google Analytics. Google owns Google Analytics, which works very differently than the Meta Pixel. *Id.* at ¶ 38. Google Analytics is not a pixel at all, but instead uses JavaScript code and cookies to monitor business activity. *Id.* at ¶ 60.

Here is how Google Analytics works: to use Google Analytics, the website owner adds a small piece of JavaScript to the pages of the website that the website owner wishes to collect data from. *Id.* at ¶ 51. Every time a user visits a webpage, the tracking code will collect pseudonymous information about how that user interacted with the page. *Id.* at ¶ 53. The code can show how many users visited one page versus another, how many purchased a certain product, etc. Unlike the Meta Pixel, Google Analytics does not have any cookies that can identify a specific user. Instead, a non-personally identifiable ID string is set which indicates that a user is browsing a particular webpage. *Id.* at ¶ 47. This randomized string of numbers cannot be tied to a particular user to indicate that an individual is browsing a particular webpage.

## IV. IP ADDRESSES

Plaintiff claims that personally identifying information has been disclosed to third parties. This is based upon the premise that the user's IP address is sent to Facebook or Google with other information about their website visit that was allegedly recorded. Complaint ¶ 47. But that is not how IP addresses work. An IP address consists of four decimal numbers separated by periods which route messages on the Internet—e.g., 123.45.678.9. *Id.* When a user wants to go to a website, their browser (i.e. Safari, Google Chrome, etc.) sends an information request to the website. At that point, the website needs to know where to send the content of the webpage, so the IP address is used to insure that the webpage is displayed correctly. *Id.*

Despite Plaintiff's allegation otherwise, IP addresses cannot be used to identify a particular person. IP addresses are not assigned to an individual, but rather, to a device or router, a mechanical component. In fact, there can be multiple IP addresses affiliated with an individual user based upon the device or router location, and similarly, multiple users can be affiliated with the same IP

address. Therefore, it is impossible to pin point definitively the identity of an individual based upon an IP address.

## V. META AND GOOGLE'S DISCLOSURES AND PLAINTIFF'S CONSENT

The fact that Facebook and/or Google collects information regarding Plaintiff's browsing information—including from third-party websites—should not come as a surprise. Facebook users consent to the transmission and use of data sent to Facebook and Meta via the Meta pixel. When they sign up for Facebook, they agree to Facebook's policies. As Facebook's policies explain, Facebook collects data about Plaintiff's browsing activities across the Internet—known as "off-Facebook activity"—through cookies and tools like the Meta Pixel, including information about the websites they visit and the content they interact with. Facebook tracks this information to help personalize and improve content and services, provide a safer experience and to show you useful and relevant ads on and off Meta Products. *Id.* at ¶ 34. Facebook also gives its account holders the ability to stop Facebook from tracking their off-Facebook activity. *See* Ex. A-1 (Meta's Cookies Policy). *See* Ex. A-2 ("Off-Facebook Activity: Control your information"); *see also* Ex. A-3 (Facebook Help Center: "How do I manage my future off-Facebook activity"). Plaintiff also has control over whether her browser retains cookies. *Id.*

Similarly, users should not be surprised that Google obtains similar data and information. When users sign up to use Google's services, they are subject to Google's privacy policies. As Google's policies explain, Google collects information to provide better services for users through cookies and Google Analytics. Complaint ¶ 41.

## LEGAL STANDARD

To survive a Rule 12(b)(6) challenge, a complaint must "plausibly suggest an entitlement to relief, raising the right to relief above the speculative level." *Glovsky v. Roche Bros. Supermarkets, Inc.*, 469 Mass. 752, 754 (2014) (citation and quotation marks omitted). The pleading "must contain allegations plausibly suggesting (not merely consistent with) an entitlement to relief." *Lipsitt v. Plaud*, 466 Mass. 240, 252 (2013) (citation and quotation marks omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007); *see also, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 635 (2008) ("adopt[ing] the . . . standard that was recently articulated by the United States Supreme Court in *Bell Atl. Corp. v. Twombly*). Nor will "legal conclusions cast in the form of factual allegations." *Edwards v. Commonwealth*, 477 Mass. 254, 260 (2017) (quotation marks omitted).

## ARGUMENT

Plaintiff's novel claim against BCH fails under the Wiretap Statute. Plaintiff has not pled, nor can she plead, that there was (1) an oral or wire communication and (2) an interception.

"The term 'oral communication' means speech, except such speech as is transmitted over the public air waves by radio or other similar device." M.G.L. c.272 § 99(B)(2). Plaintiff does not (and cannot) plead that there was an oral communication between her and BCH related to her claim.

Plaintiff instead claims there were wire communications. "The term 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." M.G.L. c.272 § 99(B)(1). As demonstrated below, Massachusetts courts have never found that mere website visits are "wire communications" within the meaning of the Statute. Instead, the courts have required **speech or conversation** between two parties before there can be a wire communication. To find that mere website visits are wire communications would expand liability to thousands of individuals, businesses, and charitable organizations – a result never envisioned when the Legislature enacted the Statute in the 1960s.

Even if these website visits were wire communications, the Statute is only violated when an individual "willfully commits an interception, attempts to commit an interception, or procures any other person to commit an "interception." M.G.L. c.272 § 99(C)(1). For there to be an interception, it must be (1) secret; (2) involve substantive "contents" and (3) recorded by an intercepting device:

> The term "interception" means to ***secretly*** hear, ***secretly*** record, or aid another to secretly hear or ***secretly*** record the ***contents*** of any wire or oral communication through the use of any ***intercepting device*** by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein.

M.G.L. c.272 § 99(B)(4). Plaintiff has not alleged any secret interception; she knowingly visited BCH's website and she consented to Facebook and Google's terms of service.

Plaintiff has not pleaded that any "contents" were intercepted, as she has not identified the contents of any "communication" ***she*** had with the BCH website. Moreover, she alleges only that the information collected includes buttons clicked, webpages visited, and search queries. Courts have rejected the notion that such "non-record" information constitutes "contents."

Finally, many courts have found "software code", such as the technology at issue here, is not an intercepting device for purposes of wiretapping statutes.

## I. PLAINTIFF FAILS TO PLEAD AN ORAL OR WIRE COMMUNICATION.

The Massachusetts Legislature enacted the Wiretap Statute to address concerns over secretive recordings of conversations by law enforcement and others. M.G.L. ch.272 § 99(a). The law was drafted in 1968 to address what people historically thought of as "wiretaps" (i.e., audio/visual recording devices.) *Id.* The Statute was enacted in large part "to help in the fight against organized crime." *Dillon v. Mass. Bay Transit Authority*, 49 Mass. App. Ct. 309, 310 (2000). The Statute was not intended to reach computer advertising technology and pixels and code –its purpose was to address secretive recordings of ***speech*** or ***conversations.*** *See, e.g.*, *Commonwealth v. Rainey*, 491 Mass. 632, 645 (2023) ("the Legislature was concerned principally with the investigative use of surveillance devices by law enforcement officials to eavesdrop surreptitiously ***on conversations***") (emphasis added); *Commonwealth. v. Hyde*, 434 Mass. 594, 600 (2001) ("our statute broadly prohibits the interception of *speech*") (emphasis in original);

M.G.L. ch.272 § 99(F)(2)(e) (an application for a warrant to intercept an oral or wire communication must include a statement that "the oral or wire communication sought are material to a particularly described investigation or prosecution and that such ***conversations*** are not legally privileged") (emphasis added).

Consistent with the law's genesis, the Wiretap Statute appellate cases largely, if not exclusively, deal with recordings of a human–to-human conversation. *See Rainey*, 491 Mass. at 639–40 (discussing various Wiretap Statute cases, all of which recorded individual statements made in conversations). The Statute was modeled after the Federal Wiretap Statute. *Commonwealth v. Moody*, 466 Mass. 196, 201 (2013). Notably, when the federal law expanded the reach of wiretapping to include "electronic communications" in 1986, the Massachusetts Legislature refused to expand the scope. *Id.* at 203.

Massachusetts courts cannot expand the reach of the Statute beyond its 1968 statutory language and intent. Pursuant to the Statute, a "wire communication" means "any ***communication*** made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and point of reception." M.G.L. ch.272 § 99(B)(1) (emphasis added). Because "communication," as it was defined in 1968, covers conversation and speech, *see, e.g., Hyde*, 434 Mass. at 600, the term connotes a back and forth speech or conversation between two persons that is ultimately intercepted by a third party. BCH is unaware of any Massachusetts criminal or civil appellate decision that has extended the definition to "website activity."

Here, Plaintiff has not alleged that BCH intercepted any speech or conversation between two people. An individual's website activity alone, therefore, cannot be a "wire communication." *Cf. Commonwealth v. Connolly*, 454 Mass. 808, 825 (2009) (holding that "[d]ata from GPS devices also does not fall within the language of the wiretap statute . . . which authorizes interception of "oral and wire communications."). Just as GPS data is not a wire communication, neither is technology that analyzes a user's website activity.

In contrast, courts have found more modern methods of communication to be wire communications **only so long as they retain the concept of person-to-person speech or conversation** that a third party could intercept. *Compare, Commonwealth v. Alleyne*, 23 Mass. L. Rep. 606 (Mass. Super. Ct., Nov. 17, 2008) (applies wire communications to communications over cellular phones) and *Rich v. Rich*, 28 Mass. L. Rep. 553, 2011 WL 3672059 (Mass. Super. Ct., July 8, 2011) (wire communications were extended to email and instant messaging) *with Commonwealth v. Connolly*, 454 Mass. at 825 (finding that GPS ***device data is not an oral or wire communication***). Plaintiff does not allege any actual communication between her and any person, let alone that BCH intercepted any such communication.

In short, Plaintiff's Complaint attempts to pound a square peg (modern day transmission of anonymous information about potential **interactions with *BCH's website***) into a round hole (a fifty-five year-old statute and a body of case law dealing with what people normally think of as secretive recordings of human conversations.) Not only is Plaintiff's attempt to cast website activity as such legally flawed, but it urges bad policy. Thousands of Massachusetts individuals, businesses and charities would be subject to criminal and civil liability for merely using common technology on their websites. Again, such drastic and extensive liability was not envisioned when the current version of the Statute was adopted.

Because Plaintiff has not alleged that there was a "wire communication" between herself and anyone, Plaintiff's Complaint should be dismissed.

## II. THERE WAS NO INTERCEPTION BY BCH.

### A. The alleged communications were not secret.

Plaintiff's claim fails because she has not pled that BCH ***secretly*** intercepted any communication. Before the Wiretap Statute can apply, a defendant must have "intercepted" communications. To "intercept" means to "***secretly*** hear, ***secretly*** record, or aid another to ***secretly*** hear or ***secretly*** record the contents of any wire or oral communication through the use of any intercepting device." M.G.L. ch.272 § 99(B)(4) (emphases added); *see also Marquis v. Google,*

*Inc.*, 2014 WL 4180400, at *12 (Mass. Jul. 27, 2014) ("if a recording is not made secretly it does not constitute an 'interception' and there has been no violation of the statute.").

The Massachusetts Legislature intended that the statutory framework be restrictive and thereby apply only to the *secret use* of such devices. *Id.* Massachusetts therefore has commonly been known as a "two-party" consent state with regards to wiretapping. M.G.L. ch.272 §§ (B)(4), C(1), C(3). This means that because both BCH and Plaintiff consented to use of the technology at issue, there could be no interception—even accepting the rest of Plaintiff's allegations as true.

There is no dispute that BCH consented to the use of Meta Pixel and Google Analytics on its website, since it implemented them on the webpage. Complaint ¶ 125. Plaintiff also consented to the disclosure of information when she visited the BCH webpage. BCH's Web User Privacy Rights, as thoroughly referenced by Plaintiff in her Complaint, informs website users that BCH utilizes the technology at issue here to enhance the usability of its website. In fact, Plaintiff does not even argue that BCH somehow did something wrong in tracking her information while browsing the BCH's website. Nor could she. *Cf. Commonwealth v. Maccini*, 22 Mass. L. Rep. 393 (2007) (noting that users of email and instant messaging implicitly consent to and are aware that email and messages are recorded recipient's computers).

While Plaintiff complains that BCH disclosed certain information to Facebook and Google, she also consented to that disclosure. When Plaintiff registered as a Facebook user, she consented to Facebook's tracking of her off-Facebook web activities, including those captured on third-party websites via the Meta Pixel. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("The district court properly held that Plaintiffs consented to Facebook's data tracking and collection practices" by accepting Facebook's terms and policies); *Rainey*, 491 Mass. at 643-44 (officers' body-worn camera did not "secretly" record conversations where defendant otherwise knew police heard his voluntary statements). Similarly, when Plaintiff assumedly signed up for Google services, she consented to Google's tracking of her browsing activities. Thus, even if the information collected by the Meta Pixel and Google Analytics contained Plaintiff's personal information, which Plaintiff does not allege, Plaintiff cannot state a Wiretap Statute claim against

BCH because there is nothing "secret" about the sharing of that information. Her claim under the Wiretap Statute should therefore be dismissed.

**B. BCH did not use an intercepting device.**

The Court should also dismiss Plaintiff's Complaint for failure to allege the use of an intercepting device. The Wiretap Statute defines an "intercepting device" as "[a]ny **device** or **apparatus** which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." M.G.L. ch.272 § 99(B)(3) (emphasis added).

Courts interpret the words of a statute according to "common and approved usage." *Commonwealth v. Narvaez*, 490 Mass. 807, 810 (2022). Under common usage, a "device" or "apparatus" must be tangible; it does not encompass intangible code on a website. *See* Black's Law Dictionary (11th ed. 2019) (defining "device" as "[a] mechanical invention that may be "an apparatus or an article of manufacture," and defining "apparatus" with reference to "machine," which is defined as "[a] device or apparatus consisting of fixed and moving parts").

Courts around the country have expressly addressed this definition, routinely holding that code embedded into a website is not a "device" or "apparatus" under similar wiretap laws. *See, e.g.*, *Potter v. Havlicek*, 2008 WL 2556723, at *8 (S.D. Ohio June 23, 2008) (dismissing federal wiretap claim because "the word 'device' does not encompass software"); *Jacome v. Spirit Airlines*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (dismissing Florida wiretap claim because session replay software is not a "device or apparatus"); *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021) (same); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (same); *cf. United States v. Ackies*, 918 F.3d 190, 199 n.5 (1st Cir. 2019) (rejecting argument that software is a "device" under Federal Stored Communications Act because "software is not a 'device' under its plain meaning"); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012) ("[S]oftware is not a tangible good or service.").

Plaintiff attempts to plead around this issue by naming hardware devices like personal computers and servers as alleged "intercepting devices" here. *See* Complaint ¶ 123. But this is a

case about pixel technology. Plaintiff's computer hardware is irrelevant. Plaintiff ignores the fact that the crux of any alleged interception in this case occurs by way of computer code—which does not qualify as a device or apparatus under the Wiretap Statute. The computer and server are not making the alleged interception; and the pixel is nothing more than software *code*. Because there is no "intercepting device," Plaintiff's complaint must be dismissed.

### C. BCH did not intercept any "contents" of communications.

Finally, the Wiretap Statute defines "contents" of a communication as "information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." M.G.L. ch.272, § 99(B)(5). For two reasons, Plaintiff wholly fails to allege how the "contents" of a communication were intercepted.

***First***, Plaintiff fails to plead adequately the existence of any communication ***she*** had with BCH. Plaintiff pleads **only examples and hypothetical situations** in which the Meta Pixel and/or Google Analytics are employed, but nowhere in her Complaint does Plaintiff actually plead the existence of any communications she had with BCH. Without this fundamental allegation, Plaintiff has not satisfied the "contents" requirement. *See, e.g.*, *Kurowski v. Rush Sys. for Health*, 2023 U.S. Dist. LEXIS 35702, *13-14 (N.D. Ill. March 3, 2023) ("Moreover, the hypotheticals provided by Kurowski appear to illustrate only what occurs when an individual—whether a patient or not—clicks on certain areas of Rush's public website. Kurowski does not allege what surreptitious patient data disclosures occur when an actual Rush patient enters her MyChart portal and navigates through it.").

***Second***, even Plaintiff's hypothetical allegations do not identify any contents of communications. While Massachusetts appellate courts have not analyzed the meaning of "contents" under the Wiretap Statute, federal case law is informative.[2] The Federal Wiretap Statute

[2] Because the Massachusetts Wiretap Statute defines "contents" so similarly to the federal wiretapping statute, 18 U.S.C. § 2510, federal decisions are highly persuasive here. BCH notes that the Massachusetts Wiretap Statute does include, unlike the federal statute, "information concerning the identity of the parties to such communication." M.G.L. ch.272, § 99(B)(5). Because Plaintiff pleads only examples, she has not identified all the parties to the purported communications. Moreover, at best, Plaintiff's Complaint alleges that IP addresses were disclosed to third parties and, she fails to explain how that can somehow be traced back to an individual. Complaint ¶ 27. As noted above, IP

similarly defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8). In other words, the defendant must capture "the intended message conveyed by the communication" like the text of an email message or words spoken on a call. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

In contrast, "non-content" or "record information" about a communication, like "extrinsic information used to route a communication," is not actionable if collected. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015); *In re Zynga Priv. Litig.*, 750 F.3d at 1108. For example, invoice/billing information —names, addresses, and phone numbers of parties called by subscribers — are not "contents" of communications within the meaning of 18 USCS § 2510(8), *Hill v. MCI WorldCom Communs., Inc.*, 120 F. Supp. 2d 1194, 2000 U.S. Dist. LEXIS 17466 (S.D. Iowa 2000).

Here, Plaintiff's "example" allegations fall within the "non-content" or "record information" category. The information that Plaintiff alleges was collected includes buttons clicked, webpages visited, search queries, search criteria, and form submissions. Complaint ¶ 124. Plaintiff's own allegations support the conclusion that no actual personal information was collected or disclosed (i.e., no names, no addresses, no phone numbers, no text actually inputted in forms, no financial information, no medical records, no medical data, etc.) Complaint ¶ 22. All that is allegedly collected and disclosed is the same type of "extrinsic information used to route a communication" that courts have found not to constitute "contents" pursuant to wiretap statutes. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 135. Thus, even setting aside that she has pled only hypotheticals, Plaintiff still has not adequately pleaded that the content of any communications has been intercepted. Her claim should be dismissed.

---

addresses are not a form of identifying personal information and therefore cannot disclose the identity of the parties. Plaintiff fails to plead there was any other information disclosed that could identify the parties and no other way that either Facebook or Google can connect this information to a specific individual or user.

## CONCLUSION

For the foregoing reasons, BCH respectfully requests this Court dismiss Plaintiff's Complaint with prejudice.

Dated: May 12, 2023

Respectfully submitted,

**THE CHILDREN'S HOSPITAL CORPORATION**

By: /s/ *Emyr T. Remy*
Emyr Remy (BBO # 740156)
remy@shb.com
SHOOK, HARDY & BACON L.L.P.
One Federal Street, Suite 2540
Boston, MA 02110
Tel: 617.531.1411 | Fax: 617 531.1602

Tammy B. Webb (*pro hac vice* forthcoming)
Patrick J. Gregory (*pro hac vice* forthcoming)
tbwebb@shb.com
pgregory@shb.com
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: 415.544.1900 | Fax: 415.391.0281

Jenn Odell Hatcher (*pro hac vice* forthcoming)
jhatcher@shb.com
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City MO 64108
Tel: 816.559.0306 | Fax: 816.421.5547

Jessica N. Wahl (*pro hac vice* forthcoming)
jwahl@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Tel: 424.324.3477 | Fax: 424.204.9093

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, the foregoing was served via electronic mail to all parties of record:

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Emyr T. Remy*
Emyr T. Remy

I HEREBY ATTEST AND CERTIFY ON February 20, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00411-BLS1<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

I HEREBY ATTEST AND CERTIFY ON February 20, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

## Table of Contents


I. Introduction ....... 1

II. A Threshold Matter: The Record on this Motion to Dismiss. ....... 2

III. The Facts. ....... 3

A. The Tracking Technologies ....... 3

B. The Interceptions Were Secret ....... 4

C. Allegations Regarding the Plaintiff ....... 5

IV. Argument ....... 6

A. Plaintiff Alleges a "Wire Communication." ....... 7

B. Plaintiff Did Not Consent to BCH's Use of the Tracking Technologies on the BCH Website ....... 9

C. Plaintiff Alleges BCH's Use of an Intercepting Device. ....... 13

D. Plaintiff Alleges the Interception of "Content" as the MWA Defines that Term. ....... 16

1. Plaintiff Pleads the Interception of Information Concerning the Identity of the Parties to the Communications. ....... 17

2. Plaintiff Alleges an Interception of "Substance, Purport, or Meaning" of Communications ....... 19

V. Conclusion ....... 20

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

## Table of Authorities

Pages

**Cases**

*Birbiglia v. St. Vincent Hosp.*,
3 Mass. L. Rep. 407 (Mass. Super. Ct. 1994) .......... 7

*Cardoso v. Whirlpool Corp.*,
2021 WL 2820822 (S.D. Fla. July 6, 2021) .......... 15

*Commonwealth v Rainey*,
491 Mass. 632 (2023) .......... 8

*Commonwealth v. Alleyne*,
2007 Mass. Super. LEXIS 591 (Nov. 1, 2007) .......... 8

*Commonwealth v. Browar-Jarus*,
97 Mass. App. Ct. 1108 (2020) .......... 15

*Commonwealth v. Connolly*,
454 Mass. 808 (2009) .......... 8

*Commonwealth v. Hyde*,
434 Mass. 594 (2001) .......... 6, 8, 14

*Commonwealth v. Jackson*,
370 Mass. 502 (1976) .......... 10

*Commonwealth v. Maccini*,
2007 Mass. Super. LEXIS 235 (Super Ct. 2007) .......... 11

*Commonwealth v. Minori*,
101 Mass. App. Ct. 1106 (App. Ct. 2022) .......... 15

*Commonwealth v. Moody*,
466 Mass. 196 (2013) .......... 6, 9

*Connor v. Whirlpool Corp.*,
2021 WL 3076477 (S.D. Fla. July 6, 2021) .......... 16

*District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*,
379 Mass. 586 (1980) .......... 17

*Doe v. Bon Secours Mercy Health*,
Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) .......... 7

*Doe v. Medstar Health, Inc.,*
No. 24-C-20-000591 (Md. Cir. Ct. 2022) ....... 6

*Doe v. Partners Healthcare System, Inc.*,
Case No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) ....... 1, 6, 11, 20

*Doe v. Sutter Health*,
Case No. 34-2019-00258072 (Cal. Cty. Ct. June 9, 2022) ....... 7, 8, 14

*Doe v. University Hospitals Health System, Inc.*,
Case No. CV-20-93333357 (Ohio Ct. Com. Pleas Nov. 16, 2020) ....... 7

*Doe v. Va. Mason Med. Ctr.*,
2020 Wash. Super. LEXIS 7567 (Super. Ct. 2020) ....... 13

*Fairneny v. Savogran Co.*,
422 Mass. 469 (1996) ....... 3

*Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co.*,
413 Mass. 583 (1992) ....... 3, 11

*Gilk v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ....... 14

*Hill v. MCI WorldCom Communs., Inc.*,
120 F. Supp. 2d 1194 (S.D. Iowa 2000) ....... 18

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D.Cal. 2015) ....... 14

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....... 20

*In re Google, Inc.*,
806 F.3d 125 (3d Cir. 2015) ....... 20

*In re Meta Pixel Healthcare Litig.*,
2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022) ....... 6, 13, 14, 20

*In re Pharmatrak, Inc. Privacy Litig.*
329 F.3d 9 (1st Cir. 2003) ....... 6, 10, 11

*In re Search of Info. that Is Stored at Premises Controlled by Google*,
2023 U.S. Dist. LEXIS 33651 (S.D. Tex. Feb. 14, 2023) ....... 19

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012) ....... 16

*In re Zynga Privacy Litigation*,
750 F.3d 1098 (9th Cir. 2014) ....................20

*Jacome v. Spirit Airlines*,
2021 Fla. Cir. LEXIS 1435 (Fla. Cir. Ct. June 17, 2021) ....................15

*Johnson v. Frei*,
2016 Mass. App. Div. LEXIS 36 (App. Div. 2016) ....................15

*Klumb v. Goan*,
884 F. Supp. 2d 644 (E.D. Tenn. 2012) ....................14

*Kurkowski v. Rush Sys. for Health*,
2023 U.S. Dist. LEXIS 35702 (N.D. Ill. Mar. 3, 2023) ....................20

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ....................14

*Marquis v. Google Inc.*,
No. 11-2808-BLS1 (Super. Ct. Jan. 17, 2012) ....................9, 11

*Martin v. Evans*,
241 F. Supp. 3d 276 (D. Mass. 2017) ....................14, 15

*Pine v. Rust*,
404 Mass. 411 (1989) ....................7

*Potter v. Havlicek*,
2008 U.S. Dist. LEXIS 122211 (S.D. Ohio June 23, 2008) ....................15

*Project Veritas Action Fund v. Rollins*,
982 F.3d 813 (1st Cir. 2020) ....................14

*Rich v. Rich*,
2011 Mass. Super. LEXIS 148 (Super. Ct. July 8, 2011) ....................8, 9, 13

*Smith v. Facebook Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ....................13

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ....................13

*United States v. Ackies*,
918 F.3d 190 (1st Cir. 2019) ....................16

*United States v. Hutchins*,
2018 U.S. Dist. LEXIS 183898 (E.D. Wis. 2018) ....................14, 15

*United States v. Lyons*,
740 F.3d 702 (1st Cir. 2014) ........ 8

**Statutes**

18 U.S.C. § 2510 ........ 18

Fla. Stat. § 934.02 ........ 15

M.G.L. c. 272 § 99 ........ passim

**Regulations**

16 C.F.R. 312.2 ........ 19

78 Fed. Reg. 3972 (2013) ........ 19

## I. INTRODUCTION

The Children's Hospital Corporation ("Boston Children's Hospital" or "BCH") aided third parties—including Google and Facebook—to secretly intercept Plaintiff Jane Doe's[1] and other healthcare consumers' wire communications with BCH. BCH injected into its website hidden code for "tracking technologies," including Google Analytics and Meta Pixel, but did not disclose to Plaintiff and other BCH website users the tracking technologies or the resulting interceptions. These technologies helped Google, Facebook, and other third parties to secretly intercept consumers' communications with BCH on the BCH Website about their medical conditions and doctors, and their communications and actions taken through BCH's purportedly secure patient portal. Plaintiff asserts a claim under the Massachusetts Wiretap Act, G.L. c. 272 § 99 ("MWA").

BCH contends Plaintiff's claim is "novel," but this is not so. At least seven courts have affirmed wiretap and similar claims relating to tracking technologies such as Meta Pixel and Google Analytics, including this Court (Davis, J.) in *Doe v. Partners Healthcare System, Inc.*, where this Court rejected many of the same arguments BCH makes here.[2]

The MWA's express text and a well-developed body of case law support Plaintiff's claim. BCH's arguments are completely divorced from and ignore the Complaint's express allegations and instead ask the Court to accept as true **<u>BCH's</u>** factual assertions. BCH's motion to dismiss also ignores the MWA's plain text and controlling authority construing it. BCH makes four legal arguments. Each lacks merit.

*First*, BCH argues that there is no "wire communication" because the MWA protects only human-to-human "conversation," and the communications here involved a human's interactions with a corporation, BCH. BCH cites no authority that limits the MWA in this fashion. The MWA's express terms contemplate "wire communications" include not only human-to-human communications but also

[1] The Court granted Plaintiff's motion to proceed in pseudonym, given the privacy interests concerning Plaintiff's minor children's status as patients of BCH. Plaintiff disclosed her true identity to BCH.
[2] *See* Ex. A (motion to dismiss in *Partners*, Case No. 1984CV01651-BLS1); Ex. B (Nov. 20, 2020 order denying motion to dismiss); Ex. C (transcript of motion to dismiss hearing explaining Court's reasoning, incorporated into order denying motion to dismiss). The *Partners* case later settled for $18.4 million.

communications between individuals and business entities like BCH. Substantial authority under the MWA and comparable wiretap laws confirm the MWA applies to website communications.

*Second*, BCH argues the interceptions were not "secret." Controlling authority construes this element to require BCH to prove Plaintiff had actual knowledge of the interceptions. Nothing in the Complaint establishes such actual knowledge. On the contrary, Plaintiff alleges in detail how the code for tracking technologies is hidden from website users and how BCH's privacy disclosures utterly fail to disclose the technologies or the resulting interceptions. Google and Facebook's terms of service, even setting aside that those terms are outside the four corners of the complaint, do not come close to establishing Plaintiff's actual knowledge of any interception of Plaintiff's communications with BCH.

*Third*, BCH argues that the tracking technologies are not "intercepting devices" because they are implemented using computer code, and such "software" is not a "device." Ample authority under the MWA and similar laws confirms that Plaintiff's allegations describe an intercepting device.

*Fourth*, BCH argues it did not intercept the "contents" of any communication. The MWA is different than other wiretap laws in that it includes in the definition of "contents" "any information concerning the identity of the parties." Controlling authority confirms that identifiers such as telephone numbers or their modern equivalent, IP addresses, count as "information concerning the identity of the parties." Plaintiff alleges the tracking technologies intercepted IP addresses in combination with other identifiers to associate intercepted communications with consumers' real-world identities. Moreover, the interceptions reflect the substance of communications, providing an alternative basis for the interceptions to involve the "contents" of communications.

In short, BCH's motion lacks merit. The Court should deny it.

## II. A THRESHOLD MATTER: THE RECORD ON THIS MOTION TO DISMISS.

BCH's motion relies and depends extensively upon materials outside the Complaint, including numerous factual contentions BCH makes without citing **<u>any</u>** source at all, contentions BCH asks the Court to deem as true in resolving its motion. This is improper.

The factual contentions and documents the Court may consider on BCH's motion are limited. For purposes of this Rule 12(b)(6) motion, the Court must "accept as true the allegations in the complaint, and draw all reasonable inferences in favor of the party whose claims are the subject of the motion." *Fairneny v. Savogran Co.*, 422 Mass. 469, 470 (1996). "**[A]ll materials outside the pleadings are excluded from this review**." *Gen. Motors Acceptance Corp. v. Abington Cas. Ins. Co.*, 413 Mass. 583, 584 (1992) (emphasis added). The Court may not, as BCH requests, simply disregard Plaintiff's factual allegations or accept BCH's factual contentions as true, whether supported by extraneous materials or not.

Plaintiff notes below where BCH repeatedly runs afoul of these basic rules.[3]

## III. THE FACTS.

### A. *The Tracking Technologies*

Plaintiff alleges that BCH injected hidden code in its website that permitted third parties, including Google, Facebook, Microsoft, LinkedIn, and Hotjar to intercept the contents of Plaintiff's and other healthcare consumers' communications with BCH through the BCH Website. ¶¶ 30–60, 80.[4] Plaintiff alleges in detail how these technologies worked, but in general terms, BCH injected hidden code into its website that intercepted information about the contents of each webpage Plaintiff visited and contemporaneously transmitted information about Plaintiff's communications to Google, Facebook, and other third parties. *Id.* The hidden code can only be discovered through special web developer tools that ordinary website users have no reason to use or investigate. ¶ 55.

The categories of information intercepted included: (i) the URL of each webpage visited (the URL is a unique identifier that acts as an address for a webpage but also describes the content of the webpage, for example, https://www.childrenshospital.org/centers/cancer-and-blood-disorders-center),

[3] In the "Background" section of its brief, BCH purports to cite Complaint paragraphs for its factual contentions. However, BCH's assertions often bear little or no relationship to what Plaintiff has actually alleged. *See, e.g.,* n.23, *infra* (explaining how Complaint does not support and instead contradicts BCH contention that Google Analytics is "pseudonymous"). The Court should evaluate the Complaint's allegations directly rather than BCH's characterizations of or outright fabrications concerning those allegations.

[4] "¶ __" refers to paragraphs of Plaintiff's Complaint.

*e.g.*, ¶¶ 48, 65, 70 (ii) the title of each page visited (such as "Emergency Psychiatric Service | Boston Children's Hospital"), *id.* & ¶ 81; (iii) narrative descriptions of each page's contents, *e.g.* ¶ 70; and (iv) actions users took on the website, including button clicks and submissions of information through online forms, ¶ 70, 86, 92, 96. BCH installed these trackers throughout its website, including the supposedly secure patient portal through which parents access their children's medical records. ¶¶ 59, 98–106.

The tracking technologies revealed sensitive health information about Plaintiff and other consumers, including (i) medical conditions, procedures, and specialties about which consumers sought information, ¶¶ 79–84; (ii) medical searches consumers performed on the website, ¶¶ 85–88; (iii) searches performed for doctors, including the consumers' location and symptoms for which they need treatment, ¶¶ 89–91, (iv) consumers' appointment requests for particular symptoms, ¶¶ 92–97; and (v) consumers' communications through the purportedly secure patient portal, including consumers' status as patients and requests to obtain diagnostic tests, obtain medications, and view bills, ¶¶ 98–106.

The interceptions also revealed identifying information about users, which, individually or in combination, permitted Google and Facebook to confirm the real-world identities of the individuals whose communications were intercepted. This enabled the third parties to use the intercepted contents for commercial purposes, including individualized advertising. That information included the following:

(i) IP addresses, which are numerical codes that operate as a device's unique address on the Internet, similar to a physical address or telephone number, ¶¶ 32, 47, 54, 67, 72;

(ii) Browser fingerprints, which are combinations of browser and computer settings unique to each individual, which Google and Facebook also collect on their own websites, thus permitting both companies to confirm the identity of individuals communicating through the BCH Website by comparing browser fingerprints, ¶¶ 66, 68, 73; and

(iii) Persistent identifiers for individuals, which are user identification numbers assigned by Google or Facebook used to track a particular individual's movements across and actions on the BCH Website, ¶¶ 66, 74.

B. *The Interceptions Were Secret*

The interceptions were secret and performed without the consent of Plaintiff and class members. The code for the tracking technologies was invisible to the website user, implemented through hidden

code injected into the website that is not depicted visually in any part of the website that the website user can see. ¶¶ 51–56, 60–64. BCH could have but did not disclose to healthcare consumers that it shares the contents of consumers' communications through the BCH Website with Google, Facebook, Microsoft, LinkedIn, and other third parties. BCH also could have but did not obtain consumers' consent for such interceptions. Instead, BCH told (and continues to tell) healthcare consumers, through their published online policies, that they do not share such information, including through several affirmatively deceptive statements regarding whether and how information is shared with third parties. ¶¶ 21–29.

C. *Allegations Regarding the Plaintiff.*

Plaintiff alleges that her "minor children are patients of [BCH.]" ¶ 10. She also alleges:

> Plaintiff regularly uses the [BCH] Website to (i) obtain information about [BCH] doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her children; and (iii) obtain and review her children's medical records through the website's patient portal.

*Id.* The pages Plaintiff alleges she regularly uses are the same for which Plaintiff presents detailed allegations on how BCH injected hidden code for the tracking technologies. ¶¶ 80–84 (alleging BCH included tracking technologies on pages regarding BCH departments, medical specialties, and practices); ¶¶ 85–88 (contents of user searches intercepted); ¶¶ 89–91 (find-a-doctor communications and searches intercepted); ¶¶ 101–07 (patient portal communications intercepted).

Given these express allegations, it is astonishing that a substantial portion of BCH's motion is grounded upon its contention that Plaintiff "fails to allege that she even accessed the Website at issue" and "does not even allege that she is a patient of BCH." MTD at 3.[5] Several of BCH's legal arguments hinge on these patently erroneous contentions.[6] Obviously, to the degree BCH's legal arguments hinge on BCH pretending that Plaintiff has not made such factual allegations, those arguments fail.[7]

[5] "MTD" refers to BCH's memorandum in support of its motion to dismiss.

[6] *E.g.,* MTD at 13 (no "contents" intercepted because "Plaintiff fails to plead the existence of any communication ***she*** had with BCH") (emphasis in original).

[7] The fact that Plaintiff alleges facts not specific to her that describe BCH's use of tracking technologies generally simply reflects that this is a **<u>class action</u>** case. Plaintiff alleges, consistent with Mass. R. Civ.

## IV. ARGUMENT

The MWA provides: "Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this action…shall have a civil cause of action against any person who so intercepts, discloses or uses such communication." M.G.L. c. 272 § 99(Q). The SJC has provided important direction to the courts in construing the MWA. The SJC has emphasized that the Massachusetts "legislature was alarmed by the commercial availability of sophisticated surveillance devices and the ease with which they facilitated surreptitious recording of private citizens" and was concerned about "intrusions on rights of privacy." *Commonwealth v. Moody*, 466 Mass. 196, 201 (2013) (quotations omitted). Accordingly, the SJC has repeatedly directed courts to construe the MWA's terms "broadly" to effectuate that legislative purpose. *Id.* at 206; *Commonwealth v. Hyde*, 434 Mass. 594, 603 (2001) (rejecting construction that would "contravene the [MWA's] broad purpose and the Legislature's clear prohibition of *all* secret interceptions") (emphasis in original).

At least seven decisions have upheld claims relating to the tracking technologies that are either the same as or similar to those at issue here. These include the *Partners* case (see n.2 & accompanying text, *supra*); *In re Pharmatrak, Inc. Privacy Litig.* 329 F.3d 9 (1st Cir. 2003) (reversing dismissal of wiretap claims relating to pixel trackers on pharmaceutical websites); *In re Meta Pixel Healthcare Litig.*, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022) (concluding in considering preliminary injunction[8] that plaintiffs made a "strong showing as to each of the elements of their [federal] Wiretap Act claim" against Facebook relating to the use of Meta Pixel on hospital websites); *Doe v. Medstar Health, Inc.,* No. 24-C-20-000591 (Md. Cir. Ct. 2022) (Ex. D) (denying motion to dismiss Maryland wiretap act case relating to hospital use of Meta Pixel and Google Analytics); *Doe v. Sutter Health*, Case No. 34-2019-00258072 (Cal. Cnty. Ct. June 9, 2022) (Ex. E) (same, except California wiretap law); *Doe v. Bon Secours Mercy Health*, Case No. A 2002633

---

Proc. 23, how BCH has acted in a uniform fashion as to all class members. Moreover, when the Complaint refers to "class members," "healthcare consumers," and "website users," such allegations include Plaintiff. *See* Ex. C at 13–15 (*Partners* court rejecting similar argument on plaintiff-specific facts).

[8] The court ultimately denied the motion for a preliminary injunction based on a defense specific to the federal wiretap act that BCH does not contend applies here. *See id.* at *37–41.

(Ohio Cm. Pl. Nov. 23, 2021) (Ex. F) (denying motion to dismiss Ohio claim similar to wiretap claim based on hospital use of Meta Pixel and Google Analytics); *Doe v. University Hospitals Health System, Inc.*, Case No. CV-20-933357 (Ohio Ct. Com. Pleas Nov. 16, 2020) (Ex. G) (same).

These cases and the serious faults in BCH's arguments on particular MWA elements,[9] to which Plaintiff responds below, compel the conclusion that Plaintiff amply states a claim.

A. *Plaintiff Alleges a "Wire Communication."*

BCH argues that Plaintiff fails to plead a wire communication. MTD at 8–10. BCH's argument is, in substance, that the MWA prohibits interceptions only of "conversations between two people," that is, "human-to-human conversation." *Id.* Because the communications at issue were between consumers and a company through its website, BCH contends the MWA does not cover such communications.

The express terms of the MWA make clear that it is not limited to human-to-human conversation. The statute defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any **person** other than a **person** given prior authority by all parties to such communication." M.G.L. c. 272 § 99(B)(4) (emphasis added). "Person," in turn, is defined to include "any individual, **partnership, association, joint stock company, trust, or corporation**." *Id.* § 99(B)(13). That is, the MWA expressly prohibits not only interceptions of communications between "individuals" (i.e., humans) but also with business entities, including "corporations" like BCH.

Furthermore, the MWA defines a "wire communication" as "**any** communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." M.G.L. c. 272 § 99(B)(1)

[9] BCH contends "the Statute is only violated when an individual 'willfully commits an interception." BCH does not move to dismiss on this element, but it is wrong no less. Paragraph (C)(1) to which BCH points sets forth elements for a criminal offense; the civil remedy provisions impose no such requirement. *Pine v. Rust*, 404 Mass. 411, 414 (1989) (contrasting federal law, which requires "willful" conduct, which MWA, which does not for a civil remedy); *Birbiglia v. St. Vincent Hosp.*, 3 Mass. L. Rep. 407, 414 (Mass. Super. Ct. 1994) ("To find civil liability under the [MWA], a violation need not rise to the level of criminal conduct… A scienter of willfulness, as required to find a criminal violation, need not be found.") (citing *Pine*).

(emphasis added). The communications here plainly occurred "by the aid of wire, cable, or other like connection," as the Internet is a network designed for the "transmission of [information] by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." *United States v. Lyons*, 740 F.3d 702, 716 (1st Cir. 2014) (construing federal law with similar wire communication definition). The MWA imposes **no** requirement that a "communication" occur between humans.

This Court (Davis, J.) affirmed that the MWA applies to tracking technologies, rejecting the defendants' technical arguments that Google Analytics and Meta Pixel do not involve the "interception of any communication." *See* Ex. A at 12; Exs. B, C; *see also Sutter* (Ex. G) at 3–4 (rejecting argument under California wiretap act that participants to communication must each be "natural persons," collecting authorities construing federal wiretap act that reject the same argument).

The cases BCH cites applying the MWA to "speech" and "conversation" contain no holding **restricting** the statute to only such forms of communication; instead, those cases either merely happened to involve speech or conversation (without implying any limitation in the MWA's scope)[10] or were construing the separate statutorily defined phrase "oral communication,"[11] which expressly includes "speech," in contrast to "**wire** communication," which is **not** defined as or limited to "speech."[12]

[10] *Commonwealth v. Rainey*, 491 Mass. 632, 645 (2023) (referencing "conversations," but **no** holding limiting "wire communication" to human-to-human communications); *Commonwealth v. Alleyne*, 2007 Mass. Super. LEXIS 591, at *4–6 (Nov. 1, 2007) (applying MWA to cell phone conversations, but **no** suggestion of exclusion of website communications); *Rich v. Rich*, 2011 Mass. Super. LEXIS 148, at *12 (Super. Ct. July 8, 2011) (holding MWA language is "sufficiently broad to include… new technologies" including "email and instant messaging"; **no** suggestion of exclusion of other forms of internet communication).

[11] BCH citation to *Hyde* is remarkable; it cites a footnote from *Hyde* to argue the MWA "broadly prohibits the interception of *speech*." MTD at 8 (BCH's emphasis). That footnote construed the phrase "oral communication," *see* 434 Mass. at 600 n.6, which the MWA defines using the word "speech." M.G.L. c. 272 § 99(B)(2). The fact that "oral communication" is defined to include "speech" but "wire communication" is not, shows that "wire communication" is not limited to "speech" or its equivalents.

[12] The Court in *Commonwealth v. Connolly* noted, without analysis or discussion, that "[d]ata from GPS devices…does not fall within the language of the wiretap statute," 454 Mass. 808, 825 (2009), but the Court did not explain which terms of the statute it applied. There was no suggestion in *Connolly* that any GPS data was transmitted over wire or that any third party intercepted such a transmission. The Court certainly did not hold that the MWA applies only to "human-to-human conversation."

BCH's contention that "[t]he statute was not intended to reach computer advertising technology and pixels and code" ignores that the Legislature made clear that it was driven by the "**grave dangers**" posed by "the **uncontrolled development** and unrestricted use of **modern electronic surveillance devices**." M.G.L. c. 272 § 99(A) (emphasis added). That is, the Legislature specifically contemplated new and developing technologies; it certainly expressed no intention to limit the MWA's reach to technologies that existed at the time of the MWA's passage.

Finally, the fact that the Massachusetts legislature has not amended the MWA to carve out a separate category for "electronic communications" does not reflect any intent to exclude such communications. As BCH's own authority explains, when Congress amended the federal law to create a new category for "electronic communications," it also amended the definition of "wire communications" to exclude "non-oral electronic transmissions," which had previously been considered "wire communications." *Moody*, 466 Mass. at 207–08.[13] In contrast, "wire communications" under the MWA have never been limited to oral communications; the MWA has always been "broad enough to cover non-oral electronic transmissions," and even after the federal act's amendment, the MWA "provides as much protection as" the federal law. *Id.* at 208.[14]

B. *Plaintiff Did Not Consent to BCH's Use of the Tracking Technologies on the BCH Website.*

The MWA defines an "interception" as meaning "to secretly hear, **secretly** record, or **aid another** to secretly hear or **secretly** record the contents of any wire or oral communication through the use of any intercepting device by any person **other than a person given prior authority by all parties to such communication**." M.G.L. c. 272 § 99(B)(4) (emphasis added). BCH contends that Plaintiff

---

[13] *See also Rich*, 2011 Mass. Super. LEXIS 148 at *13–14 ("The 1986 amendment to the federal act did not simply add a new category of 'electronic communication[s]' to the Federal Wiretap Act. It also **restricted** the definition of 'wire communication[s]' to 'aural transfer[s],' which are further defined as 'transfer[s] containing the human voice at any point between and including the point of origin and the point of reception.' 18 U.S.C.A. § 2510(1) and (18). Thus, prior to the 1986 amendment, the federal definition of 'wire communication' was broad enough to include non-aural communications, such as email.").

[14] *See also Marquis v. Google Inc.*, No. 11-2808-BLS1, Order on Motion to Dismiss at 4–5 (Super. Ct. Jan. 17, 2012) (Ex. H) (rejecting argument that "had the Legislature desired to include…electronic communications in the [MWA], then it would have done so expressly").

knew of and consented to BCH's use of tracking technologies on the BCH Website, but its arguments ignore Plaintiff's allegations and improperly depend on materials outside of the Complaint. In any event, even those outside materials do not establish Plaintiff's knowledge of or consent to BCH's conduct.

The SJC defined the contours of the secrecy element of the MWA in *Commonwealth v. Jackson*, 370 Mass. 502 (1976). Recognizing the policy driving the MWA—the "serious threat [to] the privacy of all citizens" posed by "electronic surveillance devices"—the Court explained, "it is apparent from the [legislative history] that the legislative intent was to impose more stringent restrictions on the use of electronic surveillance devices by private individuals than is done in other States." *Id.* at 506. Accordingly, the Court held that to avoid liability on the "secret" element, a defendant must establish the plaintiff's "actual knowledge" of the interception. *Id.* The test is "objective," based on circumstances that permit "an inference of knowledge," such as "clear and unequivocal conduct indicating knowledge." *Id.* at 507; *see also Pharmatrak*, 329 F.3d at 19 (defendant bears the burden in establishing consent).

Plaintiff alleges she had no knowledge her communications with BCH would be intercepted by Google, Facebook, or any other technology or social media companies. She presents detailed allegations explaining how BCH implemented Google Analytics and Meta Pixel through hidden code designed to be invisible to the website user. ¶¶ 42–56. BCH nowhere disclosed sharing communications with Google, Facebook, and other third parties. To the contrary, BCH falsely tells the users of its website that it:

> is strongly committed to protecting the privacy of its online users: patients, families, donors, the media, and others. We do not collect personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g., web forms). We do not share voluntarily provided, personally identifiable information for any purpose other than its intended use.

¶ 22. This statement was false. By injecting the hidden code into its website that permits third parties such as Google and Facebook to contemporaneously and surreptitiously intercept the contents of healthcare consumers' communications with the BCH Website, BCH does "share voluntarily provided, personally identifiable information for…purpose[s] other than its intended use." That hidden code tracks the user's IP address (i.e., the user's unique identity on the Internet), connects the IP address to the user's

browsing activity, and shares that same information with third parties such as Google and Facebook. *Id.* BCH's deception vitiates any claimed affirmative defense of consent. *Pharmatrak*, 329 F.3d at 19–20 (promises **not** to collect certain information negate consent defense to wiretap claim).

The Superior Court in *Partners* rejected the same argument that BCH makes here—that "[t]here was nothing secret about any of the Hospitals' using [Google Analytics and Meta Pixel] to track activity," explaining, "this is another situation where [the Court is] bound by the allegations of the complaint." Ex. A at 10; Ex. C at 22; *Marquis* (Ex. H) at 8 (holding at the "motion to dismiss stage," "the court accepts as true [plaintiff's] allegation that Google secretly intercepted her electronic communications").

BCH asserts its own "Web User Privacy Rights…informs website users that BCH utilizes the technology at issue here," MTD 11, but it points to no term containing such a disclosure.[15] Plaintiff alleges in detail how BCH's disclosure fails to notify users about tracking technologies and instead affirmatively misleads users by falsely telling them that BCH does not share data with third parties. ¶¶ 21–29. The Court should give no weight to BCH's analysis-free, citation-free factual contentions to the contrary.

BCH also points to materials outside the Complaint, including Google's and Facebook's terms of service. MTD at 6, 11–12. As a threshold matter, the Court should not consider this evidence in resolving BCH's 12(b)(6) motion, as "all materials outside the pleadings are excluded from [a 12(b)(6)] review." *Gen. Motors*, 413 Mass. at 584. BCH also does not explain how Google or Facebook's terms or service would even apply; no facts establish Plaintiffs' actual knowledge of those policies or their contents.

In any event, the terms BCH cites do not support their position. **Neither** set of terms state that Google Analytics or Meta Pixel is used on the BCH Website or every website or that Plaintiff consents

[15] Although BCH discloses that **BCH** logs certain information "for site management and administration," ¶ 23, this is a far cry from disclosing that BCH helps **third parties intercept** that information **for their own commercial purposes.** Any consent to BCH's own server logging does not equal consent to interception by third parties. *Pharmatrak.*, 329 F.3d at 19 ("A party may consent to the interception of only part of a communication…. Thus, a reviewing court must inquire into the *dimensions of the consent* and then ascertain whether the interception exceeded those boundaries.") (quotations omitted; emphasis in original). For this reason, *Commonwealth v. Maccini*, 2007 Mass. Super. LEXIS 235 (Super Ct. 2007), is inapposite, as it involves the **recipient** recording instant messages instead of the recipient's facilitation of an interception by a **third party** to the communication. *Id.* at *3.

to their use on the BCH Website or every website. The Facebook Data Policy provides that Facebook collects information from "Partners" but does not identify who the "Partners" and does not say that BCH is such a Partner.[16] And, significantly, the Meta Pixel terms applicable to websites such as BCH require them to "represent and warrant that [they] have provided **robust and sufficiently prominent notice** to users regarding [Meta Pixel] that includes, at a minimum:…a **clear and prominent notice on each web page where our pixels are used** that links to a clear explanation…that third parties, including Meta, may use cookies, **web beacons** and other storage technologies to collect or receive information from your websites and elsewhere on the Internet and use that information to provide measurement services, target and deliver ads."[17] Likewise, although Google's policy references that websites using "Google Analytics…may share with Google" certain data, it does not state that all websites or the BCH Website use Google Analytics.[18] The terms of service for Google Analytics to which BCH agreed imposes upon website owners (such as BCH) the obligation to prominently disclose Google Analytics to users.[19] That is, both Google and Facebook affirm websites may install Google Analytics and Meta Pixel on their websites **only when the website prominently discloses those technologies to its users**. BCH did not come close to meeting these disclosure obligations. Instead, its disclosures mislead users by indicating no such third-party interceptions are taking place. ¶¶ 21–28.

Moreover, consumers reasonably expect their communications with medical providers will not be shared with third parties. ¶¶ 17–19. In a case asserting federal wiretap **against Facebook** relating to **Meta Pixel**, a court recently held that the plaintiffs "raise potentially strong claims on the merits" and that even as to claims against Facebook, website users did not consent to Facebook's collection of

[16] https://www.facebook.com/privacy/policy/version/20220104/.

[17] Facebook imposes the obligation through its "Meta Business Tools Terms". *See* https://www.facebook.com/legal/terms/businesstools.

[18] https://policies.google.com/privacy.

[19] *See* https://marketingplatform.google.com/about/analytics/terms/us/ ("You must post a Privacy Policy…. You must disclose [to website users] the use of Google Analytics, and how it collects and processes data. This can be done by displaying a prominent link to the to the site 'How Google uses information from sites or apps that use our services."')

browsing activity on hospital websites. *Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *4–5, 24–33.

The cases BCH cites do not support its position either. The decision the Ninth Circuit affirmed in *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018), held that the Facebook terms of service provided a consent defense **only** for claims "**against Facebook**." *Smith v. Facebook Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017) (emphasis added). There was no suggestion that such terms could be invoked by hospitals, who were also defendants in the case and failed to disclose such technologies to their website users. *Smith* has been distinguished on this basis in subsequent litigation involving hospital websites. *Doe v. Va. Mason Med. Ctr.*, 2020 Wash. Super. LEXIS 7567, *4 (Super. Ct. 2020) (distinguishing *Smith* in case involving Meta Pixel against a hospital which "does not hinge on the relationship between the Plaintiff and Facebook"); *zee also Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *4–5, 24–33.

These issues—how a reasonable consumer would understand BCH's disclosures and the significance of Google and Facebook's disclosures—are not the stuff of motions to dismiss. Plaintiff more than adequately alleges the interceptions were secret. Her allegations must be taken as true on this motion to dismiss.

C. *Plaintiff Alleges BCH's Use of an Intercepting Device.*

BCH argues that Plaintiff does not allege that the interceptions at issue involve an "intercepting device" because they were accomplished through "software," and "software" is not a "device." BCH ignores compelling authorities on this precise issue, including those BCH itself cites.

The Superior Court in *Rich v. Rich* confirmed, in discussing keylogger software (hidden software that records activities on a computer), that "[t]he key logger program is an 'intercepting device' (at least when surreptitiously installed on a computer) because it 'is capable of…recording a wire…communication.'" *Rich*, 2011 Mass. Super. LEXIS 148, at *15–16. Similarly, in *Martin v. Evans*, the District of Massachusetts held that recording software on cell phones are "intercepting devices," reasoning that the MWA "is not obviously susceptible to a limiting construction that excludes the audio

recording function of cell phones." 241 F. Supp. 3d 276, 286 (D. Mass. 2017). And, this Court in *Partners* denied a motion to dismiss claims focused on the same tracking technologies at issue here. *Rich*, *Martin*, and *Partners* align with the weight of authority construing the same word, "device," under federal and other states' wiretap laws.[20]

These decisions align with common sense. Practically all modern devices are a combination of hardware and software. Construing the phrase "intercepting device" to exclude interceptions that are accomplished through a combination of hardware and software on the reasoning that "software" is not a "device" would effect a judicial repeal of the MWA as applied to most modern technology. The Legislature did not intend for the MWA to disappear as new technologies developed. On the contrary, the Legislature, in enacting the MWA, addressed the "uncontrolled development and unrestricted use of modern electronic surveillance devices," M.G.L. c. 272 § 99(A), reflecting a legislative intent to include within the MWA's scope such modern technologies.

The facts of BCH's own case—*Hyde*—reflects the incoherence its position. In *Hyde*, the SJC affirmed a criminal conviction involving a cassette tape recording of an oral conversation. 434 Mass. at 595. Today, individuals would use their cell phones for such recordings. Under BCH's construction of the MWA, cell phone recordings would be beyond the MWA's reach because cell phones use a recording app (i.e., "software") to record, and "software" is not a "device." This is not the law. Cell phone recordings are clearly within the MWA's scope. *Gilk v. Cunniffe*, 655 F.3d 78, 86 (1st Cir. 2011) (cell phone recording falls within MWA's scope); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020)

---

[20] *See also In re Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *37 (Meta Pixel transmits communications "through the use of 'devices'"); *Sutter* (Ex. E) at 5–6 (rejecting argument that California wiretap act does not cover computer "code" for Meta Pixel and Google Analytics); *Luis v. Zang*, 833 F.3d 619, 634 (6th Cir. 2016) (manufacturer of computer spyware software sold a "device" designed for interceptions in violation of federal wiretap act); *United States v. Hutchins*, 2018 U.S. Dist. LEXIS 183898, at *34–37 (E.D. Wis. 2018) (software is "device" under the federal Wiretap Act given the "ordinary meaning of" a "device"); *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015) ("[S]oftware [which records websites visited on a cell phone] is a 'device' for purposes of the Wiretap Act."); *Klumb v. Goan*, 884 F. Supp. 2d 644, 661 (E.D. Tenn. 2012) (affirming wiretap liability where "program has been installed on a computer which [caused] emails sent…through the internet to be rerouted…to a third party address").

(MWA "makes it…a crime…to use a smartphone to [secretly] record"); *Martin*, 241 F. Supp. 3d at 286 (rejecting argument that cell phone recordings involve no "device"); *Commonwealth v. Browar-Jarus*, 97 Mass. App. Ct. 1108 (2020) (affirming **criminal conviction** under MWA for cell phone recording); *Commonwealth v. Minori*, 101 Mass. App. Ct. 1106 (App. Ct. 2022) (same); *Johnson v. Frei*, 2016 Mass. App. Div. LEXIS 36, *11-12 (App. Div. 2016) (affirming MWA liability for cell phone recording).

The cases BCH cites either do not hold as BCH contends or construe materially different statutes. In *Potter v. Havlicek*, a case involving computer spyware software, the court carefully held only that the software "**alone** is not a…device," because software "**alone** cannot be used to intercept communications." 2008 U.S. Dist. LEXIS 122211, at *23 (S.D. Ohio June 23, 2008) (emphasis added). The *Potter* court's repeated use of the word "alone" implies that even if software "alone" is not a device, software in combination with hardware **may** operate as an a "intercepting device." The court did not decide that issue, as the plaintiff only asserted a claim against the software manufacturer, not the individual who installed the software on a computer to intercept a communication.[21]

BCH also cites a series of Florida cases construing Florida's wiretap act to exclude software. The Florida act, however, is different in a critical respect. In *Jacome v. Spirit Airlines*, 2021 Fla. Cir. LEXIS 1435 (Fla. Cir. Ct. June 17, 2021), the court emphasized that the Florida act was "amended in 1988 to exclude '[a]ny communication from an electronic or mechanical device which permits the tracking of the movement of a person or an object,'" *id.* at *7–8 (quoting Fla. Stat. § 934.02(12)(c)), and therefore, the court reasoned, "software which *tracks* a website browser's movements…is thus definitionally excluded." *Id.* The MWA contains no such exclusion for devices that track the movement of a person; accordingly, *Jacome*'s reasoning does not apply to the MWA. The other Florida cases BCH cites simply follow *Jacome*. *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *6 (S.D. Fla. July 6, 2021) (citing *Jacome*); *Connor v. Whirlpool*

[21] "[T]here are reasons to doubt such a strict interpretation of the Wiretap Act [as articulated in *Potter*] would be warranted even if the court were to undertake such an interpretation. Determining that the Wiretap Act could never apply to software would require the court to overlook the notably broad language of the Wiretap Act…." *Hutchins*, 2018 U.S. Dist. LEXIS 183898, at *36–37.

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

*Corp.*, 2021 WL 3076477, at *6 (S.D. Fla. July 6, 2021) (same).[22]

In short, the better-reasoned authority that construes the MWA's actual text, rather than materially different statutes, confirms that Plaintiff's allegations fall comfortably within the MWA's definition of an "intercepting device."

D. *Plaintiff Alleges the Interception of "Content" as the MWA Defines that Term.*

BCH contends Plaintiff fails to allege that the "content" of any wire communication was intercepted. The MWA's express terms and controlling authority dictate otherwise.

The MWA's text is critical on this issue, as it differs materially from federal and most other state wiretap laws. The MWA provides a remedy wherever the "contents" of a communication are intercepted, and the MWA defines "contents" as: "**[A]ny information** concerning the **identity of the parties to such communication** **or** the **existence**, contents, substance, purport, **or** meaning of that communication." M.G.L. c. 272 § 99(B)(5) (emphasis added). Plaintiff pleads interception of both "information concerning the identity of the parties" **and** "information concerning…the contents, substance, purport, or meaning" of communications, although allegations of **either** type of "contents" are sufficient to state a claim, given the statute is framed in the disjunctive.

As a threshold matter, BCH's argument that "Plaintiff fails to plead adequately the existence of any communication **she** had with BCH," MTD at 13, is nonsense. As explained above, § I-C, *supra*, Plaintiff alleges she regularly visited pages on the BCH Website into which BCH injected the tracking technologies. BCH's arguments that the intercepted information was not "content" are also wrong.

[22] BCH's other cases involve materially different laws. *United States v. Ackies* construed a different statute on warrants for the installation of "mobile tracking devices." 918 F.3d 190, 199 (1st Cir. 2019); M.G.L. c. 272 § 99. The court relied on the "context" of that statute, which it understood to focus on physical GPS trackers; here, in contrast, the express statutory text contemplates the MWA will apply to "modern electronic surveillance devices." M.G.L. c. 272 § 99(A). BCH's citation to *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012), is even further off-point, as that case construes the phrase "tangible good or service," which is much different than "device."

1. Plaintiff Pleads the Interception of Information Concerning the Identity of the Parties to the Communications.

The plain text of the MWA provides that "contents" include "**any** information concerning the **identity of the parties**." M.G.L. c. 272 § 99(B)(5) (emphasis added). Plaintiff alleges multiple types of information the tracking technologies intercept that Google and Facebook use both to positively identify the user whose communications are intercepted. The information concerning the identity of website users that BCH helps Google and Facebook intercept include IP addresses, which are a device's unique address on the Internet (equivalent to a telephone number), ¶ 32, 47, 54, 67, 72; browser fingerprints, which are combinations computer settings that are unique to individuals, ¶¶ 66, 68, 73; and identification numbers Google and Facebook assign to individuals to track them across the BCH Website and other websites, ¶¶ 66, 74. After identifying the individual using these techniques, Google and Facebook use the contents of the intercepted communication to serve **individualized** advertising. ¶¶ 34–37, 40–41.

BCH's motion depends upon its false claim that "Massachusetts appellate courts have not analyzed the meaning of 'contents' under the [MWA.]" To the contrary, in *District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*, 379 Mass. 586 (1980), the SJC construed the definition of "contents," and its holding directly applies here. *New England Telephone* addressed the use of "cross frame unit traps," which record phone numbers of incoming calls to a particular phone line (but **not** the audio of the call itself). *Id.* at 587. The SJC held that telephone numbers count as "contents" of communications under the MWA's plain text. It reasoned:

> An interception is defined…to include the secret recording of "the *contents* of any *wire* or oral communication through the use of any intercepting device…." "Contents" in turn is defined broadly to include, among other things, "any information concerning the identity of the parties to such communication or the existence…of that communication…." [T]he recording of the telephone number of the line from which a call was attempted is "'information concerning the identity of' a party to a communication and concerning 'the existence…of that communication."

*Id.* at 591–92 (emphasis in original).

Of course, phone numbers, similar to IP addresses, do not necessarily belong to particular individuals. Given the broad definition of "contents," however, the SJC held that telephone numbers are

"information concerning the identity of the parties" and hence constitute "content" under the MWA. For the same reasons, IP addresses also constitute content under the MWA.

BCH attempts to avoid this clear law by pointing to cases under the federal wiretap act. Critically, Congress amended the federal act in 1986 to **<u>exclude</u>** from the definition of "content" "information concerning the identity" of the parties to a communication. *See* 18 U.S.C. § 2510(8). The case BCH cites to argue "phone numbers" are not "contents," *Hill v. MCI WorldCom Communs., Inc.*, 120 F. Supp. 2d 1194 (S.D. Iowa 2000), explains that before Congress removed the phrase "information concerning the identity of the parties" from the definition of "contents" (that is, when the federal act mirrored the current text of the MWA), the act "**<u>did cover such information</u>**." *Id.* at 1196 (emphasis added).

Here, Plaintiff alleges that BCH assisted Google and Facebook in intercepting information concerning the identity of the parties—in fact, the technologies are designed to permit both Google and Facebook to use the intercepted information to serve personalized advertising upon particular individuals. Even focusing on IP addresses in isolation, IP addresses are simply the Internet's equivalent of telephone numbers. Under *New England Telephone*, IP addresses fall comfortably within the "broad" language of the MWA as "**<u>any</u>**" information concerning the identity of the parties.[23] And, to repeat, Plaintiff's allegations are not limited to IP addresses; she also alleges Google and Facebook intercepted other identifying information that both companies used in combination with IP addresses to positively identify the individuals, including persistent identifiers and "browser fingerprints." ¶¶ 66, 68, 73, 74.

The Federal Trade Commission ("FTC"), in construing another privacy law, rejected the same argument BCH makes here—that IP addresses provide no identifying information because they relate to "devices," not "individuals." In rejecting challenges to a rule under the Children's Online Privacy

[23] BCH contends, without support, that Google Analytics is "pseudonymous." Although BCH cites to Complaint ¶ 53, the Complaint does not say that, and instead, Plaintiff specifically alleges Google can and does associate intercepted communications with individuals' real-world identities. ¶¶ 54, 67–68; *see also Bon Secours* (Ex. F) at 4 (rejecting hospital contention that visits to website are anonymous because "this is contradicted by the amended Complaint," including allegations that Google used "IP address, user agent and browser fingerprints" to identify individuals).

Protection Act in which the FTC defined "individually identifiable information about an individual" to include IP addresses, *see* 16 C.F.R. 312.2 ("Personal Information"), the FTC explained:

> The Commission continues to believe that persistent identifiers [including IP addresses] permit the online contacting of a specific individual. [I]t is not persuaded by arguments that persistent identifiers only permit the contacting of a device. This interpretation ignores the reality that, at any given moment, a specific individual is using that device. Indeed, the whole premise underlying behavioral advertising is to serve an advertisement based on the perceived preferences of the individual user.
>
> Nor is the Commission swayed by arguments noting that multiple individuals could be using the same device. Multiple people often share the same phone number, the same home address, and the same email address, yet Congress still classified these, standing alone, as "individually identifiable information about an individual."

78 Fed. Reg. 3972, 3980 (2013).[24] The FTC correctly analogizes IP addresses to telephone numbers, confirming the SJC's holding in *New England Telephone* that such identifiers reflect "information concerning the identity of the parties" to a communication. *New England Telephone* controls here. Consistent with this clear authority, this Court in *Partners* affirmed an MWA claim over the precise same argument BCH makes here. *Partners* (Ex. C) (rejecting argument that IP address "really just identifies a machine" and "any one of those devices can…be held by any number of people"); Ex. B.

2. Plaintiff Alleges an Interception of "Substance, Purport, or Meaning" of Communications.

Although Plaintiff's allegation of an interception of "information concerning the identity of the parties" is sufficient to uphold Plaintiff's claim, Plaintiff also alleges interception of communication's "substance, purport, or meaning," providing an additional basis for BCH's liability under the MWA. Plaintiff presents detailed allegations regarding the intercepted information, including descriptive URLs such as "https://www.childrenshospital.org/centers/cancerand-blood-disorders-center," webpage titles, descriptions of the more detailed contents of webpages, the precise search terms consumers used on the website, the precise criteria consumers used to search for doctors, and consumers' communications with

[24] *See also In re Search of Info. that Is Stored at Premises Controlled by Google,* 2023 U.S. Dist. LEXIS 33651, at *15 (S.D. Tex. Feb. 14, 2023) (confirming in context of application for search warrant that "Google often has records of the Internet Protocol, or 'IP,' address used to register the Google account and the IP addresses associated with particular logins to the account," which can be used to identify individuals).

BCH through the purportedly secure patient portal, including requests to add patients, obtain diagnostic tests, obtain medication, and view bills. *See* ¶¶ 10, 85–91, 98–106; *see also* § II-A, *supra.*

Even focusing on URLs alone, ample authority confirms that URLs contain "content" when they are "descriptive" by revealing the substance of a webpage that a user visits. The district court in *Meta Pixel Healthcare* found allegations relating to Meta Pixel on hospital websites to be "strong," rejecting the argument that the interceptions accomplished through Meta Pixel did not involve contents. It explained:

> [T]he log-in buttons and the kinds of descriptive URLs identified [by the plaintiff] are "contents" within the meaning of the statute. Unlike in *Zynga*,[25] the URLs at issue here would not merely reveal the name of a Facebook user or group.... [Instead, the URLs] are content because they concern the substance of a communication.... [P]laintiffs' internet communications on their healthcare providers' websites appear to fall squarely within the statutory definition [of "contents"].

2022 U.S. Dist. LEXIS 230754, at *4, 35–37; *Partners* (Ex. C) at 12 (crediting allegations that hospital URLs reveal the substance of communications); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (affirming wiretap claim; explaining that "the URL provides significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it"). Here, Plaintiff alleges in detail how the intercepted URLs are descriptive, revealing highly personal medical information about the website user. Those URLs, combined with the other information intercepted (page titles, content, and user requests), reflect the "content" of the communication.

## V. CONCLUSION

For the foregoing reasons, BCH's motion to dismiss must be denied.

---

[25] "*Zynga*" refers to *In re Zynga Privacy Litigation,* 750 F.3d 1098 (9th Cir. 2014), a case BCH cites. As *Meta Pixel Healthcare* explains, *Zynga* did not hold that URLs never contain "content"; instead, the particular URLs in *Zynga* did not. 2022 U.S. Dist. LEXIS 230754, at *35–36. The Third Circuit in *In re Google, Inc.* likewise rejected the district court's "categorical assessment that [URL]s *never* 'concern[] the substance, purporting, or meaning' of a communication." 806 F.3d 125, 136–37 (3d Cir. 2015). Whether URLs disclose content is a fact question. *Id. Kurkowski v. Rush Sys. for Health*, 2023 U.S. Dist. LEXIS 35702 (N.D. Ill. Mar. 3, 2023), is even further off-point. The passage from *Kurkowski* on which BCH relies did not discuss whether website interactions count as "contents" but instead whether interactions revealed information protected by the federal Health Insurance Portability and Accountability Act, an entirely different question not presented here. *Id.* at *13–14.

Dated: June 9, 2023

Respectfully submitted,

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by e-mail on June 9, 2023.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

# Exhibit A

29:1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM, HEALTH INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

Defendants.

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2: 44
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals")[1] move under Massachusetts Rule of Civil Procedure 12(b)(6) ("Rule 12") to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. Plaintiffs have filed a 111-

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

page, 419-paragraph First Amended Complaint ("FAC"), replete with graphics, flowcharts, links to YouTube videos, snippets of code, and digressions from academic articles.[2] In fact, Plaintiffs spend 73 pages before even trying to allege a single cause of action against the Hospitals, inveighing against Google, Facebook, a hodgepodge of lesser-known companies, and the way the Internet generally functions. (Indeed, Plaintiffs' counsel, Simmons Hanly Conroy, sues these non-profit hospitals after suffering dismissal of a similar suit against Facebook itself, and a group of other hospitals, in California.) With this bulk of extraneous material, Plaintiffs seek to obscure their fundamental failings and proceed into costly class discovery, threatening non-profit hospitals with millions in damages. They cannot do so. Even assuming all their factual allegations to be true, the FAC does not "raise a right to relief above the speculative level." Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (adopting the Fed. R. Civ. P. 12 standard set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007)). To the contrary, a close examination of the allegations and the law compels dismissal.

## I. SUMMARY OF ARGUMENT

Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99 ("Wiretap Act"). To the contrary, the FAC and referenced documents show that the Hospitals extensively disclosed what everyone already knows – that websites in 2019 use third-party cookies. Further, the actions that Plaintiffs describe in their FAC do not amount to "interception" at all.

---

[2] To say Plaintiffs' initial filings are voluminous is an understatement. Plaintiffs have filed: (i) two complaints, the first was fifty pages and 218 paragraphs, and the second is over one hundred pages and four hundred paragraphs (without any change in the underlying facts); (ii) two motions for preliminary injunction and memoranda in support; and (iii) two affidavits by their expert, totaling over one-hundred pages.

Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy" as required to recover under G.L c. 214, § 1B ("Invasion of Privacy"). The Hospitals' disclosures, incorporated by reference in the FAC, amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients. To sustain such a claim, the Court would have to create a new fiduciary duty under Massachusetts law. Members of the public engaging with general informational websites is certainly not compelling grounds upon which to build such a duty.

Lastly, Plaintiffs fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are non-profit, charitable institutions and by offering publicly-available informational websites they are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally-cognizable injury.

## II. FACTUAL ALLEGATIONS AND FACTS SUBJECT TO JUDICIAL NOTICE

### A. The Hospitals' Non-Profit Status Is Subject to Judicial Notice

Plaintiffs accuse the Hospitals of violating patient privacy for economic gain. Plaintiffs are wrong. The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. The Hospitals' non-profit status is a fact subject to judicial notice. That status is a "fact that is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction," and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Mass. G. Evid., § 201(b). For example, the Secretary

of the Commonwealth maintains records of the status of non-profit (and for profit) corporations,[3] and the Office of the Attorney General maintains a registry of non-profit entities in the state.[4] The Hospitals' non-profit status is listed on each of these sources. Therefore, the Court can take judicial notice of that non-profit status, even at this stage. Mass. G. Evid., § 201(c) ("A court may take judicial notice at any stage of the proceeding, whether requested or not[.]").

**B. Hospital Website Disclosures Incorporated By Reference**

The FAC cites continuously to websites maintained by the Hospitals. These include massgeneral.org, brighamandwomens.org, and dana-farber.org (the "Informational Websites"). The FAC not only references these websites, but provides multiple screenshots. Therefore, the disclosures made on each of these sites is incorporated by reference and subject to the Court's notice on this Motion. See, e.g., Martin v. Lefkowitz, 93-7454, 1994 Mass. Super. LEXIS 37, at *6 (Aug. 3, 1994) (granting motion to dismiss after giving defendants the benefit of documents incorporated by reference into the complaint).

**1. The Hospitals' Websites' Disclosures Make Clear Their Informational Nature**

The Informational Websites each provide disclaimers about the nature of the websites themselves. For example, MGH states on its Informational Website: "Disclaimer: The Massachusetts General Hospital website is intended to provide general educational information and to help users more easily access information about health care services at Mass General."

---

[3] SEC. OF THE COMMONWEALTH OF MASS., CORPORATIONS DIV., SEARCH FOR A BUSINESS ENTITY, http://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx (last visited Sept. 10, 2019).

[4] OFFICE OF THE MASS. ATT'Y GEN., NON-PROFITS & CHARITIES DOCUMENT SEARCH, http://www.charities.ago.state.ma.us/charities/ (last visited Sept. 10, 2019).

TERMS OF USE, https://www.massgeneral.org/notices/terms-of-use.aspx (last visited Sept. 10, 2019).

Brigham and Women's Hospital's Informational Website states:

> The Brigham and Women's Hospital (BWH) web site is intended to provide general educational information and to help users arrange more easily for health care services...This site is not an attempt to practice medicine or provide specific medical advice .... Use of programs on the BWH site does not establish a doctor-patient relationship.

DISCLAIMER, https://www.brighamandwomens.org/about-bwh/disclaimer (last visited Sept. 10, 2019).

DFCI's Informational Website states:

> The Dana-Farber Cancer Institute website is intended to provide general information about the Institute, its care and research programs, and about cancer and related diseases. This site also provides links to health information that may be written by Dana-Farber staff or by outside providers, and access (links) to some external websites for your convenience .... This site is not an attempt to practice medicine or provide specific medical advice, nor does the use of the site establish a doctor-patient relationship.

LEGAL STATMENTS, https://www.dana-farber.org/legal-statements/ (last visited Sept. 10, 2019).

**2. The Informational Websites Make Any Necessary Privacy Disclosures**

On any fair reading, the Informational Websites disclose an active web environment, with data being gathered automatically and subject to analysis, potentially with the help of third parties. For example, MGH affirmatively states:

> The Mass General websites use "cookies", tracking pixels and related technologies. Cookies are small data files that a website can transfer to your computer. Examples of information we collect include how often someone visits our site and what they do while on our site. We use this information in the aggregate to understand how our visitors as a group use different resources and to help us improve our site. We also collect information about the activity of individual website users. This information may be used to target related Mass General advertisements to you on other third-party sites.

WEBSITE PRIVACY POLICY, https://www.massgeneral.org/notices/privacy/websiteprivacy.aspx (last visited Sept. 10, 2019). Similarly, the BWH privacy policy discloses:

> The Brigham and Women's website[s] use web analytics, tag management services, and remarketing tools provided by Google, Inc. ("Google") and other third parties to collect certain information relating to your use of the website. Google Analytics uses "cookies", which are text files placed on your computer, and tags (such as tracking codes and event codes) to help us analyze how users use different resources and to help us improve our site. This information may also be used to target related Brigham and Women's Hospital advertisements to you on other third-party sites.

WEBSITE CONTENT AND PRIVACY POLICY, https://www.brighamandwomens.org/about-bwh/privacy (last visited Sept. 10, 2019). Both provide a link to opt out of interest-based advertising.

Likewise, DFCI discloses the use of cookies "to track traffic coming to our site." DANA-FARBER WEBSITE PRIVACY STATEMENT, https://www.dana-farber.org/privacy-policy/ (last visited Sept. 10, 2019). Thus, the Hospitals' Informational Website policies clearly disclose the use of cookies and other tracking tools.

### C. The First Amended Complaint Is Overstuffed with Irrelevant Red Herrings

The First Amended Complaint starts with a quote from a speech by an executive of one of the Hospitals. In this quote, she is discussing the values of the organization, and promoting privacy. In that context, she states that "[t]he trust and the confidence that you place in your potential or existing health care provider is sacred." *FAC*, Ex. 1.[5] The Hospitals, of course, stand by that quote and act accordingly. But the First Amended Complaint does not say what legal relevance this quote has and, without offering any support to the contrary, misappropriates and weaponizes it against well-meaning Hospitals.

---

[5] All "¶" references are to the FAC unless otherwise noted.

As an initial matter, Plaintiffs patently misstate the purpose and functionality of the Informational Websites. The Informational Websites are sources of information about the Hospitals, recent medical news and research, events, and other health-related issues.[6] Plaintiffs attempt to augment this reality with phrases like "the precise content of the patient's communication" (¶¶ 12, 14, 16), implying the false narrative that visitors are able to communicate directly with medical professionals through the Informational Websites as opposed to the reality that visitors are merely navigating through publicly-available materials. Plaintiffs contend, for example, that the Informational Websites "are designed for patient communications, including . . . signing up [for] and signing in to a personal patient portal" (¶ 30), and that clicking a link from each of the Informational Websites is all that is required to sign up and sign in (¶¶ 103-11). This clever wordplay obscures the fact that the Informational Websites merely provide a link to a separate website, where one may sign up or sign in – a fact that Plaintiffs concede later in the FAC. See ¶ 146 (belatedly referencing a "specific webpage within [a Partners] website that contained the Patient Portal log-in").[7]

The FAC also generally maintains the fiction that every person who visits the Informational Websites is, in fact, a patient. ¶¶ 29-30. The websites on their face make clear that their purpose

---

[6] While the Hospitals respect that, for the purposes of a Motion to Dismiss, they must accept all well-pled allegations as true, it is notable that Plaintiffs misrepresent the functionality of the Informational Websites (see, e.g., ¶ 30), which only provide visitors with *information about* actions such as payment and accessing the patient portal, not the ability to complete those tasks. In fact, the Informational Websites direct visitors to Hospital personnel and/or a separate online resource for direct communications with doctors and other functions related to their actual medical care or records.

[7] Although Partners need not respond to the contention in ¶ 146 that any action taken by that separate website – which is used for a distinct purpose from the Informational Websites and against which Plaintiffs raise **no** allegations – was related to the instant suit (in fact, it was not), it is absurd to suggest that the Informational Websites be treated the same as a patient login portal.

is to provide information to the public at large – for example, providing a history of the institutions, the offerings at each facility, and information about various health issues, among other content. Further, those websites expressly disclaim the creation of a patient relationship, and there is nothing unique about a patient's interaction with any of the Informational Websites as compared to that of a member of the public at large. Critically, Plaintiffs do not allege (nor could they) that the Hospitals know whether the visitors to their Informational Websites are patients, medical professionals, medical students, employees, or other members of the public.

The FAC spends dozens of pages describing the general business practices of third parties not named as defendants in this action, only vaguely relating these practices to the instant claims. Plaintiffs never explain how the Hospitals would be liable for the business model of these third parties. For example, Plaintiffs speculate that Facebook may have tools that allow it to scrape appointment request forms from the Hospitals' websites, but admit "Plaintiff is without knowledge whether Mass General and Partners have actually implemented form-scraping functionality." ¶ 123.

Further, Plaintiffs surmise that Facebook and Google cookies may be synched up in a nefarious tracking scheme on the Hospitals' respective websites, but admit that without further discovery, "it is impossible to know whether and how much data is disclosed to Facebook through this method." ¶ 176. Without any supporting facts, Plaintiffs allege that tag manager tools are deployed as "invisible tracking" (¶¶ 63-64); then, they concede, in the following paragraph, that tag managers improve website functionality (¶ 65). The continuing implication is that Plaintiffs need to engage in full-scale discovery to determine whether there is any merit to their claims against the Hospitals; but, the reality is that Plaintiffs want to start a fishing expedition targeting

these non-defendant third parties, without sufficiently alleging that it would result in any liability against the Hospitals.

**D. Almost Nothing in The FAC is Actually About Plaintiffs**

By contrast, John Doe and Jane Doe, the supposed parties in interest, barely appear in their own FAC. Fewer than a dozen of the 419 paragraphs concern John Doe or Jane Doe, as opposed to the countless allegations that if "a patient" were to do this or that, the Informational Websites would respond in such and such a way. ¶ 25. Plaintiffs make no allegations about the privacy settings they deployed on their own Internet browsers, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

The FAC alleges in a conclusory fashion that "Defendants disclosed Plaintiffs John Doe's and Jane Doe's communications, including patient status and personally identifiable information associated with these communications to third parties," and were, thereby, compensated "in the form of enhanced marketing services." ¶¶ 294-95. Plaintiffs do not identify what "personally identifiable information" was disclosed to third-parties, and deliberately use the term "compensate" to create the misleading impression that the Hospitals received money in connection with the allegations in the FAC. But, Plaintiffs stop short of actually making any such allegation. There is no allegation, nor could there be one in good faith, that any of the Hospitals received financial remuneration in connection with the operation of their Informational Websites.

The FAC does not allege with whom John Doe's or Jane Doe's information was shared, by which Hospital, or for what purpose. FAC Paragraphs 95-101 criticize browser fingerprinting, in general, but the FAC does not allege that John Doe's or Jane Doe's browser was fingerprinted. Long sections of the FAC concern appointment schedulers and how the Informational Websites can be searched ("queries"), but neither John Doe nor Jane Doe alleges that they used the appointment scheduler or made any queries on the website. The FAC discourses at length on

alleged inadequacies, gaps, or lacunae in the online disclosures but does not allege that John Doe or Jane Doe read or relied on any of them.

Nor does the FAC allege any facts specific to John Doe or Jane Doe to demonstrate any damage from or consequence of the alleged sharing of "personally identifiable information". The FAC relies on academic musings about the economic value of personal information, ¶ 227, but does not allege that John Doe or Jane Doe were ever looking to sell their personal information or were somehow thwarted by the Hospitals in those (hypothetical) efforts. See, e.g., Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 451 (D. Mass. 2012) (dismissing claim for "value" of personal information involved in a data security breach). Like their pseudonyms, John Doe and Jane Doe are ciphers in this suit, which is first, last, and only about the desire by Plaintiffs' counsel to make money suing non-profit hospitals.

## III. LEGAL ANALYSIS

### A. Plaintiffs State No Claim Under The Wiretap Act

Under the Massachusetts Wiretap Act, it is unlawful to intercept, disclose, or use intercepted oral or wire communications. Mass. Gen. Laws ch. 272, § 99. The critical limiting term in the statute is "interception," expressly defined to mean "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Id., § 99(B)(4) (emphasis added). There was nothing secret about any of the Hospitals using third-party cookies to track activity. Each of them disclosed that fact in their respective privacy policies posted on their websites. Under § 99(C)(1), a recording made pursuant to public notice is not secret, and hence not a violation. See, e.g., Glik v. Cunniffe,

655 F.3d 78, 87-88 (1st Cir. 2011) (finding "actual knowledge" does not require that there be any explicit acknowledgment of or reference to the fact of the recording).[8]

Even apart from the specific privacy policies, it is common knowledge that cookies "are part of routine Internet functioning and can easily be blocked." See In re Facebook Internet Tracking Litig., 263 F. Supp. 3d 836, 846-847 (N.D. Cal. 2017) (dismissing privacy claims, and noting that "websites routinely embed content from third-party servers in the form of videos, images, and other media, as well as through their use of analytics tools, advertising networks, code libraries and other utilities"). There, the Court noted that the Plaintiffs did not "have a reasonable expectation of privacy in the URLs of the pages they visit," in part because they "could have taken steps to keep their browsing histories private." Id. at 846.

For almost two decades, the plaintiffs' bar has been trying to cash in on hyper-technical claims surrounding cookies, and for almost two decades the courts consistently have rebuffed these efforts. See, e.g., In re DoubleClick Privacy Litig., 154 F. Supp. 2d 497 (S.D.N.Y. 2001) (dismissing claims against ad network for using cookies to target advertisements). Indeed, the DoubleClick court's legal decision and reasoning has withstood the test of time. It noted that the Internet is predicated on sharing information between computers: "The Internet is accurately described as a 'network of networks.' Computer networks are interconnected individual computers that share information. Anytime two or more computer networks connect, they form an 'internet.'" Id. at 501. DoubleClick provided website advertisements for its clients, promising

---

[8] Plaintiffs make much of the standard of consent under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). However, that is not the applicable law. Plaintiffs did not and cannot sue under it. See, e.g., Miller v. Nichols, 586 F.3d 53, 59-60 (1st Cir. 2009), cert. denied, 559 U.S. 1008 (2010) (refusing to create a private cause of action since one did not already exist for a HIPAA violation); Padilla-Ruiz v. United States, 593 F. App'x 1, 4 (1st Cir. 2015) (affirming District Court decision that HIPAA does not create a private right of action).

that it "will place their banner advertisements in front of viewers who match their demographic targets," and "creat[ing] value for its customers in large part by building detailed profiles of Internet users and using them to target clients' advertisements." Id. at 502. Critical to the DoubleClick court's analysis in dismissing plaintiffs' complaint with prejudice was the fact that "users can easily and at no cost prevent DoubleClick from collecting information from them." Id. at 504. Thus, at least as a general matter, website visitors understand that third-party cookies are part of virtually any website.

Further, the actions that the Plaintiffs allege do not amount to "interception" of any communication at all. The FAC first describes the GET request, by which a web user asks to see a page (¶ 56); then, describes the POST request, by which a web user can send form information (¶ 57); and finally, alleges that the Hospital servers, in response to these requests, send commands to the web user's browser (¶ 58). Allegedly, these commands tell the browser to redirect the GET or POST information to a third party. Even if this were true, it would not constitute the "interception" of any communication. See, e.g., In re Facebook Internet Tracking Litig., 263 F. Supp. 3d at 844 (dismissing Wiretap Act claim).

Here, as in In re Facebook, Plaintiffs allege several communications, but none is intercepted. In the first, the user sends a GET or POST request to the web server. The web server sends instructions back. The third party is not a part of these communications. Then, following directions, the web user's browser sends information to the third party. Dismissing the Wiretap Act claim, the court held that "[t]he fact that a user's web browser automatically sends the same information to both parties does not establish that one party intercepted the user's communication with the other." Id. at 844.

A contrary conclusion would subject almost all websites to catastrophic potential liability pursuant to the liquidated damages available under the Wiretap Act. Further, the Wiretap Act is a criminal statute; and Plaintiffs' interpretation of that statute would criminalize basic Internet functionality (which has been recognized by courts in the United States for nearly twenty years). See, e.g., Flemings v. Contributory Ret. Appeal Bd., 431 Mass. 374, 375-76 (2000) ("If a sensible construction is available, we shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results").

**B. Plaintiffs State No Claim For Invasion of Privacy**

To sustain a claim for invasion of privacy, "the invasion must be both unreasonable and substantial or serious." Nelson v. Salem State Coll., 446 Mass. 525, 536 (2006). Relevant to the analysis is the "location, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." Polay v. McMahon, 468 Mass. 379, 383 (2014). In this case, to the extent that anything can be gleaned from the FAC concerning John Doe and Jane Doe specifically, the "intrusion" is nothing more than placing standard cookies files on their browsers; the frequency and duration is minimal; and, the underlying purpose is to help with retargeting, ¶ 220, which is a standard advertising practice. As a matter of law, even if what Plaintiffs say is true, it is not an actionable invasion of privacy. Cf., Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514 (1991) (finding that scattered telephone calls over a period of years from stock brokerage firm advertising sale of securities, which did not disrupt daily routine, did not constitute an actionable invasion of privacy). Moreover, courts in other jurisdictions assessing allegations similar to those made by Plaintiffs have concluded that disclosure of unique device identifier data, personal data, and geolocation information (including physical addresses) does not constitute "an egregious breach of social norms" but rather "routine commercial behavior." See

In re iPhone App. Litig., 844 F. Supp. 2d 1040, 103 (N.D. Cal. 2012) (citing Folgelstrom v. Lamps Plus, Inc., 195 Cal. Rptr. 4th 986, 992 (Cal. Ct. App. 2001)).

The FAC's perpetual reference to the health care context does not help them avoid dismissal. See, e.g., Kelley v. CVS Pharmacy, Inc., No. CIV.A. 98-0897-BLS2, 2007 WL 2781163 (Mass. Super. Aug. 24, 2007) (Gants, J.). In Kelley, the plaintiff obtained prescription drugs from defendant CVS to help with his diabetes. CVS, in conjunction with defendant Merck & Co, Inc., sent Kelley a letter promoting the use of high cholesterol medication. The plaintiff sued CVS, Merck, and a third-party mailing company used to coordinate the promotion for invasion of privacy. The Suffolk County Superior Court found that plaintiff had no actionable claim under Massachusetts law for invasion of privacy:

> Even if this Court were to assume that it would constitute a substantial or serious interference with Kelley's privacy for CVS to reveal the medication he was prescribed or his diagnosis of diabetes, there is no evidence that CVS did so here. CVS did not even provide Kelley's name to Merck. It provided his name, address, and date of birth to Elensys, and directed Elensys to send him the letter described above, but it did not reveal to Elensys his prescription or medical diagnosis. Nor could anyone from Elensys determine what his prescription or medical diagnosis was from the fact that this particular letter was sent to him because Elensys never was informed of the criteria that CVS used to determine which of its customers would receive this letter.

Id. at *2. The Kelley court found that "[t]he limited dissemination of this information falls well below the threshold of a substantial or serious interference with privacy." Id. at *3. The court went on to note that there was "plainly nothing improper" about a pharmacy using its own records to do targeted, knowledge-based outreach, and it "[could] not imagine any good reason" to prohibit pharmacies from doing so in conjunction with third parties. Id.

In contrast, here, neither John Doe nor Jane Doe even allege any specific targeted communication that they received (Kelley at least provided the court a letter). Neither John Doe nor Jane Doe allege what information was supposedly breached (diabetic condition for Kelley).

Nor do Plaintiffs say to whom that information was allegedly provided (Kelley specifically named multiple recipients). Kelley fell short in his drive to prove an actionable violation of Massachusetts law, and lost his case on summary judgment – John Doe and Jane Doe do not even get so far as pleading the requisite facts, and their invasion of privacy claim should be dismissed at the pleading stage.

Nothing about the online, cookie context changes these common sense standards. See, e.g., Smith v. Facebook, 262 F. Supp.3d 943 (N.D. Cal 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) (dismissing claim for invasion of privacy). In Smith, the plaintiffs[9] sought to sue the social media company and a series of hospitals. Those hospitals, Smith alleged, had websites that incorporated Facebook plug-ins. Therefore, Smith claimed, the hospitals were impermissibly disclosing confidential health care information to Facebook, *i.e.*, the fact that a certain website user may be browsing pages associated with a certain medical condition. The court dismissed the action on a variety of grounds, including for failure to state a privacy claim. As the Smith court told this same Plaintiffs' counsel, utilizing cookie-generated information that includes "general health information that is accessible to the public at large" is not an invasion of privacy. Id. at 955.

More generally, Plaintiffs constantly use the term "personally identifiable information" in their allegations, yet in an effort to obfuscate those allegations, they leave this term undefined. See discussion supra, at Part I.D. By contrast, G.L. c. 93H, § 1, defines "personal information" as a resident's first name and last name or first initial and last name in combination with any 1 or more of the following data elements that relate to such resident:

---

[9] Plaintiffs in Smith were represented by Simmons Hanley Conroy, lead Plaintiffs' counsel in this case. Apparently, after unsuccessfully pursuing the likes of Facebook and Google, Plaintiffs' counsel has trained their sights on non-profit hospitals that simply utilize Facebook and Google technology.

> (a) Social Security number;
> (b) [D]river's license number or state-issued identification card number; or
> (c) [F]inancial account number, or credit or debit card number, with or without any required security code, access code, personal identification number or password, that would permit access to a resident's financial account[.]

Plaintiff does not allege that any "personal information," so defined, is at issue in connection with these Informational Websites.

### C. Plaintiffs State No Claim for Breach of Fiduciary Duty

"To establish a breach of fiduciary duty, there must be a duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the breach." Estate of Moulton v. Puopolo, 467 Mass. 478, 492 (2014). Here, Plaintiffs allege that the Hospitals breached some unprecedented, unsupported duty by claiming obliquely that the Hospitals "owe Plaintiffs … a fiduciary duty of confidentiality in the data and content of communications between [the Hospitals] and the Plaintiffs []." ¶ 349. No Massachusetts court has ever imposed such a duty on a hospital owing to a patient, nor any other type of fiduciary duty. See, e.g., Doe v. Boston Med. Ctr., 88 Mass. App. Ct. 289, 289 (2015) (evaluating hospital on negligence standard, and not from a fiduciary perspective, in connection with claims made by a patient relating to an assault that occurred during patient's stay at hospital).

Under Massachusetts law, a fiduciary duty only "arises out of a unique or intimate one-to-one relationship[.]" Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600, at *4 (Mass. Super. July 11, 2005) (finding no fiduciary relationship between a diocese and the parishioner of a diocesan church); cf. Knelman v. Middlebury Coll., 570 F. App'x 66, 68 (2d Cir. 2014) ("While schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim"). Thus, for certain purposes, Massachusetts law recognizes a fiduciary duty as between physicians and their patients. See, Korper v. Weinstein, 57 Mass. App. Ct. 433, 437 (2003). No

Massachusetts court has extended this fiduciary duty to hospitals, and certainly not in this factual context.

Plaintiffs allege that they used websites available to the general public. The use of public websites does not create a "unique or intimate one-on-one relationship" between users and the website operator. Further, each of the websites disclaims the offering of advice and/or creation of a physician-patient relationship. Dismissal at the Rule 12 stage is appropriate. See Smith v. Massimiano, 414 Mass. 81, 85 (1993) (noting that the viability of a legal theory should be tested on Rule 12 rather than waiting until summary judgment).

**D. Plaintiffs State No Claim Under Chapter 93A**

Chapter 93A makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). This proscription "must be read to apply to those acts or practices which are perpetrated in a business context." Hubert v. Melrose-Wakefield Hosp., 40 Mass. App. Ct. 172, 175-76 (1996). Plaintiffs cannot assert a c. 93A claim against the Hospitals because none of these charitable institutions were acting in a business context when Plaintiffs voluntarily engaged with their websites, and, accordingly, the Hospitals were not engaged in "trade or commerce" within the meaning of c. 93A.

The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. See discussion, supra, Part II.A. Through the operation of their websites, the Hospitals were engaged in incidental activities necessary to meet their charitable purpose—*i.e.*, providing information regarding health care services and increasing educational opportunities and awareness of health care related issues. Furthermore, the Hospitals did not seek to profit from maintaining their websites or from providing information about their institutions to the Plaintiffs. Therefore, c. 93A does not apply as a matter of law. See All Seasons Servs., Inc. v. Comm'r of Health and Hosps. of Boston, 416 Mass. 269, 271-72 (1993) (declining to extend c. 93A to a non-profit

hospital that did not seek to profit from a contract with a food service company because providing food services was incidental to primary hospital activity); Hubert, 40 Mass. App. Ct. at 176 (affirming denial of motion for leave to add c. 93A claim against non-profit hospital because "[n]othing in the record indicated that the hospital, a non-profit organization, was acting in a business context so as to generate a profit" in land purchase from home owners).

Furthermore, the Plaintiffs cannot assert a Chapter 93A claim against the Hospitals merely as interested citizens who believe that an unfair or deceptive act or practice has occurred. Chapter 93A is not intended "to authorize purely 'vicarious suits by self-constituted private attorneys-general.'" Bellerman v. Fitchburg Gas & Elec. Light Co., No. WOCV200900023B, 2013 WL 518526, at *15 (Mass. Super. Jan. 7, 2013) (quoting Leardi v. Brown, 394 Mass. 151, 161 (1985)); see also Roberts v. Enterprise Rent-A-Car Co., 445 Mass. 811, 813-14 (2006) (concluding that plaintiff had no standing to allege that car rental company's collision damage waivers were deceptive for purposes of c. 93A because plaintiff never purchased such a waiver). Rather, the Plaintiffs must allege that they have "suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). "[T]he violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Id.

Here, Plaintiffs recite the same general five-category description of their purported damages in each Count. ¶¶ 334, 346, 351, 419. The three additional allegations relating to "harm" made in connection with Plaintiffs' c. 93A claim demonstrate that Plaintiffs have not suffered any distinct injury: (i) "Defendants shared Plaintiffs' . . . personally identified information with third parties;" (ii) "Defendants bartered and sold Plaintiffs' personally identifiable information . . . ;" and (iii) "Defendants used Plaintiffs' . . . personally identifiable information and communications

for marketing purposes." ¶ 419 (b), (c), (e).[10] Even if these alleged actions could be considered unfair or deceptive (they were not), Plaintiffs have not alleged that they suffered any separate, identifiable harm resulting from these actions. Therefore, Plaintiffs have failed to allege distinct injuries, and their Chapter 93A claim should be dismissed for this reason as well.

## IV. CONCLUSION

For the foregoing reasons, the Hospitals respectfully request that the Court grant the Hospitals' motion to dismiss.

[10] Plaintiffs make no allegations about the security settings they deployed on their own Internet browsers, no allegations about what free and publicly-available tools they used to protect their Internet behavior, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM HEALTH, INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:49
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

Dated: September 20, 2019

**CERTIFICATE OF SERVICE**

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

Suffolk
2019.
1651



#70392032_v1

Exhibit B

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411

11/25

10.23 NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

NOTICE SENT
12.07.20
H.+K.
C.A.M.
C.M.I.
M.T.M.
K.B.
K.+C.
J.M.C.
S.H.C.
E.S.J.
T.R.V.T.

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:41
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM, HEALTH INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

Defendants.

## DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals"),[1] through their undersigned counsel, move under Massachusetts Rule of Civil Procedure 12(b)(6) to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. As grounds for this motion, the Hospitals state as follows:

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

① After a virtual hearing, this motion is Allowed in Part. The motion is denied as to Counts I and II of the Plaintiffs' First Amended Complaint for the reasons stated on the record at the hearing. The motion also is denied as to Count III of the Complaint alleging breach of fiduciary duty. The Massachusetts Supreme Judicial Court has held that a physician has a "fiduciary obligation to hold in trust confidential information of his or her patient." Alberts v. Devine, 395 Mass. 59, 69 (1985). See also Harper v. Weinstein, 57 Mass. App. Ct. 433, (cont. below)

② 437 (2003) ("[A] physician has a duty to maintain the confidentiality of a plaintiff's medical records."). An individual's fiduciary obligations also can extend to the organization of which he or she is a member. See, e.g., Baker v. Wilmer Cutler Pickering Hale and Dorr LLP, 91 Mass. App. Ct. 835, 847 (2017) (law firm potentially liable for breach of fiduciary duty to client based on actions of law firm's attorneys). The motion is allowed as to Count III alleging violations of G.L. c. 93A, however, because the information-sharing issue serves the defendant non-profits' [illegible]

③ core mission, and, "[i]n most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission." Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 26 (1997). [signature] 11/20/20

1. In their First Amended Complaint, Plaintiffs attempt to allege claims individually and on behalf of the unsubstantiated Class and Subclasses against the Hospitals for: interception of wire communications in violation of G.L. c. 272, § 99 (Count I); invasion of privacy in violation of G.L c. 214, § 1B (Count II); breach of fiduciary duty (Count III); and, unfair and deceptive business practices in violation of G.L. c. 93A, § 9 (Count IV).

2. Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99. Indeed, the actions that Plaintiffs describe in their First Amended Complaint do not amount to "interception" at all.

3. Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy," as required to recover under G.L c. 214, § 1B. The Hospitals' disclosures amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

4. Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients.

5. Plaintiffs also fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are nonprofit, charitable institutions that are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally cognizable injury.

For the foregoing reasons, explained in detail in the accompanying Memorandum of Law, the Court should (A) grant this Motion, (B) dismiss all counts of the First Amended Complaint with prejudice and without leave to amend, (C) award the Hospitals costs and reasonable attorney's fees, and (D) grant such further relief as justice requires.

**REQUEST FOR ORAL ARGUMENT**

The Hospitals respectfully request a hearing on this Motion at the Court's earliest convenience.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM HEALTH, INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

Dated: September 20, 2019

## SUPERIOR COURT RULE 9C CERTIFICATION

Pursuant to Mass. Sup. Ct. R. 9C(a) and (b), Adam J. Bookbinder (counsel for Defendants) and J. Michael Conley (counsel for Plaintiffs) met and conferred on August 14, 2019 by telephone. Despite good faith efforts, the parties were unable to eliminate or narrow the issues of dispute.

Michael T. Maroney

## CERTIFICATE OF SERVICE

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via email and first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

# Exhibit C

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



Volume: I
Pages: 1-88
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS SUPERIOR COURT

* * * * * * * * * * * * * * * * * *
* JOHN DOE, *
* *
* Plaintiff, *
* *
* v. * No. 1984CV01651
* *
* PARTNERS HEALTHCARE SYSTEM INC *
* *
* Defendant *
* * * * * * * * * * * * * * * * * *

RULE 12 HEARING
BEFORE THE HONORABLE BRIAN A. DAVIS

APPEARANCES:

For the Plaintiffs, Mr. J. Michael Conley, Esquire
For the Plaintiffs, Mr. Jason Barnes, Esquire
For the Defendants, Mr. Michael Maroney, Esquire
For the Defendants, Mr. Mark Melodia, Esquire
(Full Appearance list on Page 2)

Boston, Massachusetts
November 20, 2020

(Transcript prepared from Audio Recording)
Reporter: Raymond F. Catuogno, Jr.

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



APPEARANCES:

For the Plaintiffs John & Jane Doe:
Kenney & Conley, P.C.
100 Grandview Road
Post Office Box 9139
Braintree, Massachusetts 02185
By: J. Michael Conley, Esquire

Simmons Hanly Conroy
One Court Street
Alton, Illinois 62002
By: Jason Barnes, Esquire

For the Defendants Partners Healthcare System Inc.; The General Hospital Corporation Doing Business as Massachusetts General Hospital; Brigham Health Inc.; Dana-Farber Cancer Institute Inc.; Dana-Farber Partners Cancer Center Inc.; Dana-Farber Inc.:
Holland & Knight LLP
10 Saint James Avenue
Boston, Massachusetts 02116
By: Michael T. Maroney, Esquire
Mark Melodia, Esquire

(Court in session.)

(2:01 p.m.)

THE CLERK: Good afternoon, your Honor. Calling Docket No. 1984CV1651; John Doe versus Partners Healthcare System Incorporated. This matter is before the Court for a Rule 12 hearing.

Counsel, will you please state your name for the record beginning with plaintiff's counsel, followed by the defense counsel.

THE COURT: Good afternoon. You can hear me?

MR. BARNES: Yes, your Honor.

MR. CONLEY: Yes, your Honor. Mike Conley for the plaintiffs.

THE COURT: Okay. Welcome.

Again, who's here on behalf of plaintiffs?

MR. CONLEY: In addition to me Mike Conley, Jay Barnes is present, and -- Jay, who else is --

MR. BARNES: Your Honor, Eric Johnson is on the phone. And Mitchell Bright is here. Mr. Bright has not entered his appearance in the case. But of course I want to note his presence --

THE COURT: Okay.

MR. BARNES: -- on the call.

THE COURT: Welcome. So who will be arguing on behalf of plaintiffs?

MR. BARNES: I will, your Honor --

THE COURT: Mr. Barnes.

MR. BARNES: -- Jay Barnes.

THE COURT: Mr. Barnes. Got it.

All right. And who's here on behalf of defendants?

MR. MARONEY: Good afternoon, your Honor. Michael Maroney on behalf of defendants. And my colleague Mr. Melodia will be arguing. I'll let him introduce himself.

MR. MELODIA: Good afternoon, your Honor. Mark Melodia from Holland and Knight on behalf of all of the defendants on this motion. And I'll just note that a number of my colleagues who are not necessarily needed in the case but who are attending arguments are in attendance; Chris Iaquinto, Teresa Lahoy, Ester Clovitz, Courtney Grow and Chelsea Rogan.

THE COURT: Mm-hm. All right.

MR. MELODIA: But I'll be arguing, your Honor.

THE COURT: Got it. So counsel, for those of you who are, you know, interested but not arguing, would you be kind enough to turn off your microphones and your cameras. It does reduce the Hollywood Squares effect for me during the course of the argument. So

I appreciate that. Thank you.

Counsel, we're here -- I think we're here officially on the motion to dismiss. However, we still have the motion for preliminary injunction that I need to address which is -- and you should note I've read all the materials on the motion to dismiss and I've gone through the stack of materials that were sent to me, some of which I asked for, some of which I didn't necessarily ask for, with respect to the preliminary injunction. So I have submissions from both sides; defendant's response on the preliminary order, I received the plaintiff's response to preliminary order, and then I received a series of letters with attachments. And I've reviewed those materials.

So what I intend to do here today is I'd like to start with the motion to dismiss. And then I -- don't worry, I intend to circle back on the motion for the preliminary injunction.

So we're going to start with the motion to dismiss. All right, folks, again I've read the papers. So we've got four counts here that we're fighting over, correct? We've got a count -- first count is wiretap act, the Massachusetts Wiretap Act. Then we've got the invasion of privacy claim which is

also officially statutory in Mass. We've got the breach of fiduciary duty claim. And we have the 93A claim. And defendants are moving forward to dismiss all of those claims. Okay.

MR. MELODIA: Correct, your Honor.

THE COURT: All right. So again I've read the papers Mr. Melodia. I've -- recognizing that I've read your papers and I've reviewed the arguments, is there information that isn't in your papers that you wish to share with me or anything that you want to highlight at this point in time?

MR. MELODIA: I think there are some fundamental things, your Honor, that cut across each of the counts. And I would be happy to address each of the specific counts as well. But I do recognize that the (inaudible -- indecipherable at 2:05:10) plaintiff. But let me focus on some of the fundamental reasons that really require dismissal of this case in its entirety as reflected in the first amended complaint.

Is anybody else getting an echo? Perhaps --

THE COURT: No.

MR. MELODIA: -- somebody's not on mute.

THE COURT: No. And again, and I'll give you an opportunity to speak Mr. Melodia. I am going to -- if you're going to jump into all the fundamental

aspects, again a reminder -- so I read the papers. I read the papers. And I have questions for both sides. And again it's an -- and let me remind you as well as you address the issues this is a motion to dismiss. So I accept the factual allegations as true. There seems to be some back and forth with respect to voracity of some of the factual allegations, but I have to accept the factual allegations as true. So what we're really doing here is we're testing the legal viability of the claims. That's all that this proceeding is about. And I make no determination at the motion to dismiss stage regarding the merits of the claims, just their legal viability.

MR. MELODIA: Yes, your Honor. And this complaint is legally not viable for fundamental reasons that can assume the truth of the properly pled parts of the first amended complaint. And I say properly pled because there are some things that this court can see and take judicial notice of from the websites themselves which are I think fair game on a motion to dismiss under Massachusetts State case law.

The privacy cases always need to be about an identifiable person. And here we don't have an identifiable person. We have at most an (inaudible

-- indecipherable at 2:06:54) which as the Court knows really just identifies a machine and really identifies the random physical numbers that changes every few months. And any one of those devices can in fact be held by any number of people at any given moment using it, but doesn't identify a person.

And similarly, even the Facebook ID and the Google ID that are used to somehow identify a person, even identify a patient according to plaintiff's theory don't, because a web point visitor has to first allow, set up their browser in a way that would allow for that information to pass to Facebook and Google, and would have to have a relationship with Facebook and Google ahead of time with their own terms and condition.

So I'm just talking about a privacy case needs to be about identifiable people. And this one, even if you take the first amended complaint as true, legally and technically is not.

Second, successful privacy cases like the cases that the plaintiff cite in this case; "Pharmatrak", "Google Cookies" from the third circuit, the "Nickelodeon" case in the third circuit, each and every one of those cases had deception by the defendant at their core. And we have no deception or

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



secrecy here. Instead we have website privacy policies that were and are on each of these hospital websites. And each and every one of those discloses the use of cookies, and discloses (inaudible -- indecipherable at 2:08:38.)

Third, you need a private space to be intruded upon in some way in a privacy case. And here we have public websites, literally public websites that anybody with an internet connection anywhere in the world can access.

And so I think it's important, your Honor, given that you've already mentioned the preliminary injunction motion -- I'm going to reference your Honor's order from April on that motion, there's a reference in the factual summary on page one of that order that talks about the hospital websites as providing direct portals that allow for access to health records and services. That is factually incorrect. And not because I say so or because an expert says so, but because it's obvious from the face of the websites which are specifically referenced in the first amended complaint and therefore are properly considered by the Court on a motion to dismiss. The three hospital websites referenced in the first amended complaint do not

share personal and protected health information. And the only way the plaintiff's counsel confuses the issue repeatedly in the first amended complaint is by referencing information pages on each hospital website that are about the patient gateway, your Honor, about it, descriptive of it. Not --

THE COURT: Pause for a moment Mr. Melodia.

MR. MELODIA: -- allowing --

THE COURT: So the allegation is -- pause. And here's one thing -- I apologize in advance to everyone. One thing I don't like about Zoom is it's difficult -- it's more difficult to sort of modulate the back and forth between counsel and -- between me and counsel. So I apologize if at some points in time I feel like I'm barging in. But unfortunately unless I mute you, which I think is even more offensive, I have no choice but to sort of get your attention.

So what's alleged in the complaint -- and here's what I recall from our discussion around the preliminary injunction, is that it is possible -- so someone can go on what you call the informational website -- and I recognize that there's a separate patient portal. That really doesn't seem to be in dispute in this proceeding. I got that.

MR. MELODIA: Correct.

THE COURT: I think. I recognize that. So what we're talking about is what the defendants refer to as the informational websites. What plaintiffs allege is that someone can go on the informational websites. They claim -- they're representing patients; existing patients, go on the informational website, look at information, pull down information. For example, look at the information about specific medical providers, say a particular doctor at MGH or the like, and that that information gets conveyed -- it's what's alleged, gets conveyed through Facebook in such a way that Facebook can match that information perhaps with its own Facebook identifier. So Facebook can put together, do a, you know, one and one, they can conclude that that individual who has a Facebook page -- which isn't -- is not that unusual, that person is cruising for for example a breast cancer specialist or something for that, looking for information about breast cancer on the MGH website. So Facebook can say this particular person -- you have someone in the waiting room with you? Would you mind? Thank you. This particular person is looking for information about breast cancer specialists, which -- and doesn't say it for sure, but it could

lead to an inference that that person has a real concern or perhaps a diagnosis of breast cancer, which would be confidential information perhaps. So that's what I understand to be the allegations. And again, it seems to me I have to take those allegations as true for purposes of the motion to dismiss.

I understand that there are disputes about whether in fact that information gets conveyed or how useful it is to Facebook. But at this point in time I've got to accept the allegations if that information flows to Facebook that they can match it with an individual, and therefore that there is a disclosure of patient confidential information.

Don't I have to look at it that way?

MR. MELODIA: You do have to look at it in terms of taking the allegations are true, your Honor, but no, you don't have to pile supposition upon supposition, and inference and possibility upon possibility to perhaps find some probability. We're not in a, you know, (inaudible -- indecipherable at 2:13:15) state. I mean (inaudible -- indecipherable at 2:13:20) standard of pleading. And these do need to be probable allegations, and these are not. Number one, because it's not personally identifiable.

THE COURT: If there's one thing plaintiffs didn't do in this case is under-plead, okay?

MR. MELODIA: Well certainly --

THE COURT: Actually they're not guilty of under-pleading. But go ahead.

MR. MELODIA: -- well, in some senses that's true, your Honor. It's a 111 page complaint. It's over 400 paragraphs. True enough. However, literally page 67 is the only page that deals with the named plaintiffs in this case. So they absolutely did under-plead with respect to the only two people who are before this Court. And they do not state anything about themselves. They don't tell us about their browser settings. They don't tell us whether they're Google and Facebook members. They don't tell us whether they had information accessed. They don't tell us whether they took privacy protective measures like trying to block cookies and that somehow those were overcome by something the defendant did. They don't even say if they ever looked at the privacy policy or the notice of privacy practices; the NPP, which I want to make sure we talk about, which is inapplicable to this website because it only deals with protected health information as required by HIPAA and OCR.

So we know nothing actually, notwithstanding the 111 pages, about the actual named plaintiffs and their claims in this case. And ultimately they have to stand, as this court knows, on their own two feet before they can claim to represent other people with similar claims.

But let me go back to the IP address idea that somehow that identifies a person. It doesn't.

THE COURT: So you -- no, I get -- I picked up on that argument in your papers Mr. Melodia.

MR. MELODIA: Okay.

THE COURT: So I did go back and I took a look at the amended complaint because I wanted to see what was -- specifically was alleged. And I look at for example page 74 of the complaint which is part of the Count One interception of wire communications, the wiretap act claim. Paragraph 327 says "Defendants engaged in and continue to engage in an interception by aiding others including Facebook and Google to secretly record the contents of plaintiff's and class member's wire communications."

So that's what's alleged. And I read your argument about that there isn't much meat on the bone with respect to these individual plaintiffs.

MR. MELODIA: Okay.

THE COURT: Again but I look at the -- so that's why I pulled the complaint to see what allegations were made with respect to these individual plaintiffs. And it looks like they covered their bases in terms of making allegations that these plaintiffs are representative with respect to at least the complaints that are made in this amended complaint.

MR. MELODIA: Yes, I was just responding to your Honor's sense of volume. That the volume is mostly generalized pleadings discussed in almost like a white paper about the internet, as opposed to about what happened to identifiable people. But I'll move on --

THE COURT: Let me -- can I -- can we talk about the claims one at a time?

MR. MELODIA: Sure.

THE COURT: So wiretap act claim, really you have two arguments. One of the arguments is that it's not an interception, but -- and there are various cases cited, but I'm dealing with the Massachusetts statute which is Chapter 272, Section 99. And that defines an interception as among other things -- and I'm inserting some letters in here, but aiding another to secretly hear or secretly record a wire

communication.

And I'm going to come back to the secret piece for a second.

But the Massachusetts Wiretap Act alleges -- it prohibits aiding someone else in secretly hearing or secretly recording.

So doesn't that address the arguments in your papers that it's not an interception because what they're -- what's alleged in this case is that these defendants have configured their websites in such a way as to aid Facebook and Google? And I just read you the allegation in Google and others --

MR. MELODIA: But --

THE COURT: -- and secretly recording or listening and to hearing the communications between MGH and its patients.

So doesn't that, at least for purposes of this statute, qualify as an interception?

MR. MELODIA: No, it doesn't, your Honor. Putting aside the secrecy issue for the moment and just focusing on the interception, there needs to be a third party at some point while the communication is in transit between person number one and person number two. There needs to be a third person --

THE COURT: The statute doesn't say that. The

statute doesn't say that. The statute says aiding --

MR. MELODIA: Well --

THE COURT: -- aiding somebody. It doesn't say if it has to be contemporaneous or the like. It simply says aiding a third party in hearing or -- in secretly hearing or secretly recording.

MR. MELODIA: -- right. But we don't -- even by the allegation the hospital's website does not aid in the interception. It does not in any way allow Facebook to eavesdrop or get in the middle of in the way that one can intercept a passing football or intercept anything else. You need to get in the middle of a communication that is ongoing. That communication has already finished. The get communication, communication number one -- may I share my screen, your Honor? We have a couple of demonstratives that I've shown to Mr. Barnes a couple of days ago.

THE COURT: Yes. I'll let you share a screen. One moment. All right, you should have that capability now.

MR. BARNES: Your Honor, Mr. Melodia did share them with me. I have no objection -- assuming they're the same, and I assume they are going to be the same, particularly in regards to the preliminary

injunction. I would note however on the motion to dismiss, to the extent they go beyond anything in the motion itself, that's not entirely proper. But I've seen them. They're fine for the Court to consider. Particularly that we're taking up both motions here today. Thank you, your Honor.

THE COURT: Mr. Melodia?

MR. MELODIA: So what we've tried to do, your Honor, is just diagram based upon the way it's described in the complaint and the way it's described in the plaintiff's expert's report, the so-called get communication; communication number one, and the so-called post communication; communication number two. And there are two distinct communications here. One is between the hospital's website and the visitor's browser -- that is the plaintiff, if the plaintiff has configured their browser in a way that allows that communication to occur. And --

THE COURT: Meaning if they allow third-party cookies?

MR. MELODIA: To allow third-party cookies, your Honor.

THE COURT: Yes.

MR. MELODIA: And so in that case there's a communication there that Facebook is not a part of.

So there is no interception or aiding and abetting. And then that communication complete --

THE COURT: So pause for a moment. Mr. Melodia, would it be possible for Facebook to gain access to that communication if for example defendants did not include Facebook, did not permit Facebook to post cookies through their website?

MR. MELODIA: -- I don't believe so.

THE COURT: You don't believe it would be possible?

MR. MELODIA: I don't believe it would be possible. But of course --

THE COURT: So isn't that -- doesn't that at least qualify as aiding?

MR. MELODIA: -- it's aiding, but not aiding a communication that is communication number two, the post communication, yes.

THE COURT: Got it.

MR. MELODIA: Aiding an interception, no.

THE COURT: But again, we're talking about --

MR. MELODIA: An interception --

THE COURT: -- an interception is defined as aiding another party in its ability to hear --

MR. MELODIA: -- hearing, hearing.

THE COURT: -- or secretly -- to hear or secretly

record. And here --

MR. MELODIA: To hear or secretly record.

THE COURT: -- yes.

MR. MELODIA: But there is no -- let me show you the next slide, your Honor, which -- okay, these are the actual communications. This is the code, your Honor, in the Smith affidavit that shows the actual communication. These are not the same communications. So you can't aid and abet somebody either hearing or recording something they don't hear or record. Communication number one is neither heard nor recorded by Facebook.

THE COURT: So you read "hear" -- and the definition of interception you mean it really has to be audibly heard as opposed to communicated --

MR. MELODIA: No.

THE COURT: -- no? I see.

MR. MELODIA: No. I accept -- I'm not taking some luddite approach to the wiretap act, even though it's been around 40 years and has not been applied to this exact scenario. Nonetheless, I'm not taking that approach. I'm saying that these are separate communications. And one way we know they're separate communications, not just a (inaudible -- indecipherable at 2:22:43) but it is the actual

separateness, the content of the communication as reflected on these slides from the Smith affidavit.

The next is you can see communication number one is over and communication number two continues. You cannot aid and abet somebody in intercepting something that is neither heard in any technological sense, or recorded by Facebook. They're simply not a part of communication number one. In the same way hospital is not a part of communication number two. So there is true separateness in the way that they're -- so in other words, using the football analogy, you know, here's -- if there's no completion, you know, if there's a completion of a transmission, a completion of a pass, and then the other team gets it, that's called a fumble. And the difference is there has -- there's a complete transmission in communication number one. And then communication number two occurs, and that is a different communication. It's a communication between the individual plaintiff; the website visitor and Google and Facebook, or any other third party. And that's the way the internet works across the internet; healthcare companies and all sorts of other companies including law firms.

So your Honor, again this whole theory, I mean

every --

THE COURT: Mr. Melodia, let me -- if you don't mind, let me jump in here and help you with your argument which is I don't buy this argument. Okay. I don't buy it. The language of the wiretap act in Mass is broad, is different than what I -- I looked at the language of some of the other jurisdictions that were cited.

So it seems to me that what you're describing is aiding. And so -- and let me just -- I'll help you along by saying you're not going to win that one. I'm not persuaded.

I want to talk briefly about the secret piece. Which is I did -- this is another situation where I went back to see what was alleged, because again I've got to -- I'm bound by the allegations of the complaint, the amended complaint. And it's alleged, at least in paragraph 327, among other places, I think, that there was a secret recording of plaintiff's wire communications by Facebook, Google and others. So again, if I'm dealing with a motion to dismiss, and I have to accept that allegation as true, why are we fighting about whether it's secret?

MR. MELODIA: Because that's a legal label, your Honor, that plaintiffs added. That's not a factual

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



statement. That is not something the Court has to accept as true. That is a legal conclusion. The word "secret" is in the wiretap act, and they have merely (inaudible -- indecipherable at 2:25:30) back to the Court. That is not a sufficient pleading. There is no secret here. In addition to these being -- this is the way in which the internet works. Literally this hasn't been secret for 20 years. The "Double-Click" case in 2001 acknowledged that the use of cookies and the use of tracking on websites is not secret.

In this particular case each hospital disclosed the use of cookies and disclosed tracking on the website, including references to Google analytics, as well as the pixels. So where is the secret? There can't be a secret by people who are using a free website from a device and looking at -- and clicking around. In the same way that if somebody visited a law firm website, your Honor, they don't become a client. These people don't become patients by virtue of simply clicking around on a public website. There's no secrecy going on.

THE COURT: Right, but these plaintiffs allege they are patients. They're already patients.

MR. MELODIA: It doesn't matter, your Honor. If

a client of a law firm who is a client goes on to the general website of a law firm and clicks around and searches anti-trust law, or searches breach of contract, or fraud, and then looks at attorney bios, and looks at email addresses and phone numbers for contacting, that does not make that person a client in that setting. They are not for example -- the clicking and the searching is not for example attorney/client privilege, is it? That can't be attorney/client privilege. Does the law firm have a duty all of a sudden -- for example, if they looked up breach of contract and then they missed a statute of limitations, can the law firm be sued for malpractice because they missed the statute of limitations on behalf of somebody who was a client but didn't tell the law firm in engagement that they are a client for purposes of a contract claim? No. Those --

THE COURT: See the problem with that -- actually, Mr. Melodia, that's interesting that you choose that analogy, because I've been bouncing that one around in my head for some time. And here's the problem I ran into with that analogy, which is assume for the moment that the person who's using the website is a client of the law firm. And they're

getting on and looking at some of the law firm materials about their particular legal problem, which is confidential. And the law firm then takes that communication and makes it available to Facebook, such that Facebook can then match the fact that that client of the law firm has been rummaging around the law firm's website with respect to a particular legal issue that's confidential, and can match that information with the identity of the user? So that's more like what we have here. And in those circumstances would that be deemed again -- there are a number of claims here that are made with respect to that type of activity, but it seems to me that at least again -- and I understand you have an argument with respect to disclosure, I've got that, but the allegation is it's done secretly. It seems to me that in those circumstances that's potentially a violation of the wiretap act.

Let me also mention yet again this is a motion to dismiss. You read the prologue to the wiretap act -- and the wiretap act is designed really for different circumstances I'll have to say. And so again the -- let me pull up the actual language in the act. But the preamble says, "The general court finds that organized crime exists within the Commonwealth and

that the increasing activities of organized crime constitute a grave danger to the public welfare and safety."

So I agree with you this statute I think was targeted towards a different set of problems. But what I have to deal with in this context is how does it apply here, and does plaintiff state a viable claim? And I have to say under the wiretap act, I think they do, based on the allegations of the complaint. I recognize you disagree. I recognize that. But I'm bound by what the allegations of the complaint are in a motion to dismiss. And it seems to me that they do, they state a viable claim under the wiretap act. Whether that claim will succeed or not is a completely different matter. But I'm --

MR. MELODIA: Understood, your Honor, but --

THE COURT: -- yes?

MR. MELODIA: -- the Court respectfully does not need to take as true the secrecy allegation when the secrecy is how the internet works across the entire internet. Logically, just realistically, sociologically, technically, there is no secret here. This is all public information that anybody who is using the internet ought to know and is charged with knowing. And our law all the time charges people

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



with knowing things they may or may not actually in fact know, but that doesn't make it secret and that doesn't make it improper. And even the "Pharmatrak" case, your Honor, which is the one case they can point to that applies to in the Federal Wiretap Act context apply, you know, these types of statutes to facts that are somewhat similar in the sense that they're happening on a website and they involve deflection of information. But they're still different. I mean "Pharmatrak", it was an anonymous party. There was absolutely no disclosure whatsoever of a PII being collected. PII being collected was name, and address, and gender, and insurance information, and medical conditions and medications. And in there -- and this is the case, the main case the plaintiffs rely upon your Honor for their wiretap act theory. In that case the court did not decide this timing issues as Mr. Barnes calls it on this -- and what I think of as separate communications, they didn't resolve the timing issue. They in fact explicitly reserved the timing issue and said the facts here do not require us to enter the debate over the existence of a real time requirement. And why was that? Because they found a simultaneous communication, which we don't have here, and an

identical communication, which we -- I showed on the screen, we don't have here. So "Pharmatrak" really doesn't get them where they need to go. Nor does the "Facebook" case out of the ninth circuit. I mean that case only --

THE COURT: Again -- again, Mr. Melodia, I don't see any simultaneous or contemporaneous requirement in the Massachusetts Wiretap Act. I don't see it. Am I missing something? Is it there? Have I just overlooked it?

MR. MELODIA: -- well I think it doesn't say the word "simultaneous", your Honor, that is true. However, what it does say is a third party needs to have heard or recorded a communication. And that didn't happen here. As alleged, it didn't happen here. There was no recording, secret or otherwise. And there was no hearing, secret or otherwise by Facebook, or Google, or any third party to communication number one, the get communication, as pled by Mr. Barnes in the complaint and as is obviously found in the Smith affidavit repeatedly.

THE COURT: Okay. Let me pause for a moment --

MR. MELODIA: So that's my point.

THE COURT: -- Mr. Melodia. I'm going to ask you to pause there. I'm going go through these claims

one at a time.

Mr. Barnes, briefly what do you have to say in response to Mr. Melodia's point that it's not the same communication?

MR. BARNES: Well, your Honor, if you have Mr. Smith's declaration -- well, do you have the complaint in front of you?

THE COURT: I do. The amended complaint, yes.

MR. BARNES: Right. If you go to paragraphs 103 and 104, they are on pages 24 and 25. Mr. Melodia says --

THE COURT: I have them.

MR. BARNES: -- Mr. Melodia says there are two separate communications here. And I want to provide just one example from the complaint to show that there are not two separate communications. Your Honor has it right. The Massachusetts law makes no distinction that the federal law does. But if you look at paragraph 103 there is the button up there at the top right screen in the screenshot that says "enroll or sign in to patient gateway."?

THE COURT: Yes.

MR. BARNES: Okay. When a patient clicks that button what happens is that's the patient's communication. That is the patient's sole

communication to Mass General Hospital in that example. It starts a transmission of data and exchange of content between Mass General and the patient's web browser. But immediately upon clicking that button the source code Mass General puts on its website redirects the content, the precise content of that button click to Facebook. And that's shown in paragraph 104. You see --

THE COURT: I see.

MR. BARNES: -- at the top of the graph where it says "EV subscribe button click", and then it says "button text enroll or sign in to patient gateway." That's not a -- the patient did nothing else to send that data to Facebook. That's entirely the result of the source code that Mass General put on its web property. And the same is true of every other communication we're talking about in this case. As it relates to the Facebook tracking pixel, your Honor, this piece of source code is set up in a way that Facebook actually gets the content of the communication in most circumstances before Mass General even receives it. And the reason for that is Facebook wants to make sure that it gets it.

I also heard Mr. Melodia say that this is only because the plaintiff's web browsers are configured

-- they had to choose to let this happen. First of all the default setting out of the box, this happens in the default setting out of the box.

Second of all, I believe we've alleged in the complaint -- I don't have the particular paragraph, we've alleged the deployment of what's called cookies syncing technology. And what cookie syncing technology means is that even if a user tried to block Facebook's cookies and tracking on a website like MGH, it happened anyway because of this cookie syncing. They've hacked -- they've figured out a way to hack their way around the browser settings that would block this tracking behavior.

So there is no separate communication of the patient. And the Massachusetts Wiretap Act is set up to protect the communications of people, not of the redirections caused by intercepting devices.

What Mr. Melodia is essentially asking this Court to do is repeal the wiretap act. Because if you think even in the context of a traditional wiretap act, right, where there's a bug on a telephone, a bug on a telephone results in the content of that communication being delivered to the recording interceptor along a separate path from the communication between the victim's phone and the

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



person they're speaking with's phone. The bug sends it this way. And that's exactly what this Facebook source code does. That's why they're called web bugs, your Honor.

THE COURT: Got it. All right, I think I've got it Mr. Barnes. Thank you, sir.

So Mr. Melodia, I think I've got this one, sir. I -- this is a motion to dismiss. I'm going to deny the motion to dismiss with respect to the wiretap claim. Again, a different matter whether that claim ultimately succeeds, but on a motion to dismiss I've got to -- I have to deny the motion with respect to -- that's Count One.

We talked briefly about the invasion of privacy claim. That's statutory as well. "Has to be an unreasonable, substantial or serious interference with privacy, and whether the intrusion is unreasonable, substantial or serious presents a question of fact." That's the "Polay" case from the SJC back in 2014. And again when I look at the allegations of a complaint of what the plaintiff allege is that the defendants are disclosing confidential patient medical information to third parties, including information about their medical condition. Here's what -- okay, you can -- I'll

listen to you in a moment Mr. Melodia, but here's what I saw in the complaint. And if I'm misreading it you can point it out to me. But what I see in the complaint is plaintiffs allege that the defendants are disclosing confidential patient medical information to third parties, like Facebook and Google, that the information includes information about the patient's medical condition and diagnoses, and interest in particular specialists. For example what we just discussed, the perhaps a patient's interest in a breast cancer specialist. And that they're doing it in a way that allows the third parties like Facebook to correlate that information and identify the particular user.

So again, you say that's not an unreasonable, or substantial or serious invasion of the privacy of those people. I am not sure I see it that way.

MR. MELODIA: Well, your Honor, I would never say that the disclosure of an individual's personally identifiable health information was not serious and substantial. The hospitals completely understand that. I understand that. Nobody is disputing that. But that's not what's happening. Not because --

THE COURT: But pause one moment. What's happening is a different animal.

MR. MELODIA: Okay.

THE COURT: So that's the point I'm trying to get across here --

MR. MELODIA: I get it.

THE COURT: -- is there's a huge dispute between these parties with respect to how this technology actually works and what's being transmitted. I got that. I understand that. But my point is simply I've got a motion to dismiss. So what I have to do is I have to accept plaintiff's version which is no, it is happening, it is happening. That's what plaintiffs allege. And in those circumstances if it is happening isn't that an invasion of privacy?

MR. MELODIA: Well if a true medical condition of an identified individual were being transmitted to Facebook and Google from our website that would be actionable, that would be an invasion of privacy, that would be substantial and serious. But that's not what really is alleged. They use the word medical conditions, but what they're talking about is searches, and URLs and search terms on a public website like these hospitals. And that is not actionable. That is not PHI. That is not covered by HIPAA. That is no way protected health information. PHI is defined by the law. It's also not even

personal information as defined by Massachusetts law.

THE COURT: If a patient has --

MR. MELODIA: And --

THE COURT: -- has breast cancer for example. Again, obviously something that can be deeply disturbing to that patient for good reason --

MR. MELODIA: -- certainly.

THE COURT: -- there's something that they do not wish to disclose publicly. They get on the MGH website and start cruising the MGH website for information about breast cancer and about breast cancer specialists. Maybe they're looking at Dana-Farber. I don't know. But they're looking on your defendant's websites for information that will help inform them about, you know, their diagnosis, about what alternative treatment alternatives exist, who their treatment, you know, provider should be. All of that information seems to me that can be, very possibly is, confidential information, confidential patient information. That patient doesn't want other people to know that the looking for information about breast cancer diagnosis, and treatment and potential providers. But that's the kind of information that plaintiff say is shared with Facebook and that Facebook can then trace back and say we know that

this particular Facebook user is looking for a breast cancer specialist. That's what they allege. And I don't -- again, I don't think I've got the allegations wrong. That's -- whether again that's true in the real world is not a matter for me to resolve today. But that's what they allege. Isn't that enough to support a claim for invasion of privacy under Mass law?

MR. MELODIA: Not to an unidentified individual, your Honor. They may be a patient in the same way again that somebody may be a client going onto a law firm website, but they are not a patient on a public website with disclosures telling them that cookies are being used and tracking is happening. Not to mention the disclosures that they agreed to which Facebook and Google when they became users of those products to begin with. So no, your Honor, somebody -- whether they're a patient or not, that visits a general website -- they could be on Google.com, they could be on WebMD, they could be anywhere doing that search, and if their information went to Facebook and Google from any of those websites, it is not the website operator's business whether that operator is a hospital or anybody else; Google, or WebMD, or anybody else, to know that that person's a patient.

In fact, the hospitals don't know. And they don't try to know in any way who a device ID represents, because as I mentioned at the outset, a device ID could represent -- I'm sorry, not a device ID, an IP address, can represent any number of people, any number of devices. And it doesn't tell us that that person is a patient doing a search on their condition. That is not what personal health information is, protected health information is. It has to be identifiable to an individual. And that's not, because all you're doing is a search on a public website from a certain IP address that can change over time, can change that day. And it could be you, it could be somebody doing medical research for a friend or a family member, it could be somebody doing a term paper in eighth grade or in medical school. It could be a competing research facility that wants to know what's going on at Dana-Farber because they just won, you know, a Nobel Prize in that particular area, and so let's find out more about the research. That does not signify patient status.

And importantly, this idea -- I want to go back to paragraph one of three that Mr. Barnes was highlighting. That's a really important paragraph in the complaint because that shows us the page from

which the Court seems concerned that there could be a direct portal into actual patient records and the types of HIPAA protected information that does deserve full protection and is subject to HIPAA, and is subject to the notice of privacy practice; NPP that is prominently displayed as it is required to be by federal law on the website. Not because there's PHI on the website, but because that notice has to be disclosed on a website in the same way for example that you put a notice of a federal employment law like a parental leave policy. You put that on the bulletin board of the employer. That doesn't mean that everybody who walks by the parental leave policy becomes a parent and has a right to all of a sudden get leave and get paid for leave. It doesn't create a new right, nor does the NPP create rights or signify that there's PHI or patient activity going on on these websites. Instead these websites are about the services being offered in the appropriate places, in the protected places. These hospitals know how to handle HIPAA. And as your Honor pointed out in his paragraph 146 of the amended complaint makes really clear this is not about the patient gateway. This is not about what's behind a firewall. Where you get if you log in with a user name, and credentials and a

password, that's where you can make an appointment with a doctor. That's where you can communicate with a doctor. That's where your PHR or your pharmacy records are. None of this that is going on on a public website is protectable. And it's certainly not a substantial and serious privacy concern. If it is, then websites across the world -- not just for hospitals, because this basic principle would flow through to virtually every profession, every website dealing with any sort of information that if it were linked truly to an individual, an identifiable individual could be of concern. But it's not. That's the entire reason to have a general website, and then a separate distinct URL which is the patient gateway. Which I'm not sure whether that's become clear enough yet that that is a separate URL --

THE COURT: No, it's clear.

MR. MELODIA: Okay. I --

THE COURT: I promise you it's clear. And also -- I'll also tell you I think at a macro level I agree with you I think that HIPAA is a bit of a red herring in this proceeding and in these arguments, okay? I'm not persuaded that HIPAA really has much of a role to play in the analysis that I have to undertake. But I'm taking it --

MR. MELODIA: Well --

THE COURT: -- in a much more maybe mundane pragmatic level, which is I've got a complaint that alleges that take aside, ignore the patient portals, that patients who use the defendant's website for other purposes, their own personal medical purposes, that that information is in fact being shared with third parties through the website. And that -- we'll get to -- at some point in time again I want -- we need to re-circle, circle back on the question of disclosure and consent, we're going to get there. But I -- and that's what I've got is alleged here.

So Mr. Melodia I'm going to ask you to pause for a second.

MR. MELODIA: Mm-hm.

THE COURT: Mr. Barnes, two minutes, anything you want to say on this -- we're talking about invasion of privacy.

MR. BARNES: Right, your Honor. I think I want to answer that I think there is a question there in HIPAA's role and the analysis. We would agree that the Court doesn't have to ultimately reach any HIPAA question here. But HIPAA does play some role in the analysis. And let me explain why. And the first place I think to start is paragraph one where Mass

General's chief marketing officer says the trust and confidence that you have in your --

THE COURT: This is the sacred language, the sacred language that if I -- I wish I could search your complaint for sacred, I think it would pop up a number of times. Certainly plaintiff's made good use of that language. I got it.

MR. BARNES: -- right. And those are their words.

THE COURT: Yes, I understand.

MR. BARNES: And part of that is patients to a person understand -- they might not know the line and detail of the HIPAA statute and HIPAA regs, but they've got this idea that HIPAA protects their personally identifiable information from disclosure from their healthcare provider. And that idea is furthered when they show up for their first appointment and it's required by law that the HIPAA notice is provided to them. And as you noted in the previous hearing, that HIPAA notice says we never share your personal information for marketing purposes without your written authorization. And "never" is in italics. And so any time that a patient goes to these web properties they go to -- they go there with the -- they're bringing with them

Date Filed 6/23/2023 5:50 PM
Superior Court - Suffolk
Docket Number 2384CV00411



this baggage so to speak, this trust and confidence that their healthcare provider is not like Zappos.com. They're not buying shoes here, Judge, they're talking to their healthcare provider. Okay? And so that colors every other disclosure that there may or may not have. And I want to -- we can get further into those disclosures later but that colors everything.

In addition to that Mr. Melodia keeps talking about public websites, oh, and basically making the argument I think that there is no privacy on public websites on the internet. Well, your Honor, the "Pharmatrak" case called that argument frivolous. Not my words. That's the first circuit's words to the argument that hey if you go on the internet you need to be wary.

The second thing is that didn't prevent the court in "Medstar" -- "Doe versus Medstar" from finding a claim, or "Doe versus Virginia Mason", or the "Google Cookie" case that I happened to argue, or the "Nickelodeon" case that I happened to be counsel for the plaintiffs on, or "Weld versus -- well, "Weld versus CVS" was not an internet privacy case, or the Facebook" internet case that the ninth circuit said was actionable on which I represented the plaintiffs.

This is squarely in the line of those cases. If anything, the conduct of the defendants here are worse.

THE COURT: Thank you.

MR. MELODIA: Your Honor, may I respond?

THE COURT: Mr. Melodia, one minute, I'll give you one minute to respond. But then we're going to keep moving.

MR. MELODIA: It's absurd to say that the conduct here was worse. The whole idea of the "Google" case in the third circuit, the "Nickelodeon" case in the third circuit, and the "Pharmatrak" decision is outright deception by the plaintiff -- by the defendants against the plaintiffs, the active hoarding of their efforts to protect their privacy and active deception; saying one thing and doing another. The only thing that plaintiffs can come up with to try to create the impression of that here is by tying us to a promise in the NPP which only applies, according to OCR, when you have PHI. So if your Honor is true to his words --

THE COURT: Believe me -- pause for a moment Mr. Melodia. I've got it. There's always a certain level of hyperbole in these arguments. Okay? And so I've got it. I heard what Mr. Barnes had to say.

Here's what we're going to do. I'm denying the motion to dismiss with respect to the invasion of privacy claim. Folks, that's a very ambiguous right in Massachusetts, but it seems to extend to confidential medical information. And the allegations of the complaint are that patient's confidential medical information is being shared probably without their knowledge or understanding with third parties. That it seems to me that at least states a viable claim for invasion of right of privacy under Massachusetts law. So I'm going to deny it.

We've got a breach of fiduciary duty claim. Here's the -- I think we can deal with this one pretty quickly.

Mr. Melodia, I read the arguments. Not a lot of ink was spilled on either side on this one. But I did. So I was interested to see actually the SJC has recognized a fiduciary obligation on the part of physicians not to disclose medical information. They did that in the "Alberts versus Devine" case. And the appeals court has picked up on that as well in the "Corper versus Weinstein" case. So --

MR. BARNES: Yes.

THE COURT: -- those cases seem to recognize yes

in Mass a physician could have a fiduciary obligation not to disclose -- or the opposite side, flip side of the coin is to maintain the confidentiality of a patient's medical information.

So basically what we've got alleged here, it seems to me that it's potentially -- potentially it's a breach of fiduciary duty. And it seems a little bit of an odd fit. But those cases recognize a fiduciary obligation.

MR. MELODIA: But we're being -- no, that would be I think clear error to find that in this case. Because --

THE COURT: It wouldn't be the first time, but go ahead.

MR. MELODIA: -- no. But this one -- clearer than most, your Honor, because of this reason. Look, the -- if you take as a given that a physician can have such a personal fiduciary relationship with a patient in the same way that for example a priest might have with a parishioner like the "Petrelvy Reposi"(phonetic) case we've cited, case nine of our brief. That's fair enough, those are personal relationships. I'm not contesting that. I don't think we ever contested that. The point here is nobody has sued a physician. We've sued hospital

systems and hospitals. Fundamentally what the "Petrelvy Reposi" case stands for is that the church as an organization and the diocese is not the priest. Nor is the physician, the hospital or the hospital system. There's fundamentally a difference in a fiduciary --

THE COURT: So you're argument essentially that an organization can't owe a fiduciary obligation? It has to be an individual obligation? Am I characterizing --

MR. MELODIA: -- it has to --

THE COURT: -- correctly?

MR. MELODIA: -- but I think there are times when you could have a sole proprietorship or something, your Honor, where there's an organization technically speaking, but there is a personal relationship. I'm not suggesting that it only has to do with how many people or the corporate form. I'm having -- I'm talking about where the reality of the relationship rests, where the duty rests. And the duty rests not with the hospital in terms of an individualized personal relationship with the plaintiff here, with the patient. Rather it rests with the physician. In the same way that --

THE COURT: Well pause, Mr. Melodia. You're

confusing me. So are you saying for example that MGH doesn't have any duty or obligation to its patients?

MR. MELODIA: -- well --

THE COURT: You have MGH -- let me finish the question. Does MGH, or Dana-Farber, or Brigham, have any duty as organizations not to disclose their patient's confidential information? Do they have a duty?

MR. MELODIA: Yes, under HIPAA, absolutely, your Honor. They have a --

THE COURT: You don't think they have any common law duty? So when the SJC talks about a physician's obligation not to disclose confidential medical information of a patient again you don't think that there's a comparable duty on the part of the organizations as well?

MR. MELODIA: -- I don't think there's a fiduciary duty, your Honor. I think you could have a negligence claim, your Honor. There could be a duty in the negligence sense. So you could have a breach of a duty in the negligence claim potential. But I can't see -- I mean and of course if an institution says one thing and does another, you know, there's a problem there. But that's not what we have here. We're trying to impose a fiduciary duty. And that is