**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANE DOE, individually and as parent and guardian for her minor children, S.N., H.N., and B.N., on behalf of herself and classes of all others similarly situated,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>Defendant. | **Case No.: 1:25-cv-10343-PBS**<br><br>**JURY TRIAL DEMANDED**<br><br>Leave to file granted on February 10, 2026 (Doc. No. 58) |

# SECOND AMENDED COMPLAINT

Plaintiff Jane Doe[1] ("Plaintiff"), individually and as parent and guardian for her minor children, S.N., H.N., and B.N., on behalf of herself and the proposed Classes (defined below), alleges as follows:

## Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive healthcare communications between healthcare consumers and the defendant, The Children's Hospital Corporation, which does business as Boston Children's Hospital ("Boston Children's"), including but not limited individually identifiable health information ("IHII") and protected health information ("PHI") of Boston Children's patients (referred to collectively as "Private Information").

2. Specifically, Boston Children's intercepted communications between Plaintiff and other Class Members (both putative Classes are defined below)[2] and Boston Children's made through

[1] "Jane Doe" is a pseudonym used to protect the privacy of the Plaintiff, given that this case involves private health information of both Jane Doe and the minor children of Jane Doe. Ms. Doe's identity has been disclosed to counsel for the Defendant per the Massachusetts Superior Court's order of January 22, 2023.

[2] "Class Members" refers specifically to members of the Website Visitor Class (defined below), except where otherwise noted.

a website maintained by Boston Children's (the "Boston Children's Website"). Boston Children's enabled Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technologies" to secretly eavesdrop on healthcare consumers' communications with Boston Children's by injecting hidden code on the Boston Children's Website. Those third parties, including Google and Facebook, then associated the intercepted communications with the real-world identities of individuals known to Google and Facebook. Boston Children's subsequently used the contents of the intercepted communication for marketing purposes, such as serving personalized advertisements, including advertisements on Google and Facebook's advertising platforms, to healthcare consumers based on the contents of the secretly intercepted communications.

3. Boston Children's intercepted the contents of healthcare communications on the Boston Children's Website to disclose those communications to Google, Facebook, and other companies so that those third parties and Boston Children's could then use the contents of the intercepted communications to advance Boston Children's marketing efforts. The tracking technologies advanced Boston Children's marketing efforts by enabling Boston Children's to use Google and Facebook's advertising platforms to target the patients whose communications were intercepted with advertising and to optimize the Boston Children's Website to market Boston Children's more effectively to customers (i.e., patients). That is, Boston Children's had an incentive, which it acted on, to disclose sensitive healthcare communications, including communications that reveal Private Information, to Google and Facebook to advance Boston Children's own marketing efforts.

4. As shown herein, Boston Children's intercepted communications for the primary purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as

amended in scattered § of 42 U.S.C.S.), and Massachusetts statutory and common law torts described below. In particular, HIPAA prohibits the (i) disclosure or (ii) use of Private Information without informed consent, including, specifically, the use of Private Information for marketing purposes. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.,* ¶¶ 34, 35, 44-54, 56-65, 78-79, 85-86, 94, 102, 108-12, 115-16, 119, 121-22, 125, 130, 138, 153-55, 163-66), Boston Children's intercepted patient healthcare communications, including communications that reveal Private Information, for the primary purpose of (i) disclosing the contents of those communications to third-party marketing companies; and (ii) subsequently using the intercepted communications to advance Boston Children's marketing of its services, both of which are acts that violate HIPAA, the Massachusetts Right to Privacy Act and Massachusetts tort law.

5. By intercepting healthcare communications for the primary purpose of disclosing those communications, including communications that reveal Private Information, to third parties for commercial gain, including later using the contents of the intercepted communications for Boston Children's targeting of advertisements to those patients through Google and Facebook's advertising platforms, Boston Children's put its business interests over the privacy of its patients.

6. The Plaintiff's and Class Members' communications with the Boston Children's Website were secretly and contemporaneously monitored, recorded, and transmitted to these third parties without their knowledge or consent, and Boston Children's subsequently used the intercepted communications for marketing purposes, without the consumer's knowledge and consent. The intercepted communications included, among other things, requests for information on particular medical conditions and treatments, keyword searches, doctor searches, appointment requests, and communications made through the Boston Children's patient portal.

7. Boston Children's gives parents of minor children, guardians of minor children and children over the age of 13 access to a patient portal where medical records can be accessed. Boston

Children's embedded tracking technology not just on publicly available web pages leading to the patient portal, but also deployed the tracking technologies inside the secure patient portal, which requires patients to log in, which Plaintiff and Class Members used to access information about patients' medical care.

8. Boston Children's secret interception of healthcare communications with Boston Children's, including communications that reveal Private Information, enabled the third parties, including Google and Facebook, to know that a specific patient was seeking confidential medical care from Boston Children's. Recipients, such as Google and Facebook, subsequently sell Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies. Boston Children's also used Facebook's and Google's advertising platforms, which enabled the hospital to target advertisements based on the healthcare communications and Private Information that Boston Children's intercepted and disclosed to Facebook and Google. After the interceptions, Boston Children's engaged in extensive targeted advertising on those platforms using the communications and Private Information it intercepted from Plaintiff and Class Members.

9. Boston Children's did not disclose to the Plaintiff and Class Members that it intercepted and disclosed to third parties, such as Google and Facebook, the contents of their communications with Boston Children's or that those third parties and Boston Children's used the content of the intercepted communications for targeted advertising. Boston Children's also did not seek or obtain patients' consent for such interceptions, the disclosure of the intercepted communications, or the subsequent use of the intercepted communications for marketing. On the contrary, Boston Children's **falsely** told healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

10. Moreover, Boston Children's knew of the privacy implications of deploying the tracking technologies throughout its website, including on pages like the patient portal and appointment request pages, the use of which reflected patient status. As detailed below, the functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed Boston Children's to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages. Notwithstanding this knowledge, Boston Children's deployed the tracking technologies, including on pages specifically designed for patients (including inside its patient portal), without obtaining patient consent. Indeed, Boston Children's deployed the tracking technologies for that very purpose: to disclose a patient's status as a Boston Children's patient, and healthcare communications on its website, so that Boston Children's and others could target patients and their parents and guardians with advertising on Google and Facebook's advertising platforms.

11. Boston Children's owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, Boston Children's assumed legal and equitable duties to patients to protect and safeguard the communications and Private Information from unauthorized disclosure.

12. As described more fully below, Plaintiff, Class Members, and their children have suffered injury as a result of Boston Children's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed healthcare communications and Private Information; (v) statutory damages; (vi) unjust

enrichment; and (vii) the continued and ongoing risk of further disclosure of their healthcare communications, including communications that reveal Private Information.

13. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. (Several other judges had likewise denied motions to dismiss in similar Massachusetts Wiretap Act cases against Massachusetts hospitals.) The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court, in a split decision, reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," referencing in particular the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq*.), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

14. In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicated her claim under the Massachusetts Wiretap Act, Plaintiff previously amended her complaint to assert

new claims under the ECPA, the Massachusetts Right to Privacy Act, and several claims under common law.

15. The ECPA prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. As detailed in this complaint, Boston Children's intercepted the electronic communications for the primary purpose of committing criminal and tortious acts, including the unauthorized disclosure and subsequent use of healthcare communications, including communications that reveal Private Information, in violation of HIPAA and in violation of Massachusetts law, as described below. In committing such criminal and tortious acts, Boston Children's was motivated to use health information in violation of HIPAA and Massachusetts law to serve its own financial self-interest in maximizing the effectiveness of its online marketing, including targeted advertising. The ECPA thus provides a private remedy for Boston Children's interception of electronic communications, enforceable against Boston Children's.

16. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Boston Children's Website (the Website Visitor Class, defined below). Plaintiff, individually and as guardian for her minor children, also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment on behalf of Website Visitor Class and the Minor Children Class, as defined below (collectively, the "Classes").

## PARTIES

17. Plaintiff is a resident of Burlington, Massachusetts. Plaintiff's minor children are patients at Boston Children's. Plaintiff regularly used the Boston Children's Website during the Class Period (defined below) to (i) obtain information about Boston Children's doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her children; and (iii) obtain and review her children's medical records through the website's patient portal. Boston Children's gave Plaintiff access to the patient portal to access medical records of her minor children.

18. As described below, Plaintiff has an interest in the privacy of her own communications with Boston Children's, which is protected both under the ECPA and other state law. Plaintiff's children also have an interest in their own medical information, and Plaintiff also has an interest in protecting the privacy of her minor children's personal medical information, including Private Information, and as a parent, can sue on their behalf. Plaintiff sues in her individual capacity and as parent and guardian for her minor children. She brings suit on behalf of the Classes defined below.

19. As described below, Boston Children's implemented tracking technologies that intercepted communications between Boston Children's and healthcare consumers throughout the Boston Children's Website, including inside the patient portal. During the Class Period, Plaintiff visited specific pages on the Boston Children's Website that were among the webpages on which Boston Children's embedded code for various tracking technologies, including Meta Pixel, Google Analytics, DoubleClick, Bing Ads, LinkedIn Insight, and Hotjar. The pages Plaintiff visited during the Class Period included:

a. Boston Children's patient portal (*see* ¶¶ 126-138, *infra* for an explanation of how Boston Children's deployed tracking technologies that intercepted communications not just on the landing page for the patient portal but within the patient portal itself, which

was used to obtain medical records, and how the intercepted communications were disclosed to and subsequently used for marketing by Boston Children's, Google, Facebook, Microsoft, LinkedIn, and other companies).

b. Boston Children's searchable database of doctors and pages for particular doctors (*see* ¶¶ 117-119, *infra*, for an explanation of how Boston Children's deployed tracking technologies that intercepted communications on its pages relating to doctors, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by Boston Children's, Google, Facebook, Microsoft, LinkedIn, and other companies); and

c. Pages about specific medical symptoms, conditions, and procedures (*see* ¶¶ 106-112, *infra*, for an explanation of how Boston Children's deployed tracking technologies that intercepted communications on such pages, the content of her communications that were intercepted, and how the intercepted communications were disclosed to and subsequently used for marketing by Boston Children's, Google, Facebook, Microsoft, LinkedIn, and other companies).

20. Plaintiff has Google and Facebook accounts, which, as described below, enabled Boston Children's, Google, and Facebook to more easily connect Plaintiff's communications intercepted through the tracking technologies described in this complaint with Plaintiff's real-world identity to facilitate Boston Children's, Google, and Facebook to target advertising directed to Plaintiff based on the content of her intercepted communications.

21. Plaintiff was unaware of and did not consent to or authorize the disclosure or use by third parties of her website communications with Boston Children, or the Private Information contained therein. She was also unaware of and did not consent to the use of her healthcare

communications, or the Private Information contained therein, by Boston Children's for marketing purposes, including targeted advertising based on the content of her intercepted communication.

22. Defendant The Children's Hospital Corporation ("Boston Children's") is a corporation that operates in Boston, Massachusetts. Its functions include providing healthcare services at various facilities in Boston and the surrounding communities, including seven hospital campuses and four physician offices (the "Boston Children's Facilities"). All of the Boston Children's Facilities share the Boston Children's Website. Boston Children's maintains and controls the content of the Boston Children's Website.

## JURISDICTION

23. Boston Children's has invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (i.e., federal question jurisdiction).

## FACTUAL ALLEGATIONS

### The Boston Children's Facilities and Its Website

24. Boston Children's operates hospitals and other healthcare facilities in Boston and surrounding communities. The Boston Children's facilities offer inpatient and outpatient care to residents near Boston and surrounding communities in eastern Massachusetts. The facilities focus on pediatric care and provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, newborn care, children's services, and trauma care.

25. Boston Children's maintains the Boston Children's Website as a common website for its hospitals and other healthcare facilities, found at https://www.childrenshospital.org/. Through that website, healthcare consumers can obtain information about the services Boston Children's provides, including information about doctors, services, and treatments provided by Boston Children's for particular medical conditions.

26. The Boston Children's Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The Boston Children's Website provides general information about the Boston Children's Facilities.

(b) The Boston Children's Website provides information about healthcare services provided at the Boston Children's Facilities, communicated through service-specific pages for a range of services such as an "Eating Disorders Program," "Emergency Medicine," "Gynecology," and "Neurology," among others.

(c) The Boston Children's Website provides substantive information about specific health conditions through the website's "Conditions & Treatments" section, which presents a comprehensive database of conditions Boston Children's treats, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by Boston Children's.

(d) The Boston Children's Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e) The Boston Children's Website permits healthcare consumers to book an appointment online through the website.

(f) The Boston Children's Website permits healthcare consumers to access and pay bills online.

(g) The Boston Children's Website lets healthcare consumers access their private medical information online through the MyChildren's Patient Portal.

27. Because the Boston Children's Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user, including information intercepted while navigating within the highly private patient portal.

**<u>Reasonable Expectations of Users of the Boston Children's Website</u>**

28. Healthcare consumers have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Boston Children's Website.

29. Users of healthcare-related websites, such as the Boston Children's Website, have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Boston Children's will not share their healthcare communications or the Private Information of their minor children with third parties without their consent. That expectation of privacy is heightened when navigating within the patient portal.

30. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Boston Children's from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual (or parent or guardian if the individual is a minor). *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as Boston Children's from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

31. The privacy expectations do not only extend to patients of Boston Children's but also to their parents. Boston Children's acknowledged in its HIPAA Notice of Privacy Practices during the Class Period, "Patients younger than the age of 18 are usually considered minors. Most of the time, the parents or legal guardians of minor patients make decisions about their children's medical care and have the privacy rights described in this Notice."

32. Healthcare consumers would **<u>not</u>** anticipate or expect that their communications with healthcare providers, including Boston Children's, which reveal information about that individual's or family members' personal health conditions, will be intercepted and secretly shared with third parties

such as Google and Facebook for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

33. The expectations and understanding of users of Boston Children's Website were informed by what Boston Children's told them about how it handles their healthcare communications, including communications that reveal Private Information.

34. During the Class Period, the Boston Children's "Web Site User Privacy Rights" notice stated:

> Boston Children's Hospital is strongly committed to protecting the privacy of its online users: patients, families, donors, the media, and others. We do not collect personally identifiable information about individuals, except when it is knowingly provided by such individuals (e.g., web forms). **We do not share voluntarily provided, personally identifiable information for any purpose other than its intended use.**

(emphasis added). This was false. As explained more fully below, Boston Children's injected hidden code into its website that surreptitiously intercepted and disclosed to third parties, such as Google and Facebook, the contents of healthcare consumers' communications with the Boston Children's Website. That hidden code tracked the user's IP address (i.e., the user's unique identity on the internet), connected the IP address to the user's browsing activity, and shared that same information with third parties such as Google and Facebook. The tracking technologies revealed Private Information about particular individuals to Google and Facebook. Google, Facebook, and website owners using the tracking technologies (including, here, Boston Children's) then use the intercepted communications to serve personalized advertising to those individuals.

35. The same policy also stated: "We collect some basic web log file data about site visitors. This information includes domain names, website traffic patterns and server usage statistics. This information is used for site management and administration and to improve the overall performance and user experience on our site." This statement was deceptive and false in multiple respects. This statement was deceptive by creating the false impression that only Boston Children's (i.e., "we")

logged such activity, when in reality, Boston Children's injected hidden code into its website that intercepted and disclosed to Google, Facebook, and other third parties each user's activity on the website. The statement was also false when it stated that log files are retained only for "site management" and "performance" purposes. Google, Facebook, other third parties, and website owners (including Boston Children's) used the intercepted communications for commercial and marketing purposes, including serving personalized advertising and applications for particular individuals identified and tracked through the tracking technologies.

36. The same Boston Children's policy also stated that when a user completes a "form" on the Boston Children's Website, the "forms are located on a secure site," suggesting that Boston Children's took special measures to protect information a website user communicates to Boston Children's through the Boston Children's Website. This, too, was false. For certain forms on the Boston Children's Website, Boston Children configured its website to intercept and disclose to Google, Facebook, and other third parties the contents of information the website user has inserted into "forms" to communicate with the website. The Find-A-Doctor form described below is an example; as described below, Boston Children's configured the form to intercept and disclose to Google, Facebook, and other third parties the contents of the criteria the healthcare consumer selects in seeking a doctor.

37. The same Boston Children's policy also stated: "We do not sell visitors' personal information to third parties, such as marketers." This, too, was deceptive. Although Google and Facebook did not pay money for Boston Children's to install their tracking technologies on the Boston Children's Website, Boston Children's did receive value in return, including free analytical data collected by Google and targeted advertising from Google and Facebook. That is, Boston Children's, in substance, bartered the content of its website visitors' communications with the Boston Children's Website in exchange for services by Google and Facebook that were valuable to Boston Children's.

38. The same Boston Children's policy also contained a disclosure about website "cookies" that was likewise deceptive. As an initial matter, the tracking technologies upon which Plaintiff's claims are not based on cookies—as described below, the technologies are hidden snippets of JavaScript code, which is a different technology. If any event, the "cookie" disclosure was deceptive by creating the false impression that (i) tracking of website users would only be for "record-keeping purposes" to track user "preferences"; (ii) cookies were only used to share "non-identifiable demographic information"; and (iii) the user could "turn off cookies."

39. Setting aside the fact that tracking technologies such as Google Analytics and Meta Pixel are not "cookies" at all, the reality is (i) these tracking technologies are used for more than "record-keeping" but instead are used by Boston Children's, Google, Facebook and other companies for commercial purposes, including targeted advertising to the indivdiuals whose communications were intercepted; (ii) the tracking technologies **do** share identifiable information, including user IP addresses and other unique identifiers; and (iii) turning off "cookies" for a website through your browser will not disable tracking technologies such as Google Analytics, Doubleclick, Bing Ads, LinkedIn Insight, and Meta Pixel, primarily because, as noted, those technologies are not "cookies," and turning off cookies will not stop the execution of the hidden code for those tracking technologies.

40. Moreover, the cookie disclosure stated that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." This may be true for cookies, but it is not true for JavaScript-based tracking technologies such as Google Analytics and Meta Pixel. Both Google and Facebook maintain records on their own servers of all information intercepted and communicated to them through each tracking technology; exiting the Boston Children's site does not cause any such intercepted data to be deleted from the servers of third parties such as Google and Facebook.

41. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties or used for marketing purposes without their

consent—an understanding reinforced strongly by Boston Children's false and deceptive statements on the Children's Hospital Website. The interceptions of website users' communications with Boston Children's, and the subsequent marketing use of the intercepted communications to facilitate targeted advertising to patients, were, therefore, truly secret and made without any consent from Plaintiff or the other Class Member website users.

**Third Parties Offering Tracking Technologies**

42. Plaintiff describes in this complaint various tracking technologies Boston Children's implemented on the Boston Children's Website that caused the secret interception, recording, and transmission of the contents of Class Members' internet communications with Boston Children's. The next section presents a basic overview of how the technologies work, including how third parties intercept and record the contents of Class Members' internet communications with Boston Children's and the purposes for which interceptions are made.

43. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[3] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

44. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers. Facebook is a "real identity" platform. This means that users are permitted only one account and must use the name they go by in everyday life. To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

---

[3] Facebook rebranded its parent company as "Meta" in October 2021.

45. Facebook derives most of its revenue from selling targeted advertising directed to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to particular individuals by building extensive behavioral profiles for each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

46. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

47. Facebook states: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site."[4] Among the key features of Metal Pixel, touted by Facebook, are[5]:




[4] https://www.facebook.com/business/tools/meta-pixel.

[5] https://www.facebook.com/business/tools/meta-pixel.

48. Indeed, the express purpose of Meta Pixel is to track and disclose to Facebook individuals' communications on a website, identify that individual user, and target that individual with advertising from the website owner (here, Boston Children's). For example, Facebook tells website owners to "[i]nstall the Facebook pixel if you want to retarget your website visitors." Facebook explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[6]

49. Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account. Even for someone without an account with any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook still combines data it obtains through the Meta Pixel with other sources (including data obtained through data brokers) to identify the individual, and Facebook then sells the intercepted communications obtained through Meta Pixel, together with identifying information, to data brokers (i.e., companies that are in the business of collecting and compiling data on individuals from various sources then reselling that data to advertisers).

50. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

51. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[7]

---

[6] https://www.facebook.com/business/goals/retargeting.

[7] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-

52. The primary reason businesses such as Boston Children's deploy Meta Pixel on their website that intercept communications with website users is to maximize the effectiveness of the business's targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells website owners like Boston Children's that they can use the Meta Pixel to "[o]ptimize delivery of your ad campaigns," and after the Meta Pixel is deployed, business owners can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[8]

53. Boston Children's advertises through Facebook's advertising platforms (this is, in fact, the reason why businesses use Meta Pixel—to advance their advertising efforts on Facebook's advertising platforms). Boston Children's has an incentive to share as much information as possible with Facebook through the tracking technologies, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Boston Children's advertising through Facebook platforms.

54. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed Boston Children's to "provide[] robust and sufficiently prominent notice to users regarding [Meta Pixel]," including, a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to…target and deliver ads." Facebook also directs businesses not to use Meta Pixel on any webpage that "that includes health…information."[9] Despite these warnings that expressly put Boston Children's on notice about the operation of Meta Pixel and its implications

recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

[8] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel.

[9] https://www.facebook.com/legal/terms/businesstools.

for privacy, Boston Children's ignored the directions and warnings and deployed Meta Pixel without website users' consent on pages that contain health information.

55. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

56. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

57. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

58. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics, a marketing tool Google offers to website owners. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The intercepted communications analyzed through Google Analytics provide the website owner with insights about how users use the website, which the owner can use to improve the marketing of their business through the business's website. According to Google, Google Analytics is designed to "improve marketing ROI" and to "check the performance of [a business's] marketing." Google tells business owners like Boston Children's that

Google Analytics "works with Google's advertising and published products, so that" business owners "can use [Google Analytics] insights to deliver business results."[10]

59. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted, individualized advertisements. Furthermore, after the interceptions, the website owner (here, Boston Children's) uses communications intercepted through Google Analytics to advance its own marketing objectives, including by using the insights provided by Google Analytics to inform its website marketing to potential or existing customers.

60. Google also tells business owners like Boston Children's that after data is collected through Google Analytics, "in addition to using the data in [Google Analytics] reports, [business owners] can use the data in audiences for analyzing different groups of users and for exporting the data to advertising platforms like Google Ads so [the business] can run more data-driven advertisements."[11] By tying in Google Analytics with Google Ads, Boston Children's could "share [its] Analytics audiences with those products," thus advancing its targeted advertising efforts.[12] That is, Google Analytics data is used directly to facilitate "ads personalization," permitting Boston Children's to target advertising based on the intercepted communications.[13]

61. Another way Google collects information to build its detailed profiles on individuals is through its "DoubleClick" tags. DoubleClick was previously an independent company, founded in

[10] https://marketingplatform.google.com/about/analytics/.

[11] https://support.google.com/analytics/answer/14430645?hl=en&sjid=5860316122186797017-NA&visit_id=638953584132868414-3109291497&ref_topic=12270146&rd=1.

[12] https://support.google.com/analytics/topic/14277381?hl=en&ref_topic=9303474&sjid=5860316122186797017-NA.

[13] [GA4] Advanced settings to allow for ads personalization - Analytics Help.

1997, and was a pioneer of online, dynamically targeted advertising. Google acquired DoubleClick in 2007 and now operates it as an advertising division of Google. Google's advertising tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through the advertising tags with particular individuals to enable website owners such as Boston Children's to serve targeted advertising on the individual and measure the efficacy of Boston Children's advertising campaigns through Google's advertising programs.

62. Boston Children's extensively used Google platforms to advertise, thus exploiting the information Boston Children's intercepted and disclosed to Google through Google's tracking technologies, as reflected by the examples below of Boston Children's targeted advertisements through Google's ad platform:






63. Boston Children's had an incentive to share as much information as possible with Google, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Boston Children's advertising through Google platforms, such as the advertising examples above.

64. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising and marketing analysis through Google Analytics and DoubleClick, Google directed website owners like Boston Children's that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data." Boston Children's did not do so.

65. In summary, both Google Analytics and DoubleClick intercept the content of communications between the website user and any webpage on which the code for either tracking technology is injected. Google can and does retain communications intercepted through both Google Analytics and DoubleClick tags, and Google can and does use those intercepted communications for its own commercial purposes, and Boston Children's also uses the intercepted communications when it uses Google's advertising platforms for its own marketing (that is in fact the primary purpose of the tracking technologies).

**Website Tracking Technologies on the Boston Children's Website**

66. Boston Children's injected hidden code into the Boston Children's Website that intercepted healthcare consumers' communications with Boston Children's and disclosed them to third parties. Tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the Boston Children's Website with the website user's Facebook profile.

67. Boston Children's uses several tracking technologies on their website, including Google Analytics, DoubleClick, Meta Pixel, Bing Ads, and LinkedIn Insight. The tracking technologies are implemented through similar means.

68. Before describing how such technologies work, it is important to define some basic technological terms.

69. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

70. An **"IP address**" is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Boston Children's Website, as of the time of this complaint, is 45.60.73.21. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

71. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://" For example, the URL for the main landing page for the Boston

Children's Website is https://www.childrenshospital.org/. URLs can also point to specific pages on a website; sometimes, website owners code their websites in a way that causes URLs to reveal information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive" URLs. Boston Children's configured its website to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communication made through a particular page on the Boston Children's Website. For example, the Boston Children's Website has a page specifically about the Boston Children's Cancer and Blood Disorders Center; that page's URL is https://www.childrenshospital.org/centers/cancer-and-blood-disorders-center. That is, one can tell from the URL itself the substance of the communication between Boston Children's and the healthcare consumer—that the consumer is requesting information from Boston Children's about cancer and blood disorders.

72. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both Google Analytics and Meta Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

73. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

74. With those basic terms in mind, the tracking technologies described in this complaint—including Google Analytics, DoubleClick, Meta Pixel, Bing Ads, and LinkedIn Insight—work as follows. In general terms, a website owner (here, Boston Children's) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

75. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

76. When the JavaScript code causes the user's web browser to retrieve a file from the tracking technology vendor's website, the JavaScript code also causes the browser to communicate certain information to the vendor. That information includes, depending on the particular page visited, a combination of: (i) the URL of the website user is visiting (that is, the website address, such as https://www.childrenshospital.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

77. The JavaScript code first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the tracking technology vendor's servers (for example, Google or Facebook servers) to disclose the content of the intercepted communications to

the tracking technology vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program, they are distinct events activated by different parts of the code for each tracking technology. Although distinct, sequential events, the interception and disclosure to the third party occur contemporaneously with the website communications between Class Members and Boston Children's. The contents intercepted include Private Information, including patient status, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

78. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party, such as Google or Facebook, can then add the content of the user's communications with the Boston Children's Website to its collection of information it already has about the individual, which it can then use for advertising purposes.

79. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the intercepted communications with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them. Boston Children's can then use Facebook's advertising platform to target advertising to individuals who visited its website, based on the communication Boston Children's intercepted and transmitted to Facebook.

80. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not

displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to a third party such as Google or Facebook. The tracking technologies are detectable only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

81. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and the Boston Children's Website contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

82. Google Analytics, DoubleClick, Meta Pixel, and other tracking technologies operate and continue to intercept communications even if a website user activates an "Incognito" or "Private Browsing" mode for a web browser, and even if the website user adjusts his or her browser settings to restrict the use of cookies.

83. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[14] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

84. Boston Children's appears to be among these websites that removed Meta Pixel in reaction to the Market Article. Based on archived versions of Boston Children's Website, it appears

[14] *See* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

Boston Children's removed Meta Pixel from its website in approximately late June 2022, within a few weeks after the Markup Article was published. Boston Children's, however, continued to secretly inject Google Analytics, DoubleClick, and several other third-party tracking technologies onto its website. These tracking technologies were each substantially similar to Meta Pixel code, both in their surreptitious deployment on the website and their contemporaneous interception of communications with the website. Only approximately nine months after this lawsuit was filed did Boston Children's remove the tracking technologies described in this complaint from its website.

**<u>Boston Children's Use of Tracking Technologies on the Boston Children's Website</u>**

85. During the Class Period, Boston Children's used various tracking technologies across the Boston Children's Website. For example, throughout the Boston Children's Website, Boston Children's injected secret code for Google Analytics and DoubleClick. It also appears Meta Pixel was injected broadly throughout the Boston Children's Website before Boston Children's removed Meta Pixel in late June 2022. Boston Children's deployed the tracking technologies on the specific webpages Plaintiff visited during the Class Period, as detailed below.

86. Approximately nine months after the initial complaint was filed in this case, it appears Boston Children's significantly limited its use of Google Analytics, DoubleClick, and other tracking technologies. The examples provided below of Boston Children's deployment of Google Analytics and other tracking technologies on the Boston Children's Website reflect such deployment around the time of the original complaint in this action (or, as to Meta Pixel, prior to late June 2022). Boston Children's controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect Boston Children's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

87. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

88. Below is an image of the main landing page for the Boston Children's Website:




89. When a user loads the main landing page for the Boston Children's Website, the webpage causes the user's web browser to download from Google's servers a file called "ga.js," which

contains the JavaScript code for Google Analytics ("ga" stands for "Google Analytics," and "js" stands for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "ga.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

90. The image below depicts the landing page for the Boston Children's Website on the left-hand side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




91. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to

intercept and transmit to Google when a small file is loaded from Google's servers (with emphasis added):




92. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the Boston Children's Website are:

(a) The URL of the webpage visited (the text after the letters "utmhn," which includes the text "www.childrenshospital.org"); and

(b) The title of the webpage (after the letters "utmdt," which includes "Home Page | Boston Children's Hospital").

93. The other information transmitted to Google includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Boston Children's).

94. Boston Children's also placed DoubleClick tags throughout its website, which intercept similar information to Google Analytics, although, as discussed above, the primary purpose of these other tags—from the perspective of the website owner—is targeted advertising on behalf of Boston Children's. The contents of the communication that DoubleClick tags intercept and transmit to Google, via hidden JavaScript code, are similar to Google Analytics.

95. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Boston Children's Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers necessarily reveals the user's unique IP address to Google.

96. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser fingerprinting works by using scripts (such as the tracking technologies here) to gather many software and hardware attributes from a user's device and browser, such as their operating system, screen resolution, resolution of their browser window, and other numeric codes that represent unique browser and computer settings. When combined, these data points create a distinct identifier—a "fingerprint"—that uniquely identifies a user across different browsing sessions and websites, similar to a real-world fingerprint.

97. Browser fingerprints allow tracking technology providers to track users across websites, and together with other data points such as IP address and unique user numbers, permit the tracking technology provider to know that a person browsing the Boston Children's Website is the same person the identity of whom is known to that provider (i.e., Google or Facebook).

98. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[15] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

99. As noted, Boston Children's removed Meta Pixel from its website in late June 2022, likely in response to press coverage following the Markup Article. Archived versions of the Boston Children's Website are available, however, on the Internet Archive's "Wayback Machine," which is a website that captures, retains, and makes publicly available historical versions of websites.[16] Archived versions of the Boston Children's Website available on the Wayback Machine confirm that Boston's Children implemented Meta Pixel code on its website starting more than three years before this case was first filed, until as recently as late June 2022.

100. When Boston Children's used Meta Pixel, Meta Pixel loaded a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Boston Children's Website. The network activity that was intercepted and transmitted to Facebook when loading the Boston Children's Website's landing page is depicted below (with highlighting added):

[15] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.
[16] *See* https://archive.org/web/.

× Headers Payload Preview Response Initiator Timing »

▼ **Query String Parameters** view source view URL-encoded

id: 486220931531947
ev: PageView
dl: https://www.childrenshospital.org/
rl:
if: false
ts: 1651385346093
sw: 1920
sh: 1080
v: 2.9.57
r: stable
ec: 0
o: 30
fbp: fb.0.1651385346089.104345538
it: 1651385345395
coo: false
exp: p1
rqm: GET

101. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Boston Children's Website, including the URL of the webpage visited. The transmission to Facebook also includes information about the user's browser configuration and various codes to associate the communications with Boston Children's advertising account with Facebook.

102. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook and Boston Children's then use the contents of intercepted communications between the website user and Boston Children's for commercial and marketing purposes, including to serve personalized advertising to the

website user in the future on Facebook's advertising platforms and to target advertising for Boston Children's to the individuals whose communications were intercepted.

103. Moreover, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

104. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each user—a numeric code unique to a particular individual (similar to an account number). This permitted Facebook to track that individual across the Boston Children's Website and further confirm that individual's real-world identity.

105. Boston Children's configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below serve to illustrate how the tracking technologies work and include both webpages Plaintiff personally visited and other pages that other Class Members visited (some of the particular pages Plaintiff visited are identified in paragraphs 18-19 above). Plaintiff's healthcare communications with Boston Children's, including communications that reveal Private Information, were intercepted just like the examples set forth below.

106. The Boston Children's Website contains more than three hundred subpages for specific "Programs" and "Departments." For example, the Boston Children's Website contains a page entitled "Emergency Psychiatry Service," designed to provide information to the website user about psychiatric services Boston Children's offers for children and adolescents. By visiting this webpage, the user reveals to Boston Children's that the user has some interest in psychiatric services (for

example, the user may have a child in need of psychiatric care). When the user communicates with Boston Children's by visiting this particular webpage, Boston Children's secretly intercepts and transmits that communication to Google and other third parties. Below is a screenshot of the Emergency Psychiatric Service webpage:




107. The graphic below presents the contents of the communication between the website user and Boston Children's that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that Boston Children's secretly injects into the website (with highlighting added):




108. As reflected in the above screenshot, Boston Children's injected hidden code on its webpage, which intercepted and contemporaneously transmitted to Google the fact that the website user is visiting an "Emergency Psychiatric Service" webpage on Boston Children's Website—information that Google retains and can use for its own commercial purposes and Boston Children's can use for marketing purposes. Google and Boston Children's subsequently use the content of such

intercepted communications for their own commercial and marketing purposes, including for targeted marketing by Boston Children's over Google's advertising platforms.

109. Indeed, Boston Children's used Google's advertising platforms to target individuals with respect to particular medical conditions and treatments, as reflected in the advertisements below, which concern topics such as infant seizures, various pediatric heart conditions, vascular abnormalities, and pediatric brain tumors:


















110. Given how Google Ads works, these advertisements would have been served to individuals who had shown an interest in particular treatments, such as people who had visited pages regarding those conditions and treatments on the Boston Children's Website, on which Boston Children's deployed Google Analytics and DoubleClick tracking technologies to facilitate these kinds of advertisements targeted to such individuals. Indeed, the high degree of specificity with respect to particular conditions and treatments that Boston Children's used in its advertisements on Google's

advertising platforms confirms that such advertising would have been targeted to particular indivdiuals whom Google knew to be interested in those conditions and treatments, including through the secret interceptions Boston Children's made on communications of its own patients and their parents and guardians without their knowledge. Because Plaintiff visited during the Class Period webpages for specific conditions on the Boston Children's Website, she was subject to the same types of interceptions, disclosures, and misuse of her healthcare communications, including communications that revealed Private Information about her minor children.

111. Before Boston Children's removed Meta Pixel from the Boston Children's Website, Boston Children's inserted hidden code on the same webpage that intercepted the user's communication with Boston Children's and retransmitted that same information to Facebook. Boston Children's secretly intercepted and transmitted to Facebook the contents of the communication between the website user and Boston Children's, including that the user is visiting an "Emergency Psychiatric Service" webpage. Facebook retains and uses it for commercial purposes. Boston Children's used Facebook's advertising platforms to target advertising for Boston Children's to the individuals who communicated with Boston Children's concerning that specialty (or any other specialty about which the user communicated with Boston Children's).

112. The Boston Children's Website contains hundreds of similar pages on particular medical specialties and practices offered by the Boston Children's Facilities. For each such page, Boston Children's injected hidden code into its website that intercepted and disclosed to Google and Facebook the contents of communications with Boston Children's, similar to the above "Emergency Psychiatric Service" department example. Plaintiff visited during the Class Period pages similar to the "Emergency Psychiatric Service" example above concerning specific treatments and medical conditions of her children, and her communications were intercepted in the same manner as the above

example. Google, Facebook, and Boston Children's then use the intercepted communications for commercial and marketing purposes, including for targeted advertising.

113. The Boston Children's Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal personal information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Boston Children's. When an individual uses the search function, Boston Children's secretly intercepts the contents of that search and transmits those contents to Google, Facebook, and other third parties. Below, for example, is the search results page for "my child has stomach pain."



114. When a user performs this search on the Boston Children's Website, and the results page then loads, the Google Analytics and DoubleClick code is activated, and Boston Children's intercepts the user's search terms and transmits them to Google. Below is the information that Boston Children's intercepts and transmits to Google through Google Analytics code (with highlighting added):




115. As reflected in the above screenshot, Boston Children's, by injecting hidden Google Analytics code on the webpage, intercepted the precise search terms entered by the user and

contemporaneously transmitted the information to Google. Google and Boston Children's subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including for targeted marketing by Boston Children's over Google's advertising platforms.

116. Prior to the removal of Meta Pixel from the Boston Children's Website, healthcare consumers' searches on the Boston Children's Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code. Below is a screenshot showing how the search terms would have been intercepted and transmitted to Facebook via hidden Meta Pixel code, as confirmed by an archived version of the website on the Wayback Machine (with highlighting added):

```
▾ Query String Parameters     view source     view URL-encoded
  id: 486220931531947
  ev: PageView
  dl: https://www.childrenshospital.org/search/node?keys=my%20child%20has%
      20stomach%20pain
  rl:
  if: false
  ts: 1654560786522
  sw: 1920
  sh: 1080
  v: 2.9.61
  r: stable
  ec: 2
  o: 30
  fbp: fb.0.1654560774832.1750915368
  it: 1654560751455
  coo: false
  rqm: GET
```

Facebook then subsequently uses the content of such intercepted communications, including the precise search terms patients or their parents or guardians use to request information on the Boston

Children's Website, for their own commercial and marketing purposes, including for targeted marketing by Boston Children's over Facebook's advertising platforms.

117. The Boston Children's Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using search terms and other filtering criteria, such as locations and doctor gender. Plaintiff used the "Find a Doctor" feature depicted below during the Class Period. For example, the screenshot below depicts the search results page when a user with a child experiencing stomach pain enters the phrase "stomach pain"[17] into the search bar on the Find A Doctor Page and applies filters to search for male physicians within 25 miles of Boston zip code 02210:




[17] This is an example and does not reflect Plaintiff's personal activity on the website.

118. Depicted below are the contents of the user's communication with the Boston Children's Website that are intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded


v: 1
_v: j99
a: 1791540425
t: event
ni: 1
_s: 4
dl: https://doctors.childrenshospital.org/search?display_location=02210&distance=25&location=42.3517272%2C-71.0408624&sort=relevance%2Cnetworks%2Cavailability_density_best&unified=Stomach%20pain&filter=gender%3AMale
ul: en-us
de: UTF-8
dt: Stomach pain in 02210 - ProviderMatch
sd: 24-bit
sr: 1920x1080
vp: 1294x962
je: 0
ec: Web Vitals
ea: FID
el: 1675378795737-9096337289761
ev: 1
_utma: 98476749.1679664301.1675354141.1675375204.1675378316.6
_utmz: 98476749.1675354141.1.1.utmcsr=google|utmccn=(organic)|utmcmd=organic|utmctr=(not%20provided)
_utmht: 1675378804442
_u: SDCCCEABBAAAACAEK~
jid:
gjid:
cid: 2082766424.1675354141
tid: UA-31344009-7
_gid: 1174674318.1675354294
z: 1567927039

119. The above screenshot reflects that when an individual enters a search on the Boston Children's "Find a Doctor" page and chooses other filtering criteria, Boston Children's, through hidden Google Analytics code, intercepts the contents of the search and contemporaneouls transmits them to Google, including not only the search terms entered by the user ("stomach pain") but also the other filtering criteria the user has selected (a location within 25 miles of 02210 and a male doctor in the above example). Google retains that information and associates those search terms with the individual's real-world identity for targeted advertising purposes. Google and Boston Children's subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including for targeted marketing by Boston Children's over Google's advertising platforms.

120. If the user then clicks on the "Request Appointment" button next to a particular doctor on the results page, that action is contemporaneously intercepted and retransmitted to Google. The page below depicts the information intercepted and retransmitted to Google (with highlighting added):




121. As reflected in the above screenshot, Boston Children's, by injecting hidden Google Analytics code on the webpage, intercepted information about the prospective patient's request for an appointment with a particular doctor for a particular condition and contemporaneously transmitted the information to Google. Google and Boston Children's subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including for targeted marketing by Boston Children's over Google's advertising platforms.

122. Before it removed Meta Pixel from the Boston Children's Website in or around late June 2022, communications requesting an appointment were likewise intercepted and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the precise search terms entered with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Facebook and Boston Children's subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including for targeted marketing by Boston Children's over Facebook's advertising platforms.

123. In addition to the "Request an Appointment" function described above, which is accessible through search results, the Boston Children's Website also includes a "Request an Appointment" form that an individual can fill out to request an appointment with a Boston Children's physician. An individual visiting that page necessarily reveals that the individual is seeking medical care either for him or herself or for the individual's child. "The Request An Appointment" page is depicted below.


https://www.childrenshospital.org/request-an-appointment

Boston Children's Hospital

MyChildren's Patient Portal | Pay Your Bill | Ways to Help | Global Services

Careers Donate

Patients & Families Healthcare Professionals Researchers

Home | Request An Appointment

Request An Appointment

*This form is for **non-urgent appointment requests only**. If this is a medical emergency, please dial 9-1-1. This form should not be used in an emergency. This form is being transmitted via a secure connection.*

*Si esto es una emergencia médica, por favor llame al 9-1-1. No utilize este formulario si esto es una emergencia. Este formulario se transmite a través de una conexión segura.*

If you are interested in scheduling the COVID-19 vaccine, please visit the MyChildren's Patient Portal to schedule your appointment or call the scheduling line at 617-919-7102.

If you are an international patient, please contact Global Services to request an appointment. Start now »

Patient Information

First Name *

Please enter your first name

Last Name *

Please enter your Last name

Date of Birth *

mm/dd/yyyy

Please enter your Date of Birth

Country *

United States

Please select your Country of Origin

Contact Information

First Name *

Please enter your contact's first name

Last Name *

Please enter your contact's Last name

Email Address *

Please enter your contact's Last name

Phone Number *

Appointment Details

Clinic or Location

Not Sure At This Time

Please select your desired group for this appointment

Appointment Message *

Please tell us a little about your reason for visiting

124. When a user loads the request-an-appointment form, Boston Children's, using hidden Google Analytics code, secretly intercepts and contemporaneously transmits to Google the communication. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via the hidden Google Analytics code (with highlighting added):




125. When a user fills out the web form seeking an appointment and then submits the form, the action of submitting the form is likewise intercepted by Boston Children's and contemporaneously transmitted to Google. Google and Boston Children's subsequently use the content of such intercepted communications for commercial and marketing purposes, including for targeted marketing by Boston Children's over Google's advertising platforms.

126. Portions of the Boston Children's Website are designed to be accessible only by patients of Boston Children's and their parents and guardians. So-called "patient portals" are common on healthcare provider websites and require a patient to log in to the portal. Patient portals permit a healthcare facility patient to access medical records, pay bills, schedule visits, and renew medications, among other tasks. Plaintiff used the MyChildren's patient portal during the Class Period to access her

children's medical records. Boston Children's described the "MyChildren's Patient Portal as the website locations where "patients 13 and older, parents and legal guardians" can "view health records," "review latest test results," "send a message to your care team," "share health records with your care team," "renew your prescriptions," "eCheck-in for visits," "request appointments," "pay your bill for care received," and "updated your insurance information." The landing page for the MyChildren's patient portal is shown below:




127. When a user first accessed the MyChildren's patient portal, hidden Google Analytics code Boston Children's injected onto its website intercepted and disclosed to Google that an individual was accessing the patient portal, disclosing to Google that the user was accessing a page

about "Patient Resources | MyChilredn's Patient Portal | Boston Children's Hospital," information that Google and Boston Children's then later used for marketing purposes, including targeted advertising to the individual based on the content of the intercepted pages accessed.

128. Boston Children's use of tracking technology was not limited to the login pages for the patient Portal. Instead, Boston Children's used secret Google Analytics code on webpages inside the patient portal (i.e., the portion of the portal accessed after logging in), and thus intercepted communications with its patients or their parents and guardians, and contemporaneously transmitted the intercepted communications to Google.

129. After the publication of the Markup Article highlighting the use of Meta Pixel on hospital websites, including patient portals, some healthcare providers removed all tracking technologies (including Meta Pixel and Google Analytics) from their patient portals. Boston Children's, however, elected to maintain Google Analytics within its patient portal (i.e., a portion of the website patients can access only after logging in) until it removed Google Analytics from its website approximately nine months after the original complaint in this case was filed. Boston Children's, therefore, continued to intercept communications with patients of the hospital inside the patient portal, and contemporaneously retransmit that information to Google for nearly a year and a half after The Markup article publicized the privacy perils of tracking technologies on medical provider websites.

130. The fact that Boston Children's intercepted communications concerning medical condition, medical records, and other sensitive matters of their patients in a purportedly "secure" area of the website underscores Boston Children's total disregard for the privacy of its patients and other website users and shows that purpose was to violate HIPAA for monetary gain and to tortiously invade the medical privacy of its patients and their family members.

131. When a website user first accessed the login page for the patient portal, hidden Google Analytics code that Boston Children's injected into its own website caused the user's web browser to

contemporaneously and surreptitiously communicate to Google that the user is visiting "Boston Children's Hospital External User Portal Login Page."

132. When a patient or the patient's parent or guardian registered for an account on the patient portal, each step in that process was intercepted and contemporaneously transmitted to Google. When a website user first enrolled a patient in the patient portal, hidden Google Analytics caused the user's web browser to contemporaneously and surreptitiously communicate to Google that the website user is visiting the "MyChildrens Accounts – Add Patient" page.

133. Then, when the website user added a dependent (i.e., the child patient) to the account, hidden Google Analytics code that Boston Children's injected into its own website caused the website user's web browser to contemporaneously and surreptitiously communicate to Google: "Add Dependent Complete" and that the website user's request to add a patient is "Pending."

134. After a website user successfully registered an account and associated the account with actual Boston Children's patients, the website user could then view the patient's medical records, prescriptions, billing, and insurance information through the patient portal. Boston Children's injected hidden Google Analytics code into the patient portal, which intercepted the communications of patients, their parents, and guardians, and contemporaneously and surreptitiously intercepted every communication in the patient portal and transmitted that information to Google.

135. For example, when a website user visited a page within the portal to view the patient's test results, the hidden Google Analytics code communicated to Google that the website user is visiting "mychildrens - Diagnostic Tests."

136. Likewise, when a website user clicked on a button to renew medication, the hidden Google Analytics code communicated to Google that the user visited a page to "renew" "medications."

137. And when a website user clicked on a link to view their billing summary, the hidden Google Analytics code communicated to Google that the user viewed their "Billing Summary."

138. Plaintiff regularly used the Boston Children's patient portal during the Class Period. Accordingly, her communications on the portal were intercepted and transmitted to third parties in the same manner as described above. Those third parties retained her intercepted communications, and those third parties and Boston Children's used them for commercial and marketing purposes, including associating Plaintiff's communications with the individual's real-world identity for targeted advertising purposes (in combination with the other interceptions of Plaintiff's communications described above, including interceptions regarding specific conditions and doctors).

139. In addition to Google and Facebook, Boston Children's enables the communications between healthcare consumers and Boston Children's to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Boston Children's inserts code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(b) **Doubleclick.** Google DoubleClick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Boston Children's inserts code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(c) **Hotjar.** Hotjar is a so-called "session replay" provider that records an entire browsing path through the Boston Children's Website and then permits Boston Children's to "replay" a particular individual's visit to the website, including every mouse move, click, and page loaded on the website.

(d) **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn. Similar to Meta Pixel, hidden JavaScript code that Boston Children's injects into some pages on the Boston Children's Website cause the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's

communications with the Boston Children's Website. LinkedIn can then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

140. Boston Children's secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the operation of the Boston Children's Website. The Boston Children's Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

141. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Boston Children's via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

142. Moreover, even if Boston Children's wanted to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate or lawful reason for Boston Children's to keep secret from its website users the use of these tracking technologies or to falsely and deceptively claim that it does not share the website communications with others and that it maintains the privacy of those communications.

**Boston Children's Violated HIPAA and the FTC Act.**

143. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[18]

[18] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

144. Under HIPAA, a parent or legal guardian of a minor child is regarded as what the HIPAA Privacy Rule calls the "personal representative" of the minor child. Per the HIPAA Privacy Rule, a personal representative is authorized to exercise the HIPAA rights of the individual whom he or she represents, on that person's behalf. Therefore, a parent who is a personal representative can exercise a minor's HIPAA Privacy Rule rights with respect to PHI. In addition, personal representatives have the right to exercise other HIPAA Privacy Rule rights, such as providing written authorization for disclosure of PHI.

145. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

146. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

147. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[19]

[19] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,

148. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

149. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

150. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

151. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service,"

---

https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

152. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[20]

153. The privacy rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…." 45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies in that the primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, Boston Children's) to use the contents of the intercepted communications for marketing purposes after the interception occurs.

154. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[21]

155. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

---

[20] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.19.
[21] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[22]

156. In other words, the HHS has expressly stated that entities like Boston Children's that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

157. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

158. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

---

[22] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

159. As reflected in the current version of the HHS Bulletin posted on the HHS website, a district court decision vacated a portion of the HHS Bulletin. However, the remainder of the HHS Bulletin has neither been vacated nor withdrawn, including the portions to which Plaintiff refers above. In any event, Plaintiff is not suing for violation of the HHS Bulletin as such; instead, the HHS Bulletin reflects a reasonable interpretation of HIPAA and the Privacy Rule which is relevant for its persuasive force, including for the observation that the use of tracking technologies on healthcare provider website poses serious privacy implications and can lead to HIPAA violations, including on publicly accessible pages that disclose patient status.

160. Boston Children's provision of healthcare communications, including communications that reveal Private Information, to third parties such as Facebook and Google, and its later use of those communications and Private Information for marketing purposes without patient consent, violated the Privacy Rule.

161. Boston Children's is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

162. Boston Children's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit Private Information to third parties, and those third parties and Boston Children's then use those intercepted communications for marketing purposes, all without their authorization.

163. Boston Children's improperly disclosed to third parties Plaintiffs' and Class Members' healthcare communications, including communications that reveal Private Information regarding (a) patient symptoms and health conditions, (b) patients' doctors, (c) appointment requests, and (d) patients' status as patients of Boston Children's by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, appointmenr request pages, and the patient portal, including pages inside the patient portal).

164. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors, medical procedures, and medical records through the patient portal, Boston Children's permitted third parties to intercept information about Plaintiff's (and her child's) doctors, specific treatments connected to Plaintiff, and Plaintiff's (and her children's) patient status, each of which is protected information under HIPAA (even though some of those pages are publicly accessible).

165. Boston Children's knowingly and improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Boston Children's disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

166. Boston Children's also knowingly and improperly used healthcare communications and Private Information for marketing purposes without patient authorization, including by using the intercepted communications for its own targeted advertising through third-party advertising platforms.

167. Boston Children's violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

168. Boston Children's further violated other HIPAA regulations as follows:

(e) Boston Children's failed to ensure the confidentiality and integrity of electronic PHI that Boston Children's created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(f) Boston Children's failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(g) Boston Children's failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Boston Children's in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(h) Boston Children's failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(i) Boston Children's failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(j) Boston Children's failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

169. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[23]

170. Boston Children's undisclosed use of tracking technologies on their website violated the privacy rights under federal law of Plaintiff, Class Members, and their minor children. While HIPAA does not have a private right of action, Boston Children's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

[23] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

171. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[24]

172. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

173. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

174. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[25]

[24] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[25] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

175. In 2022, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[26]

**Boston Children's Violated Industry Standards**

176. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

177. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

178. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

179. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent

---

[26] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

> undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

180. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[27]

181. Boston Children's, through the conduct described in this complaint, including the disclosure of healthcare communications to third-party technology and advertising companies and Boston Children's own subsequent use of intercepted communications for marketing purposes, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Boston Children's failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

**<u>Plaintiff and Class Members Suffered Harm from Boston Children's Unlawful Interceptions and Disclosures of Plaintiff's and Class Members' Communications and Private Information</u>**

182. An economic market exists for consumers' personal data, including the data that Boston Children's has collected and disclosed from Plaintiffs and Class Members.

183. In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."

---

[27] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

184. In 2015, TechCrunch reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name. That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.

185. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

186. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because it is not generally available to third-party data marketing companies due to the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists to sell and purchase such private medical information.

187. Further, individuals can sell or monetize their own data if they choose. For example, Facebook has offered to pay individuals for their voice recordings and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.

188. Many other companies and apps, such as DataCoup, Nielsen Computer, Killi, and UpVoice, also offer consumers money in exchange for access to their personal data.

189. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Boston Children's has deprived Plaintiff and Class Members of the

economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and Class Members' property.

190. As a direct and proximate cause of Boston Children's unauthorized interceptions and disclosures of Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, and its subsequent commercial exploitation of that information to support Boston Children's marketing, Plaintiff, Class Members, and their minor children have been damaged by Boston Children's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) Boston Children's denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Boston Children's services or would have demanded compensation for Boston Children's use of their Private Information if they had known of Boston Children's practices;

(d) Boston Children's eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Members' rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) Boston Children's took something of value from Plaintiff, Class Members, and their minor children, and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) Boston Children's actions violated the property rights Plaintiff, Class Members, and their minor children have in their healthcare communications and Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

191. Plaintiff brings this action under Fed. R. Civ. Proc. 23 on behalf of herself and the Website Visitor Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.childrenshospital.org between three years prior to the date of the filing of the initial complaint in this action and the date Boston Children's removed from the Boston Children's Website the tracking technologies described in this complaint.[28]

192. Plaintiff, on behalf of her minor children, also brings this action under Fed. R. Civ. Proc. 23 for her minor children and the Minor Children Class, which includes:

> All minor children who were residents of Massachusetts who, while in the Commonwealth of Massachusetts, were patients of Boston Children's and had communications regarding them intercepted through tracking technologies used on any portion of the website at www.childrenshospital.org between three years prior to the date of the filing of the initial complaint in this action and the date Boston Children's removed from the Boston Children's Website the tracking technologies described in this complaint.

193. This action is properly maintainable as a class action.

194. The members of each Class are so numerous that joinder of all members in a single lawsuit is impractical.

195. Common questions of law and fact exist for all Class Members in the Website Visitor and Minor Children's Class, and those questions predominate over any questions solely affecting individual members of the Classes. Among the predominant questions of law and fact common to the Classes are:

(a) Whether communications between Website Visitor Class Members and Boston Children's, through the Boston Children's Website, were electronic communications under the ECPA.

(b) Whether Boston Children's inserted tracking technologies into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel;

[28] This precise date will be determined through discovery.

(c) Whether the tracking technologies inserted into the hidden code of the Boston Children's Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others, the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's installed an electronic device on their website with the intent to intercept and disclose to Google, Facebook, and other companies communications between the Website Visitor Class Members and Boston Children's;

(g) Whether Website Visitors Class Members' and Minor Children's Class Members' privacy interests were violated by the interceptions of their communications with the Boston Children's Website;

(h) Whether and to what extent Boston Children's had a duty to protect the IHII and PHI of Plaintiff, Website Visitor Class Members, and Minor Children Class Members;

(i) Whether Boston Children's had duties not to disclose the IHII and PHI of Plaintiff, Website Visitor Class Members, and Minor Children Class Members to unauthorized third parties;

(j) Whether the promises made in Boston Children's Web Site User Privacy Rights either were or formed part of a contract between Boston Children's and Plaintiff, and the members of both Classes;

(k) Whether Boston Children's disclosure of Plaintiff's and Website Visitor Class Members' healthcare communications, including communications that revealed Private Information of Minor Children Class Members, breached Boston Children's promises set forth in its Web Site User Privacy Rights, giving rise to liability for breach of contract;

(l) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members of both Classes, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

196. Plaintiff's claims are typical of the members of the Website Visitor Class because, like Plaintiff, each such Class Member accessed the Boston Children's Website and had their communications with that website secretly intercepted and transmitted to third parties without their

knowledge or consent. Plaintiff's claims, on behalf of her minor children, are typical of members of the Minor Children's Class, because their communications, which were intercepted and transmitted to third parties without their consent, reveal the Private Information of minor children.

197. Plaintiff will fairly and adequately protect the interests of the Class Members of both Classes and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Classes.

198. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual damages of the members of either Class are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members in either Class to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

199. Boston Children's has acted on grounds generally applicable to the Classes, making appropriate the relief Plaintiff seeks for the Classes as a whole.

## COUNT I

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of Plaintiff and the Website Visitor Class)**

200. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

201. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

202. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between

Plaintiff and other Class Members and Boston Children's, through the Boston Children's Website, were electronic communications under the ECPA.

203. The tracking technologies inserted into the hidden code of the Boston Children's Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Boston Children's Website; (ii) Class Members' web browsers used to access the Boston Children's Website; (iii) Boston Children's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Boston Children's Website.

204. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Boston Children's and users of the Boston Children's Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

205. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Boston Children's configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Boston Children's, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Boston Children's), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words

used in searches inputted by healthcare consumers. Boston Children's also used tracking technologies on pages that would confirm to third parties, such as Google and Facebook, the healthcare consumers', or their minor children's status as Boston Children's patients, including pages through which patients access Boston Children's patient portal, obtain information on doctors, pay bills, make appointments, and obtain financial assistance.

206. With respect to Plaintiff, the tracking technologies revealed information regarding the doctors, treatments, and patient status for Plaintiff (and her child) by configuring the tracking technologies to reveal the substance of communications regarding searches for doctors, requests for information on particular conditions, and requests for medical records through the patient portal.

207. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Boston Children's intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

208. Additionally, through the above-described tracking technologies, after Boston Children's intercepted communications, the intercepted information was subsequently used Boston Children's and by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

209. Boston Children's intercepted communications between the Plaintiffs and Class Members and Boston Children's, and Boston Children's disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests, and the privacy interests of their minor children, were violated by the interception and the subsequent use of the intercepted communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

210. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

211. Boston Children's was well aware of the restrictions imposed by HIPAA and that the disclosure of PHI without written consent violated HIPAA. In Boston Children's HIPAA Notice of Privacy Practices (available on its website), Boston Children's wrote during the Class Period:

What are our responsibilities?

- We are required by law to maintain the privacy and security of your PHI and abide by the terms of this Notice….
- We will not use or share your information other than as described here unless you tell us we can in writing.

212. Boston Children's primary purpose was to engage in conduct made impermissible by HIPAA, the FTC Act and other causes of action set forth in this complaint. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.,* ¶¶ 34, 35 44-54, 56-65, 78-79, 85-86, 94, 102, 108-12, 115-16, 119, 121-22, 125, 130, 138, 153-55, 163-66), Boston Children's knowingly and intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal and/or tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

213. Before engaging in such criminal and tortious acts, as described above, Google and Facebook expressly warned Boston Children's not to use tracking technology on webpages with health information without informed consent, which Boston Children's did not obtain. In committing such criminal and tortious acts, Boston Children's was motivated to use health information in violation of HIPAA and Massachusetts law to serve its own financial self-interest in maximizing the effectiveness

of its online marketing. Boston Children's financial motivations demonstrate that its purpose was to commit a criminal or tortious act, as Boston Children's had an incentive, which it acted on, to disclose sensitive healthcare communications, including communications that reveal Private Information, to Google and Facebook and later to use the same intercepted communications for marketing purposes, in order to advance its own marketing on third-party advertising platforms.

214. As alleged above, Boston Children's violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

215. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

216. The sensitive healthcare communications and Private Information of the Plaintiff, Class Members, and their minor children that Boston Children's disclosed to third parties, which both Boston Children's and the third parties later used for marketing purposes, qualifies as IIHI, and Boston Children's violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Boston Children's used the intercepted electronic communications to increase its revenues.

217. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Boston Children's specifically used tracking technologies to intercept, disclose, and

later use for marketing purposes Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information.

218. Boston Children's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without the authorization of the patient or their parent or legal guardian; and (ii) disclosed IIHI to Facebook and other third parties without the authorization of the patient or their parent or legal guardian.

219. Boston Children's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Boston Children's use of the Facebook source code was for Boston Children's commercial advantage to increase revenue from existing patients and gain new patients, through, among other things, targeted advertising.

220. The same acts that are criminal violations under HIPAA—including the disclosure and subsequent marketing use of healthcare communications, including communications that reveal Private Information, without consent—are likewise tortious acts under Massachusetts law, as detailed in the other counts of this complaint. Accordingly, Boston Children's additionally intercepted communications for the purpose of committing acts that are tortious under Massachusetts law (*see* ¶¶ 223-264, *infra*, which explains how the acts described in this complaint are tortious acts that give rise to liability, and how Boston Children's intercepted communications for the primary purpose of performing those acts that are tortious under Massachusetts law).

221. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

222. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Boston Children's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus

reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**COUNT II**

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of Plaintiff, Plaintiff's Minor Children, the Website Visitor Class, and the Minor Children Class)**

223. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

224. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

225. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

226. Boston Children's had a legal duty to adequately safeguard the confidentiality and privacy of healthcare communications, including Private Information, of Plaintiff, Class Members, and their minor children.

227. Plaintiff and Class Members, individually and on behalf of their minor children, did not authorize Boston Children's to disclose their communications or Private Information with Boston Children's to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment, nor did Plaintiff or Class Members authorize Boston Children's to later commercially exploit the improperly disclosed communications for marketing purposes, including targeted advertising to Boston Children parents, guardians and patients.

228. Boston Children's disclosed the healthcare communications and Private Information of Plaintiff, Class Members, and the children, to unauthorized third parties in order to market its own

services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, Boston Children's conduct reflected a public disclosure of private facts. Those private facts included both the communications Plaintiff had with Boston Children's (in which she has a privacy interest, as the participant in the communication), as well as the Private Information of Plaintiff's minor children. Accordingly, both Plaintiff and her minor children had a privacy interest that was violated by Boston Children's conduct.

229. Additionally, Boston Children's injection of hidden code into their website that disclosed healthcare communications and Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff, Class Members, and their minor children by invading their private affairs—their communications with healthcare providers for themselves and their minor children—in a manner that a reasonable person would deem highly offensive because of both the disclosure of communications and the later use of those communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

230. Boston Children's intruded upon Plaintiff's own seclusion by intercepting and disclosing to Google, Facebook, and other third parties her communications with Boston Children's, and Boston Children's also intruded upon the seclusion of Plaintiff's minor children by intercepting and disclosing to Google, Facebook, and other third parties communications that included personal medical information relating to those minor children.

231. Boston Children's conduct constitutes an unreasonable and substantial invasion of the privacy of Plaintiff, Class Members, and their minor children, which has subjected them to unnecessary attention, stigma, and other harms.

232. Plaintiff, Class Members, and their minor children suffered injuries as a direct and proximate result of Boston Children's disclosure of communications, including Private Information and intrusion upon their seclusion.

233. Boston Children's acts or omissions violate the Massachusetts Right to Privacy Act.

234. Accordingly, Plaintiff, individually and on behalf of members of the Classes, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 190 *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of Plaintiff, Plaintiff's Minor Children, the Website Visitor Class, and the Minor Children Class)**

235. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

236. A fiduciary relationship existed between Boston Children's, a healthcare provider, and Plaintiff and her minor children (i.e., the parent of a Boston Children's patient and the patient him or herself). That fiduciary relationship is not limited to the patient (i.e., Plaintiff's minor children) but also extends to Plaintiff herself as a parent involved in her children's healthcare.

237. Furthermore, apart from and in addition to the physician-patient relationship, Boston Children's assumed the role of a fiduciary when Plaintiff reposed her confidence in Boston Children's by entrusting to Boston Children's sensitive communications made through the Boston Children's Website, which included but were not limited to her minor children's Private Information. That fiduciary relationship extends to both the party who reposed trust (Plaintiff) and to the object of those communications (Plaintiff's minor children).

238. When possessing nonpublic medical information, medical providers such as Boston Children's have a duty to keep such information completely confidential.

239. Plaintiff, for herself and her children, had a reasonable expectation of privacy in the communications entrusted to Boston Children's through its website, including those which revealed Private Information. Boston Children's policies bolstered that expectation, given Boston Children's promises to Plaintiff that Boston Children's would not disclose communications on the website to third parties.

240. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Boston Children's installed the tracking technologies to disclose and transmit to third parties healthcare communications, including communications that revealed Private Information of Plaintiff, Class Members, and their minor children.

241. These disclosures were made without the knowledge, consent, or authorization of Plaintiff or her minor children.

242. Boston Children's secret and unauthorized disclosures of the Private Information and other communications of Plaintiffs, Class Members, and their minor children, and Boston Children's subsequent use of the information for marketing purposes, constituted a breach of Boston Children's fiduciary duties to Plaintiff and Class Members to safeguard and protect such communications and Private Information.

243. Accordingly, Plaintiff, both on her own behalf and as parent and guardian of her minor children, and individually and on behalf of members of both Classes, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 190, *supra*).

## COUNT IV

### (Negligence, on behalf of Plaintiff, Plaintiff's Minor Children, the Website Visitor Class, and the Minor Children Class)

244. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

245. Upon accepting, storing, and controlling communications, including communications that reveal Private Information, Boston Children's owed a duty to Plaintiff, her minor children, and the Classes to exercise reasonable care to secure, safeguard, and protect their healthcare communications, including communications that revealed Private Information.

246. Boston Children's breached this duty by failing to exercise reasonable care in safeguarding and protecting healthcare communications and Private Information of Plaintiff, Class Members, and their minor children from unauthorized disclosure and use.

247. It was reasonably foreseeable that Boston Children's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' healthcare communications and Private Information through their tracking technologies would result in unauthorized third parties gaining access to such communications and Private Information for no lawful purpose.

248. Boston Children's duty of care to use reasonable measures to secure and safeguard healthcare communications and Private Information arose due to the special relationship between Boston Children's and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

249. In addition, Boston Children's duty is informed by state law (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

250. Boston Children's conduct also created a foreseeable risk of harm to Plaintiff, Class Members, and their minor children, and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' healthcare communications and Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate

website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

251. Boston Children's wrongful actions and/or inactions and the resulting unauthorized disclosure of the Private Information of Plaintiff, Class Members, and their minor children constituted negligence at common law.

252. Accordingly, Plaintiff, individually and on behalf of members of the Classes, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 190, *supra*), plus costs and attorneys' fees.

## COUNT V

### (Breach of Confidence, on behalf of Plaintiff, Plaintiff's Minor Children, the Website Visitor Class and the Minor Children Class)

253. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

254. Medical providers have a duty to their patients and their family members to keep nonpublic medical information and communications completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship, which extends both to patients and to the parents and guardians of minor patients.

255. Medical providers also have a duty to maintain the confidentiality of their patients' Private Information under HIPAA and its implementing regulations.

256. When possessing nonpublic communications and medical information, medical providers such as Boston Children's have a duty to keep such information completely confidential.

257. Plaintiff, individually and on behalf of her minor children, had a reasonable expectation of privacy in the healthcare communications entrusted to Boston Children's through its website, including but not limited to communications that revealed Private Information. Boston

Children's policies bolstered that expectation, given Boston Children's promises to Plaintiff that Boston Children's would not disclose communications on the website to third parties.

258. In light of the special relationship among Boston Children's, Plaintiff, Class Members, and their minor children, whereby Boston Children's became a guardian of the healthcare communications and Private information of Plaintiff, Class Members, and their minor children, Boston Children's became a fiduciary by its undertaking and guardianship of the healthcare communications and Private Information to act primarily for the benefit of its patients, including Plaintiff, Class Members, and their minor children: (1) for the safeguarding of the healthcare communications and Private Information of Plaintiff, Class Members, and their minor children; (2) to timely notify Plaintiff and Class Members of disclosure of their healthcare communications or Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Boston Children's did and does store and disclose.

259. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Boston Children's installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' healthcare communications with Boston Children's and the contents of those communications, including but not limited to Private Information.

260. Boston Children's made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

261. The unauthorized disclosures and subsequent marketing of the communications and Private Information of Plaintiff, Class Members, and their minor children were intentionally caused by Boston Children's employees acting within the scope of their employment. Alternatively, the disclosures of the Private Information of Plaintiff, Class Members, and their minor children occurred because of Boston Children's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or

its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

262. Boston Children's disclosed the communications and Private Information of Plaintiff and Class Members, and the Private Information of Plaintiff, Class Members, and their minor children in a manner that allowed them to identify the Plaintiff and the individual Class Members.

263. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

264. Accordingly, Plaintiff, individually and on behalf of members of the Classes, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 190 *supra*), plus costs and attorneys' fees.

**COUNT VI**

**(Breach of Contract, on behalf of Plaintiff, Plaintiff's Minor Children, the Website Visitor Class and the Minor Children Class)**

265. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

266. Boston Children's required Plaintiff and Class Members to provide the personal information of Plaintiff, Class Members, and their minor children, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Boston Children's Website as a condition of receiving healthcare services. Plaintiff's and Class Members' provision of such personal information provided consideration for Boston Children's provision of services through the Boston Children's Website, including the provision of information and the use of the website to obtain medical services.

267. In so doing, Plaintiff and Class Members entered into contracts with Boston Children's (or, in the alternative, implied contracts) by which Boston Children's agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and

confidential. Boston Children's contractual promises included that (i) Boston Children's would not share "personally identifiable information" with third parties and (ii) information on individuals' interactions with the Boston Children's Website would be used for only specified purposes, which did not include third-party marketing.

268. Plaintiff and Class Members fully performed their obligations under the contract with Boston Children's.

269. Boston Children's breached its agreement with Plaintiff and Class Members by directly breaching its promises not to share information regarding website communications with third parties and to use such information for only specified purposes.

270. As a direct and proximate result of Boston Children's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their healthcare communications and Private Information and have been denied the benefit of the bargain of their agreement with Boston Children's.

271. Both Plaintiff, as the party to the communications with Boston Children's that were intercepted, and Plaintiff's minor children, as the party whose personal medical information was intercepted, were harmed by Boston Children's breach of its promises, implied and express, that it would not disclose or use such communications.

272. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 190, *supra,* plus costs and attorneys' fees.

## COUNT VII

**(Unjust Enrichment, on behalf of Plaintiff, Plaintiff's Minor Children, the Website Visitor Class and the Minor Children Class)**

273. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

274. This claim is pleaded in the alternative to Plaintiff's other causes of action.

275. Boston Children's benefits from using the healthcare communications and Private Information of Plaintiff, Class Members, and their minor children, and unjustly retained those benefits at Plaintiff's and Class Members' expense.

276. Plaintiff, individually and for her minor children, and Class Members conferred a benefit upon Boston Children's in the form of the monetizable healthcare communications and Private Information that Boston Children's collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

277. Boston Children's consciously collected and used this information for its own gain, providing Boston Children's with economic, intangible, and other benefits, including substantial monetary compensation.

278. Boston Children's unjustly retained those benefits at the expense of Plaintiff, individually and on behalf of her minor children, and Class Members because Boston Children's conduct damaged Plaintiff, Class Members, and their minor children, all without providing any commensurate compensation to Plaintiff or Class Members for the use of their healthcare communications and Private Information.

279. The benefits that Boston Children's derived from Plaintiff, Class Members, and their minor children were not offered by them gratuitously and, thus, rightly belong to Plaintiff, Class Members, and their minor children. It would be inequitable under unjust enrichment principles for

Boston Children's to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

280. Had Boston Children's informed Plaintiff that it collected and shared healthcare communications and Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of such healthcare communications and Private Information or would have demanded compensation for such usage. Now knowing of Boston Children's practices, Plaintiff demands compensation for the unauthorized use of the healthcare communications and Private Information of Plaintiff and her minor children.

281. The Court should compel Boston Children's to disgorge into a common fund for the benefit of Plaintiff and the Classes the value of all unlawful or inequitable benefits that Boston Children's unjustly received and such other relief as the Court may deem just and proper.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages to Plaintiff and Class Members in both Classes;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 12, 2026

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

*/s/ Patrick J. Vallely*
Patrick J. Vallely